

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
08/04/2009

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 09-32754** |
| **AMARAVATHI LIMITED** | § | |
| **PARTNERSHIP; dba MONTERONE** | § | |
| **ROUND ROCK; dba MANSIONS AT** | § | |
| **STEINER RANCH; dba MONTERONE** | § | |
| **CANYONE CREEK; dba MANSIONS ON** | § | |
| **THE GREEN II; dba MONTERONE** | § | |
| **STEINER RANCH; dba MANSIONS AT** | § | |
| **CANYON CREEK; dba MANSIONS ON** | § | |
| **THE GREEN I** | § | |
| **and** | § | **Chapter 11** |
| **AMARAVATHI KEERTHI, LLC; dba** | § | |
| **MONTERONE ROUND ROCK; dba** | § | |
| **MANSIONS ON THE GREEN I; dba** | § | |
| **MANSIONS AT STEINER RANCH; dba** | § | |
| **MONTERONE STEINER RANCH; dba** | § | |
| **MONTERONE CANYON CREEK; dba** | § | |
| **MANSIONS AT CANYON CREEK; dba** | § | |
| **MANSIONS ON THE GREEN II,** | § | |
| **Debtor(s).** | § | **Judge Isgur** |

## MEMORANDUM OPINION GRANTING MOTION
## TO USE CASH COLLATERAL

For the reasons set forth below, the Court finds that the post-petition rents collected from the Debtors' apartment properties are property of these bankruptcy estates. The Court finds that the cash from post-petition rents is the lender's collateral. The Court grants the motion of Amaravathi Limited Partnership and Amaravathi Keerthi, LLC to use the cash collateral generated from the post-petition rents.

### Jurisdiction & Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this District under 28 U.S.C. § 1408.

**Background**

Amaravathi Limited Partnership and Amaravathi Keerthi, LLC (the "Debtors") own four apartment properties (the "Properties") in the Greater Austin, Texas area. The Properties have 1,417 upscale apartment units available for rent. The Properties are insured and are in excellent physical condition. Occupancy of the Properties is stable and the Debtors earn substantial positive income before payment of debt service. The rents generated by the Properties are the primary source of the Debtors' income. The central dispute in this case is whether the Properties' rents are "property of the estate" pursuant to § 541 of the Bankruptcy Code. This Court concludes that the rents are property of the estate under both state and federal law.

Wells Fargo Bank, N.A. as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Pass-Through Certificates, Series 2007-C1 ("C1 Trust") financed the Debtors' 2006 acquisition of the Properties with four promissory notes totaling in excess of $180 million. The current outstanding principal balance on the notes is approximately $160 million.

The Debtors and C1 Trust entered into multiple arrangements to enhance the probability that C1 Trust would be fully repaid. Of primary concern to the Court's analysis are the deeds of trust, the assignments of rents and leases, and the cash management agreements. Those will be evaluated in more detail below. At this stage, it is sufficient to state that the purpose of each of these documents was to further C1 Trust's secured interest in the Properties and their rents.

Following the acquisition of the Properties, the Debtors routinely collected the rents and deposited them in a lockbox pursuant to the cash management agreement. C1 Trust would then

deduct the debt service from the deposits into the lockbox and make the remainder of the funds available for the Debtors' use.

By early 2009, the Properties were not generating sufficient rents to allow the Debtors to maintain the Properties, pay all taxes and insurance, and pay the full amount of debt service on the Properties. At that time, the Debtors made the unilateral decision to terminate deposits into the lockbox. The Debtors justify this decision based on their allegation that the Properties would not be well operated and maintained if the rents were applied first to debt service and thereafter to operations.

There is no evidence that the rents were diverted for any purpose other than the payment of legitimate expenses pertaining to the Properties. Nevertheless, there is no question that the Debtors' unilateral termination of the lockbox was a breach of the Debtors' obligations and that the breach created multiple loan defaults.

Following the Debtors' defaults, C1 Trust sought and obtained the appointment of a State Court Receiver. Jay Parmmelee was appointed receiver on April 22, 2009 by the State District Court in Williamson County, Texas in Case No. 09-370-C277.

The next day, the Debtors filed chapter 11 bankruptcy petitions in this Court. The Debtors promptly moved to use the rents generated by the Properties as cash collateral. C1 Trust opposed the motion. The Court heard argument on May 20, 2009. The single issue litigated by the parties was whether the assignment of rents granted by the Debtors to C1 Trust removed the post-petition rents from property of the estate. C1 Trust alleged that since the assignment was "absolute" under Texas law, the Debtors had no further interest in the rents. Without any interest in the rents, the rents could not become property of the estate under § 541(a)(1). The Debtors

argued, on the other hand, that the assignment was merely a "collateral" assignment and that the future rents remained property of the estate under § 541(a)(1).

The Court, *sua sponte*, inquired about 11 U.S.C. § 541(a)(6)'s effect on the dispute. Since neither party had previously addressed § 541(a)(6), the Court granted additional time to brief the question of whether "absolutely" assigned rents are property of the estate pursuant to § 541(a)(6).

It is important to note the facts that are not in dispute. C1 Trust does not dispute that it is necessary to spend the rents to maintain the Properties, that the Debtors' budgets are reasonable and that the proposed use of cash is appropriate. Accordingly, the sole dispute raised by C1 Trust is whether the rents are "cash collateral" that can be used under § 363 of the Bankruptcy Code.

The Court now holds:

- Under § 541(a)(6), the post-petition rents are property of the estate;

- Regardless of whether the assignment was "absolute" or "collateral," the post-petition rents are also property of the estate under Texas Law and § 541(a)(1);

- C1 Trust's collateral interest in rents includes post-petition rents under § 552(b); and

- The post-petition rents are "cash collateral" that can be used by the Debtors pursuant to § 363.

### Section 541(a)(6)

The Supreme Court has held that bankruptcy courts should generally look to state law to determine property rights in the assets of a bankruptcy estate. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979). There are two exceptions to this general rule. First, there is an exception if Congress modifies state law through legislation enacted under Congress's "authority . . . to establish 'uniform laws on the subject of Bankruptcies throughout

the United States.'" *Id.* at 54 (quoting U.S. CONST. art. I, § 8, cl. 4).  Second, state property law

must relent "if some federal interest requires a different result." *Id.* at 55.

Like this case, *Butner* dealt with a dispute between a bankruptcy trustee[1] and a mortgagee

over the right to rents collected by a bankruptcy estate. *Id.* at 52-53.  Furthermore, this case and

*Butner* both revolve around the same fundamental legal question: How to determine property

rights in rents received from a rental property after the owner of the rental property has filed a

bankruptcy petition. *See id.* at 52.  In *Butner*, the Court found that neither of the two exceptions

set forth above applied. *Id.* at 55.  The Court then held that property rights in post-petition rents

are determined by looking to state law. *Id.*

However, the Supreme Court left no doubt that federal bankruptcy law would override

state law if Congress were to enact a statute defining the rights to post-petition rents:

> The Constitutional authority of Congress to establish "uniform Laws on the
> subject of Bankruptcies throughout the United States" would *clearly encompass a
> federal statute defining the mortgagee's interest in the rents and profits earned by
> property in a bankrupt estate*.  But Congress has not chosen to exercise its power
> to fashion any such rule.

*Id.* at 54 (emphasis added).

Significantly, *Butner* was decided on February 21, 1979. *Id.* at 48.  At that time, the

Bankruptcy Act of 1898 was still in effect and had not yet been replaced by the Bankruptcy

Code. *See id.* at 49.  The Bankruptcy Code did not become effective until October 1, 1979, more

than seven months after the *Butner* decision. *See United States v. Sec. Indus. Bank*, 459 U.S. 70,

71, 103 S. Ct. 407, 409, 74 L. Ed. 2d 235 (1982).

Although *Butner* was decided under the Bankruptcy Act, it has equal force under the

Bankruptcy Code. *In re Vill. Props., Ltd.*, 723 F.2d 441, 445 (5th Cir. 1984) (determining that

---

[1] In this case, the Debtors, as debtors-in-possession, have the rights of a bankruptcy trustee.  11 U.S.C. § 1107(a)
(2006).

5

the *Butner* principle "remains unscathed by the new Bankruptcy Code").  In *Village Properties*, the Fifth Circuit applied the *Butner* principle—state law applies in bankruptcy unless federal statute or interest dictates otherwise—to a dispute involving whether a mortgagee had *perfected* its interest in post-petition rents. *Id.* at 446.  Although perfection is not an issue here, the Fifth Circuit held that courts must look to state law to resolve such perfection disputes. *Id.*

By affirming the validity of *Butner* to cases under the Bankruptcy Code, *Village Properties* establishes the framework governing this case.  But *Village Properties* does not control this case's outcome.  *Village Properties* did not address the right to collect post-petition rents or whether such rents are property of the estate under the Bankruptcy Code.  In fact, *Village Properties* did not even mention 11 U.S.C. § 541.[2]  *Village Properties* dealt solely with the separate issue of whether a mortgagee had perfected its security interest in post-petition rents. *Id.* Since it is undisputed that C1 Trust's interest was perfected pre-petition, perfection is not an issue in this case.

Neither the Fifth Circuit nor the Supreme Court has directly addressed the Bankruptcy Code's treatment of post-petition rents in a case similar to the case at hand.  Consequently, this Court must conduct an independent analysis of the Bankruptcy Code.

Unlike the Bankruptcy Act, the Bankruptcy Code unambiguously defines the "interests in the rents and profits earned by property in a bankrupt estate." *See Butner*, 440 U.S. at 54. *Butner's* invitation that Congress could define such interests was accepted in Bankruptcy Code § 541(a)(6):

> The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all of the following property, wherever located and by whomever held:

---

[2] As discussed below, § 541 of the Bankruptcy Code governs whether property becomes part of the bankruptcy estate.

>   (6) Proceeds, product, offspring, *rents*, or profits *of or from property of the estate* . . . .

11 U.S.C. § 541(a)(6) (2006) (emphasis added).

There is no doubt or dispute that the Properties, which are owned by the Debtors, are property of the bankruptcy estate under § 541(a)(1).  There is also no doubt or dispute that the rents at issue come directly from the Properties.  Thus, under the unambiguous language of § 541(a)(6), the rents that come from property of the estate are themselves property of the estate.

It is well-settled that courts must follow unambiguous statutory text unless doing so leads to absurd results: "Where the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." *United States v. Miss. Pac. R. Co.*, 278 U.S. 269, 278, 49 S. Ct. 133, 136, 73 L. Ed. 322 (1929); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 1031, 103 L. Ed. 2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."); *Norfolk & W. R. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 128, 111 S. Ct. 1156, 1163, 113 L. Ed. 2d 95 (1991) ("As always, we begin with the language of the statute . . . .  'If the intent of Congress is clear, that is the end of the matter; for the court[s] . . . must give effect to the unambiguously expressed intent of Congress.'" (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2781, 81 L. Ed. 2d 694 (1984))); *Toibb v. Radloff*, 501 U.S. 157, 160, 111 S. Ct. 2197, 2199, 115 L. Ed. 2d 145 (1991) (holding that the "plain language of the Bankruptcy Code" permits an individual non-business debtor to file a petition under chapter 11 and rejecting the ongoing business requirement that some courts had "engrafted . . . onto the plain language of § 109(d)").

Inasmuch as § 541(a)(6) unambiguously provides that the rents from property of the estate are themselves property of the estate, the Court's inquiry is complete—unless a straightforward construction leads to absurd results.

The Court finds that there is nothing absurd about § 541(a)(6)'s inclusion of post-petition rents in the bankruptcy estate.   A review of pertinent sections of the Bankruptcy Code demonstrates that Congress created a wholly rational structure for resolving disputes involving post-petition rents:

- Section 541(a)(6) makes post-petition rents property of the estate;

- Section 552(b) extends a lender's pre-petition collateral interest in rents to rents that are collected post-petition; and

- Section 363 mandates that a trustee or debtor-in-possession provide adequate protection before the rents can be utilized by the estate.

This carefully crafted statutory framework promotes the salutary goal of allowing an estate to maintain its assets, which enhances the likelihood of a successful reorganization. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204, 103 S. Ct. 2309, 2313, 76 L. Ed. 2d 515 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.").   It also accounts for the potential concerns of mortgagees by preserving and protecting the mortgagees' interests in rents.  Finally, by increasing the size of the estate and the probability of a successful reorganization, the statutory framework serves to maximize returns to unsecured creditors.

There is not even a colorable argument that this "lead[s] to absurd or impracticable consequences." *See Miss. Pac. R. Co.*, 278 U.S. at 278.  Section 541(a)(6) fits within a rational Congressional framework—the creation of which was explicitly authorized by *Butner*—that

balances the divergent interests of debtors, mortgagees and unsecured creditors in post-petition

rents. Judge Derby explained this balance struck by § 541(a)(6):

> Debtor must have the rents to operate and to exercise the opportunity provided by
> Chapter 11 of the Bankruptcy Code to reorganize, and Lender is entitled to
> adequate protection for use of the rents for these purposes. If adequate protection
> is provided, the Bankruptcy Code imposes delay on the exercise of state law
> rights in order to facilitate the goal of reorganization.

*In re Bethesda Air Rights Ltd. P'ship*, 117 B.R. 202, 210 (Bankr. D. Md. 1990).

The Court's statutory analysis is also made in light of the United States Constitution. The

Bankruptcy Clause authorizes Congress to "establish . . . uniform Laws on the subject of

Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. The Supremacy

Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made

in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State

shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

notwithstanding." U.S. CONST. art. VI. Given these broad Constitutional powers, it is no surprise

that the *Butner* Court recognized Congress's ability to supersede state law in the bankruptcy

arena. *Butner*, 440 U.S. at 54. Congress's decision to do so in the case at hand was a wholly

rational exercise of its expansive authority.

Furthermore, Congress's inclusion of post-petition rents within property of the estate

incentivizes debtors and creditors to behave efficiently. C1 Trust seeks to separate the rental

income from the assets and individuals that produce the rental income. Permitting such

separation creates inefficient incentives that could greatly impede any debtors' ability to

successfully reorganize. It is a fundamental principle of a capitalist society that when the owners

of productive assets cannot benefit from the income produced by the assets, the incentive to

produce income is eliminated. Without any incentive to generate rental income, the business's

prospects for success are minimal at best. *See* Julia Patterson Forrester, *Still Crazy After All These Years: The Absolute Assignment of Rents in Mortgage Loan Transactions*, 59 FLA. L. REV. 487, 514-515 (2007) ("Without the rental stream, a landlord would have little incentive to perform the landlord's duties under the leases. If the landlord stops performing, the tenants are likely to stop paying."). One primary loser from such a perverse set of disincentives would be the lender allegedly holding title to the future rents. Since the owner of the apartments would have no incentive to produce rents, the lender would hold a meaningless right. In any event, an interpretation of the statute that Congress intended to leave income producing assets with a linkage to the produced income is not an "irrational or absurd result" that could be used to justify departing from the plain meaning of the statute.

Conversely, the outcome sought by C1 Trust would turn one of the chief purposes of chapter 11 on its head. *See Toibb*, 501 U.S. at 163 (recognizing chapter 11's purpose is to permit "business debtors to reorganize and restructure their debts in order to revive the debtors' businesses"). Removal of the Debtors' primary incentive for generating income—in a bankruptcy system structured towards increasing the viability, productivity, and efficiency of ailing businesses—exemplifies the definition of absurd. *See* THE NEW INTERNATIONAL WEBSTER'S CONCISE DICTIONARY (1st ed. 1998) (defining absurd as "irrational; preposterous; ridiculous"). Congress likely sought to avoid such inefficient incentives when it enacted § 541(a)(6). This Court declines C1 Trust's request to create a statutorily impermissible roadblock to the Debtors' reorganization effort.

Section 541(a)(6)'s inclusion of post-petition rents within property of the estate also limits the ability of a mortgagee to "choke" the debtor out of chapter 11. Assuming that debtors-in-possession continue to generate income despite the inefficient incentives discussed directly

above, the prospects for reorganization would remain dim if the rents were paid to the mortgagee

instead of the estate.  As stated by Professor Forrester,

> Where a court finds that rents . . . are owned by the lender, the debtor in possession does not have the rents available for operation and maintenance of the mortgaged property as he would if rents were treated as cash collateral.  If the rents are unavailable for operation and maintenance of the property, there is almost no hope of reorganization for a debtor in Chapter 11.  If the debtor has no equity in the property and there is not 'a reasonable possibility of a successful reorganization within a reasonable time,' the lender is entitled to relief from the automatic stay.  Therefore, the debtor's efforts to reorganize under the protection of Chapter 11 will be frustrated even in those cases where a reorganization might otherwise have been successful.

Julia Patterson Forrester, *A Uniform and More Rational Approach to Rents as Security for the*

*Mortgage Loan*, 46 RUTGERS L. REV. 349, 401 (1993).  Section 541(a)(6) enables debtors to use

post-petition rents to increase the value of the estate, instead of simply applying them to pay debt

service.  This fits squarely within chapter 11's principal goals of allowing "business debtors to

reorganize and restructure their debts in order to revive the debtors' business . . . [and]

maximizing the value of the bankruptcy estate." *Toibb*, 501 U.S. at 163.

The outcome urged by C1 Trust, on the other hand, is in conflict with the goals of chapter

11.  It would permit C1 Trust to collect the Debtors' primary source of income while the

Properties fall into neglect and disrepair.  This unjustifiably decreases the value of the estate and

impairs the Debtors' ability to reorganize. *See In re Bethesda*, 117 B.R. at 207 ("This concept . . .

is inherently inequitable to other creditors and interest holders whose beneficial values would be

destroyed thereby, but might be saved through a Chapter 11 reorganization."); *In re Hrapchak*,

No. 07-1668, 2008 WL 1780939, at *5 (Bankr. N.D. W. Va. April 16, 2008) ("In most cases,

almost no hope of reorganization exists if there are no funds to pay for the operation and

maintenance of the property."); *In re Tripplet*, 84 B.R. 84, 87 (Bankr. W.D. Tex. 1988)

("[W]ithout the income stream, most real property reorganizations must fail."); Forrester, 59

FLA. L. REV. at 522 ("This result defeats the policies behind the Bankruptcy Code and Chapter 11, [and] is simply an injustice.").  Congress likely recognized that the better policy is to allow the estate to use the rents to reorganize while adequately protecting the interest of the mortgagee in the rents.  The Court, therefore, follows the unambiguous text of § 541(a)(6) and declines C1 Trust's request to choke the Debtors out of bankruptcy.

C1 Trust cites two Third Circuit decisions in support of its contention that the rents are not estate property.  In *Jason Realty*, the Third Circuit held that since a debtor's interest in absolutely assigned rents terminates upon default under New Jersey law, post-petition rents are not property of the estate under § 541(a)(1). *Jason Realty, L.P. v. First Fid. Bank, N.A.*, 59 F.3d 423, 425 (3d Cir. 1995).  As set forth below in the next section, Texas law does not follow New Jersey law regarding title transfers under "absolute" assignments, so the decision regarding New Jersey law is of little consequence.  The case is noteworthy, however, for its failure to address § 541(a)(6).  Although the Third Circuit acknowledges the existence of § 541(a)(6), it is more likely a typographical error than an actual reference.  The reference reads as follows:

> The issue before us is whether the assigned rents should have been classified as property of the estate under 11 U.S.C. § 541(a)(1).  Property of the estate consists of all property in which the debtor holds an interest upon the commencement of bankruptcy. *See* 11 U.S.C. § 541(a)(6).

*Id.* at 426.  Of course, § 541(a)(6) deals with proceeds of property—not property held as of the date of commencement of the case.  In that light, the reference to "*See* § 541(a)(6)" is a non-sequitur.  In any event, the Third Circuit never again mentions or evaluates § 541(a)(6) in *Jason Realty*.  It is also noteworthy that C1 Trust's brief—although extensively analyzing *Jason Realty*—does not explain its use of § 541(a)(6).

C1 Trust also references the Third Circuit decision of *Sovereign Bank*, which reached the same outcome as *Jason Realty*, albeit under Pennsylvania law. *See Sovereign Bank v. Schwab*,

414 F.3d 450, 453 (3d Cir. 2005).  Once again, the Third Circuit did not actually address the effect of § 541(a)(6) upon post-petition rents.  The Third Circuit's only mention of § 541(a)(6) is a footnote stating that § 541(a)(6) includes rents from property of the estate as property of the estate. *Id.* at 452 n.4.  Having so noted the existence of § 541(a)(6), the Third Circuit never analyzes its application to the facts of the case.

C1 Trust relies heavily on *Jason Realty* and *Sovereign Bank* for the proposition that state law—and not the Bankruptcy Code—governs whether post-petition rents are property of the estate. *See Jason Realty*, 59 F.3d at 427; *Sovereign Bank*, 414 F.3d at 453.  This reliance overstates and mischaracterizes *Butner's* holding regarding state law.  State law is not supreme and any statements to that effect ignore *Butner's* explicit recognition of Congress's power to override state law in bankruptcy. *Butner*, 440 U.S. at 54.

C1 Trust has also failed to present any sort of authority that analyzes § 541(a)(6) and offers a rationale for why the Court should reject the unambiguous meaning of § 541(a)(6).  Simply referencing the importance of state law, without explaining why state law is not preempted by § 541(a)(6), is insufficient to persuade the Court.

Unlike the Third Circuit, the Second and Seventh Circuits have analyzed the interplay of § 541(a)(6) and assignments of rents.  Both courts determined that post-petition rents[3] were property of the estate and, as such, the rents were "cash collateral" that could be spent pursuant to § 363.

In *Vienna Park*, the Second Circuit found that the rents generated post-petition from an un-activated collateral assignment were property of the estate. *Vienna Park Props. v. United Postal Sav. Ass'n (In re Vienna Park Props.)*, 976 F.2d 106, 114 (2d Cir. 1992).  The Second Circuit applied the same straightforward construction of §§ 541(a)(6), 552(b) and 363 that this

---

[3] Neither case dealt with "absolutely" assigned rents.

Court discussed above. *See id.* at 111. And the Second Circuit had little trouble determining that, under § 541(a)(6), "[r]ents that arise from property of the estate are property of the estate." *Id.*

The Seventh Circuit conducted the same analysis and reached the same outcome as the Second Circuit in *In re Wheaton Oaks Office Partners Ltd. P'ship*, 27 F.3d 1234, 1240 (7th Cir. 1994). The Seventh Circuit concluded that rents were cash collateral that could be spent pursuant to § 363 and that the rents—even though fully subject to the security interest— nevertheless became property of the estate pursuant to § 541(a)(6). *Id.* The Court explained the operation of this section as follows:

> Generally, a debtor-in-possession, as trustee, see 11 U.S.C. § 1107(a), is free to use, sell or lease property of the bankruptcy estate in the operation of the debtor's business. See 11 U.S.C. § 363(c)(1). Property of the estate consists of not only all property in which the debtor holds an interest upon the commencement of bankruptcy, see 11 U.S.C. § 541(a), but also the income, or "rents," generated from that property. See 11 U.S.C. § 541(a)(6). This is significant because the rents generated from the property would become part of the bankruptcy estate. This means that in these reorganizations, the trustee has at his disposal the rents which, if unencumbered, may freely be used to fuel the debtor's reorganization (and to pay his attorneys) without having to obtain consent from the creditors or the bankruptcy court.

*Wheaton Oaks*, 27 F.3d at 1240.

In sum, the Court must follow the clear mandate of § 541(a)(6). Section 541(a)(6) produces rational results that fit within the objectives of Chapter 11 of the Bankruptcy Code. C1 Trust argues that the Court's straightforward application of § 541(a)(6) "eviscerates" state law. This argument misconstrues *Butner*, which makes clear that Congress has the authority, under Article I Section 8 of the United States Constitution, to establish national laws defining the rights to post-petition rents generated from property of the estate. *Butner*, 440 U.S. at 55. This authority is longstanding and, subject only to other Constitutional concerns, unlimited: "The power of Congress to establish uniform laws on the subject of bankruptcies throughout the

United States is unrestricted and paramount." *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265, 49 S. Ct. 108, 110, 73 L. Ed. 318 (1929). Thus, even if Congress eviscerated state law in the realm of bankruptcy, this Court will not block the way. Nevertheless, for the reasons set forth below, the Court finds that C1 Trust's state law arguments also fail.

### Section 541(a)(1) and Texas State Law

Section 541(a)(1) of the Bankruptcy Code provides that, subject to exceptions that have not been raised in this case, "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate. 11 U.S.C. § 541(a)(1). Therefore, the Court must determine whether the Debtors had any legal or equitable interest in future rents as of the date of the bankruptcy petition.

C1 Trust claims that the parties agreed to an "absolute" assignment of rents that automatically transferred full title in the rents to C1 Trust. Alternatively, C1 Trust argues that, if the Court finds the assignment was "collateral" and not "absolute," complete title to the rents transferred when the receiver took possession of the Properties on April 22, 2009. Regardless of whether the assignment was "absolute" from its initiation or "activated" by the appointment of a receiver, the thrust of C1 Trust's argument is that Debtors lack any interest in rents sufficient to bring the rents into the estate under Texas law. For the purposes of this opinion, the Court will assume, without deciding, that the assignment at issue is "absolute." However, as will be discussed below, the outcome of this case is the same under both of C1 Trust's arguments.

Assignments of rents are interests in real property and are created and defined according to the law of the state where the property is located. *Wheaton Oaks*, 27 F.3d at 1241 (citing *Butner*, 440 U.S. at 54). The two leading cases involving assignments of rent in Texas are *Taylor v. Brennan* and *FDIC v. International Property Management, Inc.* Neither case directly

addresses bankruptcy law or the issue presently before this Court; nevertheless, their holdings and *dicta* provide the legal framework for resolving this case.

*Taylor v. Brennan* concerned whether a Houston apartment owner (Taylor) was liable for misapplying rents that he collected after a default to the first lien holder. *Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex. 1981).  In August and September of 1974, after defaulting to the first lien holder, Taylor collected rents from the tenants but used them for purposes other than payment of the first lien. *Id.*  The second lien holder (Brennan) subsequently foreclosed on Taylor's property. *Id.*  Brennan cured the defaults on the first lien and sued Taylor for diversion of the August and September rents. *Id.*  The trial court held that the assignment of rents executed by Taylor was "absolute" and that Taylor was therefore liable for diversion of the rents. *Id.*  The Texas Supreme Court reversed, finding that the assignment was a "collateral" assignment that had not yet been "activated." *Id.* at 595.

In so holding, the Texas Supreme Court discussed "absolute" and "collateral" assignments of rents.[4]  A "collateral" assignment of rents occurs when the debtor pledges the property's rents to the mortgage lender as additional security for a loan. *Id.* at 593.  In the event of default, the lender may assert rights not only to the property subject to the mortgage but also to the rents generated by the mortgage property. *Id.*  An important caveat with "collateral" assignments is that the lender must take some affirmative action to "activate" its rights to the rents. *Id.* at 594 (Texas "follows the common law rule that [a collateral] assignment of rentals does not become operative until the mortgagee obtains possession of the property, or impounds

---

[4] Under Texas law, courts look to the intent of the parties as demonstrated by the mortgage documents to determine whether an assignment is "absolute" or "collateral." *Id.* at 595.  Courts are reluctant to construe assignments of rent as "absolute" but will do so if the parties clearly intended such an assignment.  *Id.* at 594, 595.  The Court need not entertain such an inquiry in this case because the outcome is the same regardless of whether the assignment is "absolute" or "collateral."

the rents, or secures the appointment of a receiver, or takes some other similar action."). The Texas Supreme Court found that Brennan had failed to take any of the necessary affirmative steps to "activate" his right to collect the August and September rents and, therefore, Taylor was not bound to turn over the rents to Brennan. *Id.* at 595.

In *dicta*, the Texas Supreme Court explained how an "absolute" assignment of rents differs from a "collateral" assignment.[5]   The key difference is that "an absolute assignment operates to transfer the *right* to rentals *automatically* upon the happening of a specified condition, such as default." *Id.* at 594 (emphasis added).   Thus, unlike a "collateral" assignment—which forces the mortgagee to take additional steps to "activate" its "right" to collect rents—the "absolute" assignment permits the mortgagee to assert "rights" to all the rents immediately once a specified condition (usually default) occurs.

The law governing "absolute" assignments was later explained in greater detail by the Fifth Circuit—when interpreting and clarifying the *dicta* from *Taylor. FDIC v. Int'l Prop. Mgmt., Inc.*, 929 F.2d 1033, 1034 (5th Cir. 1991) ("*Taylor v. Brennan* . . . is the seminal Texas case on assignment of rents clauses.").   Unlike *Taylor*, *International Property* directly confronted the "absolute" assignment issue. *Id.* at 1035-1038.

In *International Property,* FWG borrowed $5 million to build an apartment complex. *Id.* at 1034. The $5 million loan was eventually held by the FDIC. *Id.*  The loan was secured by a deed of trust and an assignment of rents. *Id.*  FWG defaulted on the loan, which resulted in litigation over whether the assignment of rents was "absolute" or "collateral." *Id.*[6]  The Fifth

---

[5] Since the Texas Supreme Court found that the assignment was an "un-activated collateral" assignment, *Taylor's* discussion of "activated collateral" and "absolute" assignments of rents was not necessary to the resolution of the case.  Accordingly, such passages are mere *obiter dictum. See In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004) (providing definition of *obiter dictum*).

[6] But for the Debtors' bankruptcy filing in this case, the facts in *International Property* are analogous to the facts of this case.

Circuit found that the mortgage documents demonstrated the parties' intent to create an "absolute" assignment and, therefore, the FDIC had the right to collect the rents immediately upon default. *Id.* at 1038.

The Fifth Circuit's decision is vital to the resolution of this case because it interprets and clarifies *Taylor's dicta* concerning Texas law of "absolute" assignments. Under an "absolute" assignment of rents, the borrower "immediately transfers title to rents to the lender, but [the borrower] retains the right to receive those rents unless and until the borrower defaults." *Id.* at 1035 (citing *Taylor*, 621 S.W.2d. at 594). Thus, although the lender's rights arise immediately under an "absolute" assignment, the lender's enjoyment of those rights is deferred until the borrower defaults. *Id.* In this case, C1 Trust had the contractual right to have the rents deposited by the Debtors into a lockbox. After deduction of the monthly debt service, the balance of the rents was transferred back to the Debtors. Accordingly, prior to a default, the Debtors had the right to insist that the rents would (i) be applied to their indebtedness to C1 Trust; and (ii) thereafter, be available for the Debtors' use. Upon default, the loan agreements provide that C1 Trust had the right to unilaterally collect all of the rents.

The Fifth Circuit recognized that, given the nature of these arrangements, the term "absolute" assignment is, essentially, a misnomer:

> The concept of a present transfer of title to rents contingent upon default, as opposed to a security interest in the rents, is essentially a ***legal fiction*** . . . . Whatever terminology the court uses, . . . mortgagees employ such assignments to ***secure the debt***, and all such assignments would be considered security interests under the Uniform Commercial Code, which treats all transfers intended to secure a debt as security interests despite their form.

*Id.*(emphasis added); *see also In re Foundry of Barrington P'ship*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991) ("[The lender] can call this arrangement an 'absolute assignment' or, more appropriately, 'Mickey Mouse.' It's still a lien . . ."). The Fifth Circuit solidified this point by

referring to "absolute" assignments as "contingent present assignments" on four different occasions in its opinion. *Int'l Prop.*, 929 F.2d at 1035-36.   The phrase "contingent present assignment" more accurately reflects the true substance of "absolute" assignments.

The finding that there is nothing "absolute" about "absolute" assignments directly influenced the Fifth Circuit's clarification of *Taylor's* statement, in *dicta*, that an "absolute" assignment "passes *title* to the rents" to the lender. *See Taylor*, 621 S.W.2d at 594 (emphasis added).   Neither *Taylor's dicta* nor its holding elaborated on whether legal title, equitable title, or both pass to the lender.   C1 Trust argues that complete title—both legal and equitable— transfers under an "absolute" assignment.   This argument cannot be reconciled with *International Property*, which makes no mention of equitable title ever passing from the debtor to the mortgage lender.   Instead, the Fifth Circuit found that "absolute" assignments consist of only the immediate transfer of *legal* title plus the automatic *right* to the rents upon the occurrence of a specified condition (such as default):

> A contingent present assignment immediately transfers **legal title** to rents to the mortgagee but the mortgagor continues to enjoy the rents until the occurrence of a specified condition – usually default.   Upon the occurrence of the specified condition, the mortgagee receives the **right to enjoy the rents** (in addition to the **legal title** he already possessed).

*Int'l Prop.*, 929 F.2d at 1036 n.2 (emphasis added).

It is helpful to take the legalistic framework established by *Taylor* and *International Property* and place it in a practical context.   *International Property* was decided under Texas law, without an intervening bankruptcy case.   At the consummation of the loan and assignment of rents agreements, the FDIC received legal title to the rents.   Upon the debtor's default, FDIC automatically obtained the right to "enjoy" (i.e. collect) the rents. *See id.*   It is the "absolute" assignment of rents that provided the FDIC with this automatic collection right.   Upon the actual

19

collection and receipt of the rents, FDIC could utilize its legal title to pay the cash from the rents to itself in order to pay down the debt held by the FDIC.  Once the cash was applied to the debt, the debtor's equitable title transferred to the FDIC.  After the cash from the rents was paid to reduce the debt, FDIC held both legal and beneficial title to the cash.

Thus, without an intervening bankruptcy case, the Fifth Circuit fully and properly applied Texas law to determine that the FDIC had the "right to enjoy the rents" by treating the rents as being applied to the debt held by the FDIC.  The fundamental issue for this Court is whether an intervening bankruptcy allows the Debtor to utilize the cash from the rents for purposes other than application to the debt.  In that respect, this case is more akin to *Whiting Pools* than to *International Property*. *See Whiting Pools*, 462 U.S. at 203-205.

In *Whiting Pools,* the IRS seized Whiting's tangible personal property to satisfy a tax lien in the amount of approximately $92,000. *Id.* at 200.  Whiting filed a chapter 11 petition on the following day. *Id.*  The IRS then moved for a declaration that the automatic stay provision of § 362(a) was inapplicable to the IRS or, alternatively, for relief from the stay. *Id.* at 201.  The IRS sought such relief because it intended to proceed with a tax sale of the property seized from Whiting. *Id.* at 200-201.  Whiting counterclaimed for a turnover order directing the IRS to deliver the seized property to the bankruptcy estate pursuant to § 542(a). *Id.* at 201.[7]

The Supreme Court denied the relief requested by the IRS, finding that the IRS "is bound by § 542(a) to the same extent as any other secured creditor." *Id.* at 209.  The Court held that "the reorganization estate includes property of the debtor that has been seized by a creditor prior

---

[7] Section 542(a) provides "[e]xcept as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

to the filing of a petition for reorganization." *Id.*  In so holding, the Supreme Court explained that § 542(a) is one of several provisions in the Bankruptcy Code which brings into the estate "property in which the debtor did not have a possessory interest at the time the bankruptcy proceeding commenced." *Id.* at 205.  Provisions such as § 542(a) reflect Congress's intent to include "a broad range of property" in the bankruptcy estate. *Id.* at 204.

The IRS, on the other hand, was not without recourse or protection; it remained protected, for example, by § 363(e)'s adequate protection requirements. *Id.* at 211.[8]  "Section 542(a) simply require[d] the Service to seek protection of its interest according to congressionally established bankruptcy procedures, rather than by withholding the seized property from the debtor's efforts to reorganize." *Id.*

Notably, the Supreme Court also outlined the limitations of § 542(a): "Of course, if a tax levy or seizure *transfers* to the IRS *ownership of the property seized*, § 542(a) may not apply." *Id.* at 209 (emphasis added).  Thus, the Court recognized that once a full title transfer occurs, the estate has lost its interest in the property.  But a seizure, alone, does not effect such a transfer:

> The Service's interest in seized property is its lien on that property.  The Internal Revenue Code's levy and seizure provisions, 26 U.S.C. §§ 6331 and 6332, are special procedural devices available to the IRS to protect and satisfy its liens . . . and are analogous to the remedies available to private secured creditors . . . . They are provisional remedies that do not determine the Service's rights to the seized property, but merely bring the property into the Service's legal custody.

*Id.* at 210-211.  The Supreme Court also indicated the precise point at which title transfers: "Ownership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale . . . .  Until such a sale takes place, the property remains the debtor's and thus is subject to the turnover requirement of § 542(a)." *Id.* at 211.

---

[8] "When property seized prior to the filing of a petition is drawn into the Chapter 11 reorganization estate, the Service's tax lien is not dissolved; nor is its status as a secured creditor destroyed.  The IRS, under § 363(e), remains entitled to adequate protection for its interests, to other rights enjoyed by secured creditors, and to the specific privileges accorded tax collectors." *Id.*

Without an intervening bankruptcy, the IRS would have been able to possess and sell the property, and then apply the proceeds of the tax sale to the debt. *Whiting Pools* demonstrates how bankruptcy modifies the rights of not only the IRS, but of all secured creditors. *See id.* at 209. It illustrates that the bankruptcy estate's broad reach includes property that is controlled—but not owned outright—by a secured creditor. This principle directly influences the outcome of this case.

Synthesizing *Whiting Pools* with *International Property* leads to the conclusion that the post-petition rents at issue in this case are property of the estate. This conclusion is unmistakable despite the fact that the *International Property* lender was permitted to retain the "absolutely" assigned rents. The key difference between the ostensibly inconsistent outcomes in this case and *International Property* is the bankruptcy framework. Outside of bankruptcy, *International Property* stands for the proposition that once default occurs, the lender immediately has rights to the "absolutely" assigned rents. The debtor cannot keep rents received post-default. Upon receiving the rents, the lender must then take the cash from those rents and apply it to the mortgage debt. In doing so, the lender becomes both the equitable and the legal title holder of the cash from the rents. It is not until the cash is applied to the debt that the equitable title transfers from the debtor to the lender.

This case would follow the outcome of *International Property* if the Debtors had not filed bankruptcy. Upon the Debtors' bankruptcy filing, however, § 541(a)(1) brings all property in which the Debtors hold an equitable interest into the estate. At the time of the filing of the bankruptcy petition, the Debtors held equitable title to all future rents, despite the lender's right to the rents under the "absolute" assignment. *See In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 102-3 (Bankr. S.D.N.Y. 1991) ("Even if [lender] had an absolute assignment, rather than a

pledge which required further action, it would not follow that the debtor's interest in the rent was totally cut off [upon default] . . . .  It follows that such interest in the rents constitutes property of the estate [under] . . . § 541."); Forrester, 46 RUTGERS L. REV. at 400-401 ("If the borrower has any interest remaining in the rental stream under state law, then bankruptcy law dictates that the rental stream be treated as part of the bankruptcy estate.  The fact that the lender may have taken possession of the rental stream prior to the bankruptcy petition is irrelevant if the borrower still has an interest in it.").  Accordingly, all post-petition rents are property of the bankruptcy estate. *Whiting Pools* mandates this result: Until title has transferred, property controlled by a secured creditor, unless subject to an exception, must be turned over to the bankruptcy estate.[9]

Furthermore, any doubt concerning *International Properties'* legal conclusion that "absolute" assignments do not grant full title to the mortgagee is put to rest upon review of the general characteristics of an "absolute" assignment of rents transaction.  Several characteristics of these transactions, which are also present in this case, indicate that complete title simply cannot transfer to the lender.  Similarly, each of the following characteristics of the substance of an "absolute" assignment indicates that the debtor retains an interest in the rents, in the form of equitable title. *See In re Guardian Realty Group, L.L.C.*, 205 B.R. 1, 4 (Bankr. D. D.C. 1997) ("The majority of cases to consider language in a security agreement granting a mortgagee an alleged absolute assignment of rents have found the *true nature* of the mortgagee's interest to be no more than security . . . .") (emphasis added); Forrester, 59 FLA. L. REV. at 513 ("The courts holding that an absolute assignment does in fact create a type of security interest are correct because of the *true substance* of the assignment of rents in the context of a mortgage loan.") (emphasis added).

---

[9] Since the only rents at issue here are the rents generated post-petition (i.e. future rents), it would be impossible for equitable title to have transferred to C1 Trust.  As discussed below, without a pro tanto credit, equitable title does not transfer until the rents are applied to the debt.

The most obvious interest that a debtor retains following an "absolute" assignment is the debtor's ability to insist that the rents be properly applied to the debtor's obligation to the lender. As one commentator has explained, "the rents that the lender collects must be applied to the indebtedness or for expenses related to the mortgaged property. The lender cannot use rents to give its stockholders a dividend, to give its employees a raise, or to redecorate its offices." Forrester, 59 FLA. L. REV. at 513-514; *See also Travelers Indem. Co. v. Grant Assocs. (In re Grant Assocs.)*, No. M–47 (RJW), 1991 WL 21228, at *4 (S.D.N.Y. Feb. 5, 1991) ("[A]ll of the cases seem to recognize that the debtor retains *some* sort of interest in the rents, perhaps best characterized as the right to an accounting. In other words, the assignee must use the excess rent income to pay down the debt, and thus its right to the rent is not without conditions.") (emphasis in original).

The fact that the lender's use of the rents is limited by agreement with the debtor indicates that the debtor retains an interest in the rents. The first question posed by the Court at the hearing on this matter addressed this very issue. The response given by C1 Trust's counsel, acknowledges the limitations on C1 Trust's use of rents and is consistent with a transfer of legal title only:

> **COURT:** Mr. Greendyke, I need to understand [the end] game a little bit. If your client receives the rents in the theory that you think they should, can they do anything they want with them? Do they have to apply them to the debt? Can they go to Las Vegas with them? I mean, what's the limit with respect to your relationship to the debtor as to what you can do if you collect the rent?
>
> **MR. GREENDYKE**: I think the relationship to the debtor, notwithstanding the bankruptcy, is governed by the documents that we, by agreement, will put into evidence. There's a waterfall for application of the payments, and I think in a perfect world the payments to be applied to the debt would be applied down that waterfall that's mentioned in the cash management agreement, and then anything that's left over, if there was anything, would go to the debtors for operating purposes or for the debtor's profits, whoever it might be. I think that's the way that is contemplated to work.

To summarize, it is C1 Trust's position that it has title to the rents, but that its title rights are limited. It must receive the rents and apply the cash from the rents to the Debtors' obligations to C1 Trust. If C1 Trust were the "absolute owner" of the rents, with both legal and equitable title, then it would have no obligation to apply the cash to the debt. As the absolute owner, C1 Trust could use the cash in any way it pleased, including using the cash to bankroll a trip to Las Vegas. But, as counsel correctly states, the documents oblige C1 Trust to apply the cash from the rents to the Debtors' obligations. Accordingly, C1 Trust has legal title to the rents, with the equitable ownership of the rents belonging to the Debtors. The loan documents direct how the Debtors' equitable interest will be applied—initially to retire the debt.

The second characteristic demonstrating that equitable title remains with the debtor is that "[a]lthough the borrower may be required to apply rents to pay for operation and maintenance of the property and to pay debt service, the borrower's use of excess rents is not restricted." Forrester, 59 FLA. L. REV. at 513. This is precisely the arrangement that was executed between the Debtors and C1 Trust. If C1 Trust completely owned the rents, the Debtors would not have the rights to the excess rents. This arrangement indicates, therefore, that the assignment was meant to assure payment of the debt and not transfer complete ownership to C1 Trust.

Third, generally "an absolute assignment of rents is given in connection with (and only because of) the related mortgage loan." *Id.*; *See also Lyons v. Fed. Sav. Bank (In re Lyons)*, 193 B.R. 637, 648 (Bankr. D. Mass. 1996) ("To borrow a concept from tort law, but for the loan transaction, the Debtors would not have assigned rents to the Bank."). This characteristic illustrates that the parties did not intend a true sale of the rents:

> If the transaction were truly a sale of the rents to the lender, the lender would give some consideration for the purchase, such as a *reduction in the debt by an amount equal to the present value of the future rental stream*. Instead, rents collected by

the lender are applied to the indebtedness only to the extent collected.  If the lender purchased the rental stream, . . . the lender would bear the risk of non-payment by the tenants.

Forrester, 59 FLA. L. REV. at 514 (emphasis added).

C1 Trust takes the position that because of its lock box arrangement, C1 Trust owned the rents *ab initio*.  This is inconsistent with additional *dicta* from *Taylor* that acknowledged that there could be an "absolute" assignment actually transferring full beneficial title to the mortgagee.  *Taylor*, 621 S.W.2d at 594 (recognizing that in order for an assignment to be more than for additional security, a "pro tanto payment of the [debt] obligation" must be made).  For the sake of clarity, the Court will refer to this second form of "absolute" assignment as the "true" assignment.  Such "true" assignments differ from the more common "absolute" assignments which, as discussed in *International Property*, are "absolute" in name-only and intended as additional security for the mortgagee.

As mentioned in *Taylor,* a pro tanto payment must be made to create a "true" assignment.  *See id.*  A pro tanto payment is a credit to the debt of the present value of the future rental stream. *See In re Tripplet*, 84 B.R. 84, 88 (Bankr. W.D. Tex. 1988).  Thus, if the future rental stream was worth $10,000,000 at the time the loan documents were executed, C1 Trust was required to reduce the debt by $10,000,000 in order to effect a "true" assignment of title.[10]  No pro tanto payment occurred in this case.  C1 Trust's failure to credit the present value of the rents is an indication that the parties did not treat the assignment as one of both a legal and an equitable interest.

---

[10] *See also Guardian Realty Group*, 205 B.R. at 5 ("There is nothing to preclude a debtor from making what is in both form *and* substance an absolute assignment of rents.  For example, if the mortgagor and the mortgagee agreed that certain tenants' unpaid rents are assigned to the mortgagee with a credit of $10,000 to flow to the mortgagor, the mortgagor has clearly parted with ownership.  The mortgagee bears all the risks if the rents go uncollected.  If the rents actually collected exceed $10,000 the mortgagor has no right to the excess even after paying the mortgage debt in full.  But where (as here or as in *Jayson Realty* and *Commerce Bank*) no provision is made for the debtor to get any credit for the rents until the mortgagee collects them, the 'assignment' of rents is in substance for security, not a passing of actual ownership.") (emphasis in original).

Furthermore, the assignment agreement between Debtors (assignor) and C1 Trust (assignee) states that "Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure or inability to collect Rents . . . .  Assignee is obligated to account to Assignor only for such Rents as are actually collected or received by Assignee."  This passage indicates that C1 Trust bore no risk of non-payment by the tenants.  The risk of non-payment remained with the Debtors, and, accordingly, the equitable title remained as well.

Fourth, the "absolute" assignment of rents does not transfer complete title because such assignments "terminate upon payment in full of the debt.  After the debt is paid, the 'lien' on the rents must be released, and the borrower may collect them unencumbered by any obligation to the lender."  Forrester, 59 Fla. L. Rev. at 514; *see also Lyons*, 193 B.R. at 648 ("The fact that the assignments . . . will terminate upon satisfaction of the debt indicates that they . . . are not an absolute transfer of the Debtors' interest in the rents to the Bank"); *In re Bethesda*, 117 B.R. at 207 ("The Assignment ends upon repayment of the loan.  This trigger for termination of the assignment is identical to the trigger which would terminate and release a security interest.  Absent a gift to the Borrower, which is not suggested, this is not a trigger one would expect to terminate absolute ownership."); *Foundry of Barrington P'ship*, 129 B.R. at 556-557 (The lender's interest "exists only to assure payment of the debt and performance of the other obligations of the Debtor.  That is clear because the assignment terminates once the debt is paid.").  The assignment agreement here states that the "assignment shall be in full force and effect continuously from the date hereof to and until the Mortgage shall be released of record, and the release of the Mortgage shall, for all purposes, automatically terminate this Assignment and render this Assignment null and void and of no effect whatsoever."  C1 Trust's interest in the

rents terminates when the underlying mortgage debt is paid in full.  Accordingly, C1 Trust does

not fully own the post-petition rents.

Finally, it is noteworthy that the characteristics discussed directly above, which signify

that debtors maintain a continued interest in the rents, were recognized by the Fifth Circuit when

it discussed the "absolute" assignment of rents at issue in *International Property*:

> FWG contends that the deed of trust, note, and assignment of rents clause, when
> construed together, indicate that the mortgagee included the assignment of rents
> clause in order to *assure payment of the debt* and to *provide additional protection*
> upon default.  *We agree.*  The provisions in the assignment of rents clause . . . that
> *require the mortgagee to apply rental income to the debt* (with *any remainder
> going to the mortgagor*) and that provide for *termination of the assignment of
> rents on release* of the deed of trust would be unnecessary were the clause not
> intended to assure payment of the debt.

*Int'l Prop.*, 929 F.2d at 1037-1038.

In sum, *Taylor* and *International Property* were not bankruptcy cases.  They did not

address the specific issue present in this case: Whether debtors in Texas retain an interest in

"absolutely" assigned rents that bring post-petition rents into the bankruptcy estate under

§ 541(a)(1).  Nevertheless, *Taylor* and *International Property* provide the necessary guidance for

resolving this case. A thorough analysis of the two cases leads to the conclusion that, under

Texas law, an "absolute" assignment transfers legal title and the automatic right to all rents

(usually upon the occurrence of a specified condition, such as default) to the lender.  Equitable

title to the rents remains with the borrower.  Further, a "true" assignment transfers complete title

to the rents only if there is a pro tanto credit to the debt.  No pro tanto credit was made in this

case; therefore, equitable title to all post-petition rents remains with the Debtors.  Accordingly,

the future rents are property of the estate—as defined by a state law *Butner* analysis—under

§ 541(a)(1) of the Bankruptcy Code.

This conclusion is not affected by whether the Court classifies the assignment as an "absolute" or "activated collateral" assignment.  The only difference between such assignments is the fact that the lender must take affirmative steps to "activate" the "collateral" assignment.  Once activation has occurred, however, the lender's rights with respect to the debtor and the rents are identical under either type of assignment.  As Judge Ward has stated:

> [T] finding that the assignment was absolute does not necessarily compel the conclusion, as assumed by both parties, that the lendee thereby holds more than a security interest in the rents or that Debtor retains no interest whatsoever in the rents.  Herein lies the crucial issue on this appeal, which has not been directly addressed by the parties: many of the cases suggest that the distinction between absolute assignments and assignments as additional security is relevant only to the manner in which the *security interest* must be perfected by the creditor.  They do not hold (with few exceptions) that the creditor thereby gains more than a security interest in the rental income.

*Grant Associates*, 1991 WL 21228 at *4 (emphasis original).[11]  Judge Ward is correct and his conclusions aptly summarize the position of the Fifth Circuit in *International Property*.  The "absolute" assignment does not grant lenders any rights in addition to those granted in an "activated collateral" assignment.  The "absolute" assignment simply ensures that lenders will automatically have the right to the rents at the soonest possible time—usually, the moment default occurs—without any activation requirement.  The lender still does not acquire any title in addition to its legal title until it applies the rents it receives to the debt under either type of assignment.  Thus, the outcome of this case is the same under both of C1 Trust's arguments.  The Debtors retain an equitable interest in post-petition rents, which become property of the estate

---

[11] *See also Constable Plaza*, 125 B.R. at 101-102 ("The issue as to whether or not an assignment of rents clause in a mortgage creates an absolute assignment of the rents upon the mortgage default, or merely an assignment for security purposes, is important in determining if the mortgagee has *perfected* its interest.  Thus, the issue is not whether or not the mortgagee has an absolute right forever to collect rents regardless of a possible future satisfaction of the mortgage, but instead, whether the mortgagor's default, without more, gives rise to the mortgagee's *right to collect the rents during the mortgage default phase*.  Hence, the distinction is significant in resolving the *issue of perfection* for the *purpose of determining the mortgagee's right to collect the rents*, and is not dispositive of the question as to whether the mortgagee has an absolute right to collect rents indefinitely, regardless of the satisfaction of the mortgage by the mortgagor.") (emphasis added).

under § 541(a)(1), and, as discussed below, such rents can be used by the Debtors as cash collateral under §§ 363(a) and 552(b).

## Sections 363 and 552

The Debtors' equitable interest in the rents brings the post-petition rents into the estate under §§ 541(a)(1) and 541(a)(6).  This conclusion does not necessarily grant the Debtors unfettered use of the rents.

Section 363(a) defines "cash collateral," in part, as "cash . . . [or] cash equivalents . . . in which the estate and an entity other than the estate have an interest and includes the . . . rents . . . of property subject to a security interest as provided in section 552(b) of this title." 11 U.S.C. § 363(a).  Rents therefore are "cash collateral" when they are "subject to a security interest as provided in 552(b)." *Id.*  Section 552(b) "provides that a mortgagee holding a valid prepetition assignment of rents may treat postpetition rents as cash collateral entitled to adequate protection." *Lyons*, 193 B.R. at 649.[12]  There is no dispute concerning the validity of C1 Trust's interest in the rents.  Since C1 Trust had a valid interest in pre-petition rents, § 552(b)(2) applies that interest to post-petition rents.  Accordingly, the post-petition rents are "cash collateral" under § 363(a) and C1 Trust is entitled to adequate protection of its interest.

C1 Trust does not dispute the issue of adequate protection.  Thus, the Debtors are entitled to use the post-petition rents.

---

[12] Section 552(b)(2) provides: "Except as provided in sections 363, 506(c), 552, 544, 545, 547 and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(2).

**Conclusion**

Section 541(a)(6) governs the outcome of this case. It mandates that rents generated from property of the estate are included within the bankruptcy estate. Further, even if § 541(a)(6) had not been enacted, this case's outcome is unchanged under Texas law. Texas law provides that Debtors retain an equitable interest in post-petition rents and, accordingly, such rents become property of the bankruptcy estate under § 541(a)(1).

As property of the estate, the rents are subject to "cash collateral" limitations in §§ 363 and 552(b). Since C1 Trust is adequately protected, the Debtors are entitled to use the post-petition rents. Accordingly, the Debtors motion to use "cash collateral" is granted. A separate order has been issued.

SIGNED **August 3, 2009.**

_____

Marvin Isgur

UNITED STATES BANKRUPTCY JUDGE

31