IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **AMARAVATHI LIMITED** | § | Case No. 09-32754-H1-11 |
| **PARTNERSHIP,** | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | § | |
| | § | |
| In re: | § | |
| | § | |
| **AMARAVATHI KEERTHI, LLC,** | § | Case No. 09-32755-H1-11 |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| | § | Jointly Administered Under |
| | § | Case No. 09-32754-H1-11 |

---

## THIRD AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THIRD AMENDED PLAN OF REORGANIZATION

---

DIAMOND MCCARTHY LLP

909 Fannin, Suite 1500
Houston, Texas 77010
Telephone: (713) 333-5100
Telecopy:  (713) 333-5195

ATTORNEYS FOR DEBTORS AND DEBTORS-
IN-POSSESSION

Dated: May 6, 2010

# TABLE OF CONTENTS

APPENDIX OF EXHIBITS ..................................................................................IV

I. INTRODUCTION .............................................................................................1

    A.    FILING OF THE DEBTORS' CHAPTER 11 CASES ....................................1
    B.    PURPOSE OF DISCLOSURE STATEMENT ...............................................1
    C.    HEARING ON CONFIRMATION OF THE PLAN ........................................4
    D.    SOURCES OF INFORMATION AND THE ACCOUNTING METHOD USED .........4

        1.    SOURCES OF INFORMATION.................................................4
        2.    ACCOUNTING METHOD ....................................................5

II. EXPLANATION OF CHAPTER 11 ...............................................................5

    A.    OVERVIEW OF CHAPTER 11................................................................5
    B.    PLAN OF REORGANIZATION ................................................................6

III. VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS ............7

    A.    BALLOTS AND VOTING DEADLINE .......................................................7
    B.    CLAIMANTS ENTITLED TO VOTE .........................................................7
    C.    BAR DATE FOR FILING PROOFS OF CLAIM ............................................8
    D.    DEFINITION OF IMPAIRMENT ..............................................................8
    E.    CLASSES IMPAIRED UNDER THE PLAN ..................................................9
    F.    VOTE REQUIRED FOR CLASS ACCEPTANCE ...........................................9
    G.    INFORMATION ON VOTING AND BALLOTS .............................................9

        1.    TRANSMISSION OF BALLOTS TO CREDITORS.........................9
        2.    BALLOT TABULATION PROCEDURES ...................................9
        3.    EXECUTION OF BALLOTS BY REPRESENTATIVES ...................10
        4.    WAIVERS OF DEFECTS AND OTHER IRREGULARITIES REGARDING BALLOTS ....10
        5.    WITHDRAWAL OF BALLOTS AND REVOCATION .................11

    H.    CONFIRMATION OF THE PLAN ..........................................................11

        1.    SOLICITATION OF ACCEPTANCES .....................................11
        2.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...........12
        3.    ACCEPTANCES NECESSARY TO CONFIRM THE PLAN.............13
        4.    CRAMDOWN....................................................................14

IV. BACKGROUND OF THE DEBTORS ...........................................................15

    A.    THE DEBTORS' BACKGROUND ...........................................................15
    B.    THE DEBTORS' BUSINESS .................................................................15
    C.    THE DEBTORS' MANAGEMENT COMPANY ..........................................16
    D.    DESCRIPTION OF THE PROPERTIES .....................................................16
    E.    THE C1 TRUST NOTES.....................................................................17

**V. EVENTS LEADING TO BANKRUPTCY** ...................................................................... 17

    **A.**     **REASONS FOR FILING CHAPTER 11** ........................................................ 17

        1.     ECONOMIC AND MARKET CHALLENGES.......................................... 17
        2.     CNC HELPS THE DEBTORS SERVICE THE C1 TRUST DEBT. ............. 18
        3.     THE DEBTORS' WORK TO RESTRUCTURE THE CI TRUST NOTES. ..... 18
        4.     THE MARCH 2009 DEFAULT. .......................................................... 19
        5.     C1 TRUST'S RECEIVERSHIP ACTION. ............................................. 19
        6.     THE DEBTORS SEEK RELIEF FROM THE BANKRUPTCY COURT TO PROTECT THE PROPERTIES. ........................................................................... 19
        7.     THE JOINT MARKETING PROPOSAL ................................................ 20
        8.     MEDIATION AND THE GLOBAL SETTLEMENT AGREEMENT ............... 20
        9.     THE DEBTORS CONTINUE TO PURSUE BOTH ALTERNATIVES............ 21

    **B.**     **ASSETS AND LIABILITIES** ...................................................................... 21

        1.     ASSETS ....................................................................................... 22
        2.     LIABILITIES ................................................................................. 22
        3.     LITIGATION ................................................................................. 23

**VI. POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS** ............................ 24

    **A.**     **POST-BANKRUPTCY OPERATIONS** ......................................................... 24
    **B.**     **SIGNIFICANT ORDERS ENTERED DURING THE CASES** ............................... 25
    **C.**     **PROFESSIONALS** ................................................................................... 26

        1.     PROFESSIONALS EMPLOYED BY THE DEBTORS ................................. 26
        2.     NO COMMITTEE .......................................................................... 26

**VII. DESCRIPTION OF THE PLAN** ....................................................................... 27

    **A.**     **INTRODUCTION AND GENERAL OVERVIEW OF THE PLAN** ......................... 27
    **B.**     **DESIGNATION OF CLAIMS AND INTERESTS** ............................................ 28
    **C.**     **ESTIMATED SIZE OF ALLOWED CLAIMS IN CLASSES** ............................... 29
    **D.**     **TREATMENT OF CLAIMS AND INTERESTS** .............................................. 29

        1.     TREATMENT OF UNCLASSIFIED CLAIMS .......................................... 29

            (A)     ADMINISTRATIVE EXPENSES AND FEE CLAIMS .................... 29
            (B)     FEE CLAIMS ....................................................... 30
            (C)     ALLOWANCE OF ADMINISTRATIVE EXPENSES .................... 30
            (D)     PRIORITY NON-TAX CLAIMS ........................................ 30
            (E)     PRIORITY TAX CLAIMS ............................................... 31

        2.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS .......... 31

            (A)     CLASS B – SECURED CLAIMS ...................................... 31
            (B)     CLASS C –UNSECURED CLAIMS ................................... 33
            (C)     CLASS D – EQUITY INTERESTS .................................... 35

E.    MEANS OF IMPLEMENTATION OF THE PLAN ...................................................... 36

    1.    POWERS AND DUTIES OF THE REORGANIZED DEBTORS .................................... 37
    2.    MANAGEMENT OF THE REORGANIZED DEBTORS ................................................ 37

F.    PROVISIONS GOVERNING DISTRIBUTION ........................................................... 37
G.    CONTESTED AND CONTINGENT CLAIMS .............................................................. 38
H.    EXECUTORY CONTRACTS AND LEASES ............................................................... 38
I.    CAUSES OF ACTION ............................................................................................ 39

    1.    PREFERENCES ................................................................................................ 39
    2.    FRAUDULENT TRANSFERS ............................................................................... 39
    3.    OTHER POTENTIAL LITIGATION ..................................................................... 40

J.    DISCHARGE OF THE DEBTORS AND RELATED INJUNCTIONS. ..................................... 40

    1.    DISCHARGE OF DEBTORS. ............................................................................... 40
    2.    INJUNCTION REGARDING ACTIONS AGAINST THE DEBTORS AND THEIR ASSETS.40

K.    EXCULPATION AND LIMITATION OF LIABILITY ................................................... 42
L.    U.S. TRUSTEE QUARTERLY FEES ...................................................................... 42

VIII. FEASIBILITY AND RISKS ................................................................................... 42

A.    BUSINESS RISKS ............................................................................................... 42
B.    RISK OF NONCONFIRMATION OF THE PLAN ....................................................... 44
C.    NONOCCURRENCE OF EFFECTIVE DATE OF THE PLAN ........................................ 44

IX. ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS ....................................... 44

A.    DISMISSAL ...................................................................................................... 45
B.    CHAPTER 7 LIQUIDATION ................................................................................ 45
C.    ALTERNATIVE PLAN ........................................................................................ 45

X.  CERTAIN UNITED STATES FEDERAL INCOME  TAX CONSEQUENCES OF THE
    PLAN  46

A.    GENERAL ........................................................................................................ 47
B.    IRS CIRCULAR 230 DISCLOSURE ..................................................................... 47
C.    CONSEQUENCES TO HOLDERS OF CLAIMS .......................................................... 47

    1.    REALIZATION AND RECOGNITION OF GAIN OR LOSS IN GENERAL .................... 47
    2.    ACCRUED INTEREST ....................................................................................... 48
    3.    WITHHOLDING ............................................................................................... 49
    4.    CONSEQUENCES TO DEBTORS OR REORGANIZED DEBTORS - DISCHARGE OF
        INDEBTEDNESS INCOME GENERALLY ............................................................... 49

XI. CONCLUSION ....................................................................................................... 50

iii

## APPENDIX OF EXHIBITS

Exhibit 1      Third Amended Plan of Reorganization

Exhibit 2      7-year Cash Flow and Payment Projection Analysis

Exhibit 3      List of the Debtors' Executory Contracts

Exhibit 4      Updated Settlement Agreement Among Debtors, C1 Trust, CNC and Charlie Yalamanchili

Exhibit 5      Liquidation Analysis

Debtors' Third Amended Disclosure Statement
211292-1

# I.

# INTRODUCTION

Amaravathi Limited Partnership ("ALP") and Amaravathi Keerthi, LLC ("Keerthi" collectively with ALP, "Amaravathi" or the "Debtors"), the debtors and debtors-in-possession in the above-referenced bankruptcy cases, submit this Third Amended Disclosure Statement ("Disclosure Statement") pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the Debtors' Third Amended Plan of Reorganization (the "Plan"), which is attached as Exhibit 1 to this Disclosure Statement.

This Disclosure Statement[1] sets forth certain relevant information regarding the Debtors' prepetition operations and financial history and the need to seek Chapter 11 protection. This Disclosure Statement also describes the Plan's terms and provisions, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

As described more fully below, pursuant to a tenancy-in-common agreement between ALP and Keerthi, ALP owns an undivided 80% interest in each of the properties at issue in these Chapter 11 cases, and Keerthi owns an undivided 20% interest in each of the properties at issue in these Chapter 11 cases. There are no claims unique to only ALP or Keerthi. Rather, all claims, assets and liabilities are common to both ALP and Keerthi on an 80%/20% basis. There are no creditors unique to only ALP or Keerthi.

Accordingly, solely for the purposes of voting and receiving distributions under the Plan, ALP and Keerthi's respective claims and classes are consolidated to ensure efficiency and minimize confusion among creditors and interest holders. This proposed consolidation will not result in greater or lesser payments to any creditors or interest holders as compared with what would be received if the estates were dealt with separately.

## A.     Filing of the Debtors' Chapter 11 cases

The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on April 23, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). The cases are being jointly administered pursuant to the Order for Joint Administration entered on April 24, 2009. The Debtors have continued to manage their property and assets as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

## B.     Purpose of Disclosure Statement

The Debtors submit this Disclosure Statement in accordance with Bankruptcy Code section 1125 to solicit acceptances of the Plan from holders of certain Classes of Claims. The

---

[1]     All capitalized terms shall have the same meaning as defined in the Plan unless context dictates otherwise.

only Claimants whose acceptances of the Plan are sought are those whose Claims are "impaired" (as that term is defined in Bankruptcy Code section 1124) by the Plan and who are receiving distributions under the Plan.

In general, the Plan provides that the Reorganized Debtors will continue owning all of the Properties with modified obligations to C1 Trust to be set forth in modified loan assumption documents. Distributions will be made to C1 Trust and all other holders of Allowed Claims using available cash on hand as of the Effective Date, allotted funds made available through an equity contribution, and income generated from operations at the Properties.

As part of the Plan, C1 Trust will be provided with eight restructured term loans, one secured term loan and one unsecured term loan for each of the four Properties. For purposes of the Plan, the Debtors and C1 Trust have agreed through negotiations during these cases and at mediation that C1 Trust holds an Allowed Secured Claim in the amount of $140 million. This agreement between the Debtors and C1 Trust is not intended to serve as an admission by the Debtors or Reorganized Debtors regarding the actual value of the Properties.

As part of the Plan, on the Effective Date, C1 Trust will be paid $4 million in cash to reduce the $140 million secured loan balance, and the remaining $136 million will be assumed pursuant to four restructured secured term loans, one secured term loan for each of the four Properties. The restructured secured loans for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million. The four restructured secured term loans will maintain the current maturity date, and will only be modified from their original terms to account for the reduced outstanding secured principal loan balance, interest rate reductions, lowered and modified debt service coverage ratio ("DSCR") provisions (to the extent deemed necessary and applicable by the Debtors), and changed guarantors.

Moreover, as part of the Plan, CNC Investments, Ltd., L.L.P. ("CNC") will resign as the management company for the Properties and be replaced by Greystar Realty Services ("Greystar"), and Rao Kothapalli will replace Chowdary "Charlie" Yalamanchili to become the controlling person of both the ultimate general partner of ALP and the ultimate managing member of Keerthi (or of the ultimate subsidiary affiliated controlling entities of ALP and Keerthi).

As part of the Plan, C1 Trust will also receive four restructured unsecured term loans, one unsecured term loan for each of the Properties, totaling $20 million. This is the amount attributable to the deficiency amount remaining between the current $160 million principal loan balance of the Properties and the amount of C1 Trust's secured claim under this Plan. The restructured unsecured note for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million. The four restructured unsecured term loans will have the same maturity date as the restructured secured term loans. The restructured unsecured loans will be modified to reflect their unsecured nature, account for the agreed upon unsecured principal loan balances, and set forth interest rate reductions as agreed to by the parties.

The Plan provides for full payment in cash on the Effective Date to all holders of Allowed Claims, other than the Allowed Secured Claim and Deficiency Claim of C1 Trust, the CNC Claim, and claims of Equity Interest Holders.  The Reorganized Debtors will object to any objectionable Claims and will escrow payments to disputed creditors until their claims are allowed or disallowed.

The Plan also proposes that the Reorganized Debtors will receive an equity contribution in the amount of $5 million ($4 million attributable to equity in ALP, and $1 million attributable to equity in Keerthi).  The $5 million contribution, as well as the cash on hand in the Debtors' estates as of the Effective Date, will be allocated by the Debtors and C1 Trust pursuant to agreement by the parties.

The Debtors believe the reorganization proposed in the Plan is reasonable and entirely feasible based on the 7-year projections included as Exhibit 2 to this Disclosure Statement.  The Debtors base these projections on the Properties' historical performance with an anticipated gradual improvement in economic and market conditions in the Austin and Round Rock area, a property tax savings resulting from currently pending litigation by the Debtors against the Williamson and Travis County taxing authorities, and the reduced principal loan balance and interest rates contemplated in this Plan.

The Debtors prepared this Disclosure Statement pursuant to Bankruptcy Code section 1125, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against, and Equity Interests in, the Debtors, along with a written disclosure statement containing adequate information about the Debtors of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Claimants and Equity Interest Holders to make an informed judgment in exercising their right to vote on the Plan.  A copy of the Plan is included as Exhibit 1 with the materials sent along with this Disclosure Statement.

The Bankruptcy Court approved the Third Amended Disclosure Statement as containing adequate information to solicit votes on May 3, 2010.  The Bankruptcy Code requires such approval, but this approval does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered in the Plan. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of Bankruptcy Code section 1125 and contains adequate information to permit the Claimants to make an informed judgment regarding acceptance or rejection of the Plan.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE OF THE DEBTORS' CREDITORS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER**

**THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN.   THE DEBTORS' REORGANIZATION PURSUANT TO THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ABSOLUTE ASSURANCE THAT THE PLAN WILL BE EFFECTUATED AS CONTEMPLATED.**

**THE DEBTORS BELIEVE THAT THE PLAN AND THE TREATMENT OF CLAIMS UNDER THE PLAN IS IN THE BEST INTERESTS OF CLAIMANTS.  THE DEBTORS URGE THAT YOU VOTE TO ACCEPT THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THE PLAN SHOULD BE REVIEWED CAREFULLY.**

**C.**     **Hearing on Confirmation of the Plan**

The Bankruptcy Court has set June 1, 2010, at 3:00 p.m. Central Time, as the time and date for the hearing to determine whether the Plan has been accepted by the requisite number of Claimants and whether the other requirements for confirmation of the Plan have been satisfied (the "Confirmation Hearing").  Holders of Claims against the Debtors may vote to accept or reject the Plan by completing and delivering the enclosed ballot to Diamond McCarthy LLP, 909 Fannin, Suite 1500, Houston, Texas  77010 (Attn: Catherine Burrow), on or before 4:00 p.m. Central Time on May 27, 2010.  If the Plan is rejected by one or more impaired Classes of Claims, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Bankruptcy Code section 1129(b) (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims impaired under the Plan.  In the event that this Plan is not confirmed for any reason, an alternative plan may be proposed by the Debtors, or if the Court permits, by any other party.  The procedures and requirements for voting on the Plan are described in more detail below.

**D.**     **Sources of Information and the Accounting Method Used**

**1.**     **Sources of Information**

Except as otherwise expressly indicated, the information set forth in this Disclosure Statement and the attached exhibits was provided by the Debtors and their Professionals.  The financial information in the exhibits to this Disclosure Statement, including all projections, sales analysis and data, was provided by the Debtors or is based upon data generated by the Debtors or their Professionals.

In addition, certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents.  While the

4

Debtors have made every effort to retain the meaning of such other documents or portions that have been summarized, they urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves.  In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall govern and apply.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to the holder of a Claim in connection with the Plan should be relied on other than as set forth in this Disclosure Statement.  In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Debtors, Kyung S. Lee, Diamond McCarthy LLP, 909 Fannin, Suite 1500, Houston, Texas 77010 (Telephone: 713-333-5100).

### 2.    Accounting Method

The Debtors maintain their books and records in accordance with the accrual method of accounting and pursuant to generally accepted accounting principles used in the United States.

## II.

## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  The commencement of a Chapter 11 case creates an estate comprising all of the debtors' legal and equitable interests in property as of the date the petition is filed.  Bankruptcy Code sections 1101, 1107 and 1108 provide that a Chapter 11 debtor may continue to control the assets of its estate as a "debtor-in-possession," as the Debtors have done in these cases since the Petition Date.

The filing of a Chapter 11 petition also triggers the automatic stay under Bankruptcy Code section 362.  The automatic stay halts essentially all attempts to collect prepetition claims from the debtors or to otherwise interfere with the debtors' business or estate.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case.  The plan sets forth the means for satisfying the claims of creditors against, and interests and security holders in, the debtors.  Only the debtors may file a plan during the first 120 days of a Chapter 11 case (the "Exclusive Period").  The Debtors' original exclusive period to solicit their Plan, without extension by the Court, expired on October 20, 2009.  Through good faith negotiations with C1 Trust, the Debtors' exclusive period to solicit acceptances was extended

5

through March 26, 2010. Now that all relevant exclusive periods have expired, a creditor or any other interested party may file a plan. If the Plan proposed by the Debtors is not confirmed or is rejected by the creditors, the Court may allow the Debtors to propose a different plan or it may allow other parties to file their own plan.

**B.    Plan of Reorganization**

A plan of reorganization provides the manner in which debtors will satisfy the claims of their creditors. After the plan has been filed, the holders of claims against, or interests in, debtors are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against, or interest in, debtors vote in favor of a plan in order for confirmation of the plan. At a minimum, however, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and therefore are not entitled to vote. A class is "impaired" if the plan modifies the legal, equitable or contractual rights attaching to the claims or interests of that class. Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash. Classes of claims or interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore not entitled to vote.

Even if all classes of claims and interests accept a plan of reorganization the Bankruptcy Court may nonetheless still deny confirmation. Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible. The "best interests" test generally requires that the value of the consideration distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtors were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may confirm a plan of reorganization or liquidation even though fewer than all of the classes of impaired claims and interests accept it. The Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b). In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class. If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code section 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)). Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code

6

provisions and other applicable law, (ii) that the plan be proposed in good faith, and (iii) that at least one impaired class of creditors or interest holders has voted to accept the plan.

**III.**

**VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS**

**A.     Ballots and Voting Deadline**

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to Claimants (or their authorized representative) entitled to vote.  After carefully reviewing the Disclosure Statement, including all exhibits, each Claimant entitled to vote should indicate its vote on the enclosed ballot.  All Claimants entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the deadline (the "Voting Deadline") for the ballot to be considered.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than May 27, 2010, at 4:00 p.m. Central Time, at the following address:

Ms. Catherine A. Burrow
Diamond McCarthy LLP
909 Fannin, Suite 1500
Houston, Texas  77010
Fax: (713) 333-5195

**BALLOTS MUST BE RECEIVED AT THE ABOVE ADDRESS NO LATER THAN MAY 27, 2010, at 4:00 P.M. CENTRAL TIME.  ANY BALLOTS RECEIVED AFTER THAT DEADLINE WILL NOT BE COUNTED.  HOWEVER, ANY BALLOTS SUBMITTED AFTER MAY 21, 2010 MUST ADDITIONALLY BE TRANSMITTED ELECTRONICALLY PRIOR TO THE VOTING DEADLINE TO COUNSEL FOR THE DEBTORS,          BRIAN          A.          ABRAMSON,          AT BABRAMSON@DIAMONDMCCARTHY.COM AND COUNSEL FOR C1 TRUST, WILLIAM GREENDYKE, AT WGREENDYKE@FULBRIGHT.COM.  SO LONG AS SUCH BALLOTS ARE RECEIVED ELECTRONICALLY BY COUNSEL FOR THE DEBTORS AND C1 TRUST PRIOR TO THE VOTING DEADLINE, THESE BALLOTS MAY BE RECEIVED PHYSICALLY (WHETHER BY MAIL, FACSIMILE, OR HAND DELIVERY) AS LATE AS CLOSE OF BUSINESS ON MAY 31, 2010.**

**B.     Claimants Entitled to Vote**

Any Claimant of the Debtors whose Claim is impaired under the Plan is entitled to vote if either (i) the Debtors have scheduled the Claimant's Claim and such scheduled Claim is not identified as disputed, contingent or unliquidated, or (ii) the Claimant has filed a proof of Claim on or before the deadline set by the Bankruptcy Court for such filings.  Any holder of a Claim or interest as to which an objection has been filed (and such objection is still pending) is not entitled

7

to vote, unless the Bankruptcy Court (on motion by a party whose Claim or interest is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan. In addition, a Claimant's vote may be disregarded if the Bankruptcy Court determines that the Claimant's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

**C.      Bar Date for Filing Proofs of Claim**

The Bankruptcy Court established a bar date for filing proofs of Claim or Equity Interests in these Chapter 11 cases of September 8, 2009.

**D.      Definition of Impairment**

Under Bankruptcy Code section 1124, a class of claims or equity interests is impaired under a plan of reorganization/liquidation unless, with respect to each claim or equity interest of such class, the plan:

1.    leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest;

2.    notwithstanding any contractual provision or applicable law that entitles the holder of a claim or interest to receive accelerated payment of his claim or interest after the occurrence of a default;

   (a)    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Bankruptcy Code section 365(b)(2);

   (b)    reinstates the maturity of such claim or interest as it existed before the default;

   (c)    compensates the holder of such claim or interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

   (d)    if such claim or such interest arises from any failure to perform a nonmonetary obligation, other that a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

   (e)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or interest.

8

E.      **Classes Impaired Under the Plan**

Except for the creditors holding claims in Classes A and B-1, all Classes of Claims are impaired under the Plan.  Therefore, all holders of those Claims are eligible, subject to the limitations set forth above, to vote to accept or reject the Plan.

F.      **Vote Required for Class Acceptance**

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that actually cast ballots for acceptance or rejection of the plan; that is, acceptance takes place only if creditors holding claims at least two-thirds in amount of the total amount of claims and more than one-half in number of the creditors actually voting cast their ballots in favor of acceptance.

G.      **Information on Voting and Ballots**

1.      **Transmission of Ballots to Creditors**

Except as otherwise provided in the **Order Approving Third Amended Disclosure Statement Under 11 U.S.C. § 1125 in Support of the Third Amended Plan of Reorganization**, entered on May 3, 2010, ballots are being forwarded to all Claimants except the Class of Equity Interests.

2.      **Ballot Tabulation Procedures**

For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(a)     If no proof of Claim has been timely filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules of Assets and Liabilities, as and if amended, to the extent such Claim is not listed as contingent, unliquidated or disputed, and the Claim shall be placed in the appropriate Class, based on the Debtors' records, and consistent with the Schedules of Assets and Liabilities, the Claims registry of the Clerk of the Bankruptcy Court (the "Clerk") and the respective registry of holders of interests;

(b)     If a proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the proof of Claim filed with the Clerk;

(c)     Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes, except to the extent and in the manner that the Debtors indicate

9

in their objection that the Claim should be allowed for voting or other purposes;

(d)    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(e)    If a Claimant or its authorized representative did not use the Ballot, as applicable, provided by the Debtors, or the Official Ballot Form authorized under the Federal Rules of Bankruptcy Procedure, such Ballot will not be counted;

(f)    If the Ballot is not received by the Debtors on or before the Voting Deadline at the place fixed by the Bankruptcy Court, the Ballot will not be counted;

(g)    If the Ballot is not signed by the Claimant or its authorized representative, the Ballot will not be counted;

(h)    If the individual or institution casting the Ballot (whether directly or as a representative) was not the holder of a Claim on the Voting Record Date (as that term is defined below), the Ballot will not be counted;

(i)    If no Ballots are received on or before the Voting Deadline with respect to a particular class of Claims, then the Debtors may ask the Bankruptcy Court to deem such class of Claims as accepting the Plan;

(j)    Whenever a Claimant (or its authorized representative) submits more than one Ballot voting the same Claim(s) before the applicable deadline for submission of Ballots, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the voter's intent and shall supersede any prior Ballots.

### 3.    Execution of Ballots by Representatives

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Debtors' request, must submit proper evidence satisfactory to the Debtors of their authority to so act.

### 4.    Waivers of Defects and Other Irregularities Regarding Ballots

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtors in their sole discretion, whose determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The

Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until any irregularities have been cured or waived.

### 5. Withdrawal of Ballots and Revocation

Any holder of a Claim (or its authorized representative) in an impaired Class who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to counsel for the Debtors at any time before the Voting Deadline.

To be valid, a notice of withdrawal must: (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims; (ii) be signed by the Claimant (or its authorized representative) in the same manner as the Ballot; and (iii) be received by counsel for the Debtors in a timely manner at the addresses set forth herein.  The Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots that are not received in a timely manner by the Debtors will not be effective to withdraw a previously furnished Ballot.

Any Claimant (or its authorized representative) who has previously submitted a properly completed Ballot to counsel for the Debtors before the Voting Deadline may revoke such Ballot and change its vote by submitting to counsel for the Debtors before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

## H.    Confirmation of the Plan

### 1.    Solicitation of Acceptances

The Debtors are soliciting your vote for acceptance of the Plan.  The Debtors will bear the cost of any solicitation.  No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL**

11

**REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.**

**THIS IS A SOLICITATION SOLELY BY THE DEBTORS, AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY OR ACCOUNTANT FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTORS AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS OR ACCOUNTANTS, EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

The solicitation of votes on the Plan is governed by Bankruptcy Code section 1125(b). Violation of Bankruptcy Code section 1125(b) may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

**2.       Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied, in which event the Bankruptcy Court shall enter an Order confirming the Plan. For the Plan to be confirmed, Bankruptcy Code section 1129 requires that:

(a)      The Plan comply with the applicable provisions of the Bankruptcy Code;

(b)      The Debtors comply with the applicable provisions of the Bankruptcy Code;

(c)      The Plan be proposed in good faith and not by any means forbidden by law;

(d)      Any payment or distribution made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expense in connection with the Plan be disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment be subject to the approval of the Bankruptcy Court as reasonable;

(e)      The Debtors disclose the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Equity Interest holders and with public policy; and the Debtors disclose the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider;

(f)     Any government regulatory commission with jurisdiction (after confirmation of the Plan) over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)     With respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.  If Bankruptcy Code section 1111(b)(2) applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtors' interest in the property that secures that Claim;

(h)     Each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

(i)     Except to the extent that the holder of a particular Administrative Claim or Priority Claim has agreed to a different treatment of its Claim or as otherwise provided by the Bankruptcy Code, the Plan provides that Administrative Claims and Priority Claims shall be paid in full on the Effective Date or the Allowed Date;

(j)     If a Class of Claims is impaired under the Plan, at least one such Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class; and

(k)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan is proposed in good faith.  The Debtors believe they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 3.      Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of a Claim (or its authorized representative) is important.  Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan in order for the Court to confirm the Plan.  Generally, to be confirmed under the acceptance provisions of Bankruptcy Code section 1126(a), the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds in

dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan.   Even if all Classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.  In the event that this Plan is not confirmed for any reason, an alternative plan may be proposed by the Debtors, or if the Court permits, by any other party.

       4.       **Cramdown**

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Equity Interests.   "Fair and equitable" has different meanings for holders of secured and unsecured Claims and Equity Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the impaired Secured Creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal to the allowed amount of its Claims with a present value as of the Effective Date of the Plan at least equal to the value of such Creditor's interest in the property securing its liens, (ii) property subject to the lien of the impaired Secured Creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

With respect to an Unsecured Claim, "fair and equitable" means either (i) each impaired Creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

With respect to Equity Interests, "fair and equitable" means either (i) each impaired Equity Interest receives or retains, on account of that Equity Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the Equity Interest; or (ii) the holder of any Equity Interest that is junior to the Equity Interest of that Class will not receive or retain under the Plan, on account of that junior Equity Interest, any property.

In the event at least one Class of impaired Claims or Equity Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Equity Interests and is confirmable.  Section 6.3 of the Plan constitutes the Debtors' request, pursuant to Bankruptcy Code section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of

14

section 1129(a)(8) may not be met and their intent to pursue a cramdown if necessary to confirm the Plan.

## IV.

## BACKGROUND OF THE DEBTORS

### A.    The Debtors' Background

Debtor ALP is a limited partnership formed in December 2006 under the laws of Texas to acquire the real estate and apartment complex assets currently owned by the Debtors and described below.  ALP's general partner is Amaravathi Management, LLC, which owns 1% of ALP.  Amaravathi Interests LLC is ALP's 99% limited partner.

Debtor Keerthi is a limited liability company formed in December 2006 under the laws of Delaware.  Keerthi Monterone, LLC is the sole member of Keerthi.  Chowdary "Charlie" Yalamanchili, George Stallings and Bhaskar Patel serve as managers of Keerthi Monterone, LLC.

Keerthi was formed by Keerthi Limited Partnership, a Florida limited partnership ("KLP") that owned the Wellington Place Apartments in Clay County, Florida ("Original Property").  KLP sold the Original Property in the fall of 2006 and organized Keerthi to acquire replacement properties in a tax deferred exchange under Section 1031 of the United States Internal Revenue Code (26 U.S.C. § 1031).  Keerthi, then owned 100% by KLP, entered into a tenancy-in-common agreement with ALP and used the proceeds from the sale of the Original Property to acquire an undivided interest in the Debtors' current apartment properties pursuant to the tenancy-in-common agreement.

KLP transferred all interests in Keerthi to Keerthi Monterone, LLC, a Delaware limited liability company, in compliance with a request by KLP's lenders.

### B.    The Debtors' Business

The Debtors own four luxury apartment complexes in the Austin, Texas metropolitan area, all rated "Double A" or better (collectively, the "Properties").  Each Property is described below in subsection D.  Under the tenancy-in-common agreement, ALP owns an undivided 80% interest in each Property and Keerthi owns an undivided 20% interest in each Property.  There are no claims unique to only ALP or Keerthi.  Rather, all claims, assets and liabilities are common to both ALP and Keerthi on an 80%/20% basis.  There are no creditors unique to only ALP or Keerthi.

The Debtors generate the majority of their revenues from rental income associated with the Properties.  The Debtors have approximately 1,200 tenants in the Properties.

## C.     The Debtors' Management Company

The Debtors retain a professional apartment management company, CNC, to manage the Properties under three separate Management Agreements.  The Management Agreements were required by Column Financial, Inc as part of the commercial mortgage loan transactions described more fully below.  Pursuant to the Management Agreements, CNC handles the day-to-day management and operation of the Properties for a management fee derived as 3% of rents collected from the Properties.  CNC has been operating the Properties since the Debtors purchased the Properties in December 2006.

As part of this Plan, CNC will be replaced as management company at the Properties by Greystar, and the Reorganized Debtors will work with Greystar to negotiate acceptable replacement Management Agreements.

## D.     Description of the Properties

**Mansions on the Green I & II.**  The Mansions on Green apartments are comprised of two neighboring developments in Round Rock, Texas, a northern suburb of Austin.  Mansions on the Green I is located at 7710 O'Connor Drive, Round Rock, Williamson County, Texas 78681 (the "Green I Property").  Mansions on Green II is located at 7720 O'Connor Drive, Round Rock, Williamson County, Texas 78681 (the "Green II Property," together with the Green I Property, the "Green Properties").

The Mansions on the Green (including both the Green I and Green II Properties), built in 2000, includes 583 apartments in 26 two-story buildings located on over 18 acres of land. The Green Properties include amenities such as resort style swimming pools and jacuzzi, jogging and walking trials, basketball court, tennis court, putting green, a 10,000 square foot clubhouse and fully equipped business center.

**Mansions at Canyon Creek.**  The Mansions at Canyon Creek are located in 620 corridor of northwest Austin at 9009 RR-620 N Austin, Travis County, Texas 78726 (the "Canyon Creek Property").

The Mansions Canyon Creek, built in 2001, includes 332 apartments in 27 two-story buildings located on over 27 acres of land.  The Canyon Creek Property includes amenities such as resort style swimming pools and jacuzzi, jogging and walking trials, sand volleyball court, tennis court, a 10,000 square foot clubhouse, fully equipped business center and a billiard room.

**Mansions at Steiner Ranch**.  The Mansions at Steiner Ranch are located in the exclusive Steiner Ranch community on Lake Travis at 4500 Steiner Ranch Blvd., Austin, Travis County, Texas 78732 (the "Steiner Ranch Property").

The Mansions at Steiner Ranch, built in 2003, includes 502 apartments in 36 two and three-story buildings located on over 118 acres of land.  The Steiner Ranch Property includes amenities such as resort style swimming pools and jacuzzi, state-of-the-art health club, natural hike and bike trials, a 25,000 square foot clubhouse, theatre, billiard room, and business and conference centers.

**E.      The C1 Trust Notes**

The Debtors financed most of the purchase price for their acquisition of the Properties with commercial mortgage loans secured by the Properties.  In December 2006, the Debtors entered into four separate Promissory Notes for the Green I Property, Green II Property, Canyon Creek Property and Steiner Ranch Property, respectively, with Column Financial, Inc. (the "Original Noteholder") in the cumulative original principal amount of $180,234,000.00 (the "Promissory Notes").

Pursuant to the Promissory Notes, which were subsequently amended to decrease the rate of interest, the Debtors agreed to make monthly interest only payments, at the rate of 5.77% per annum, beginning on February 11, 2007 and continuing through December 11, 2016.  The entire outstanding principal balance is due on January 11, 2017.  In addition to the Debtors' interest only payments, the Debtors were required to pay $20,234,000.00 of the principal amount to the Original Noteholder within twelve months of the closing of the loan.  The Debtors fulfilled this obligation by obtaining four mezzanine loans (one for each of the Properties) from Rubicon Mezzanine Loan Fund I, LLC ("Rubicon") in the name of Amaravathi Management, LLC, general partner of ALP, and Keerthi Monterone, LLC, managing member of Keerthi.  As of the Petition Date, the remaining principal balance of the Promissory Notes is approximately $160,000,000.00.

The Promissory Notes are secured by first priority liens on substantially all of the Debtors' assets, including but not limited to, all real property, leases, rents and accounts, as evidenced by: (1) the Promissory Notes in connection each of the Properties; (2) four separate Deed of Trust and Security Agreements dated December 28, 2006, in favor of the Original Noteholder in connection with each of the Properties (the "Deeds of Trust"); (3) four separate Assignments of Leases and Rents dated December 28, 2006, in favor of Original Noteholder in connection with each of the Properties (the "Assignments of Rents").

On or about August 7, 2008, pursuant to various assignments, endorsements and/or transfers the Original Noteholder assigned the Promissory Notes and related security documents to Wells Fargo Bank, N.A., as trustee for the Registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Pass-Through Certificates, Series 2007-C1 (the "C1 Trust").  The Promissory Notes are hereinafter referred to as the "C1 Trust Notes," and the associated mortgage and security documents are referred to as the "C1 Security Documents."

**V.**

**EVENTS LEADING TO BANKRUPTCY**

**A.      Reasons for Filing Chapter 11**

**1.      Economic and Market Challenges**

Since 2006, the Austin and Round Rock real estate markets have faced significant unanticipated economic hardships.   These hardships stemmed initially from the obvious downturns in the economy, which have been felt throughout Austin and Round Rock, where

17

thousands of people are currently unemployed or underemployed. These problems are exacerbated in the Austin and Round Rock real estate markets, where the past several years have seen an enormous growth in the building of upscale apartment complexes and other residential housing like the Debtors' Properties. Throughout Austin and Round Rock, this dire combination of a down economy and increased capacity has resulted in reduced occupancy levels and average monthly rents, and increased costs to fill apartment vacancies. Accordingly, apartment complexes like the Debtors' Properties have increasingly been unable to achieve their expected revenues and maximize values.

Despite the tough real estate market in Austin and Round Rock, the Debtors' Properties have fared exceedingly well in comparison with comparable properties, where occupancy levels at some competitor properties in Round Rock have dipped to as low as approximately 40%. Current occupancy at the Properties is, on average, approximately 92%.

### 2.    CNC helps the Debtors service the C1 Trust Debt

Despite these economic and market challenges, the Debtors worked diligently to comply with the terms and conditions of the C1 Trust Notes from the inception of the loans in December 2006 through February 2009. The Debtors' efforts to satisfy the terms and conditions of the C1 Trust Notes are highlighted by the fact that, since nearly the inception of the C1 Trust Notes, total revenues from the Properties often did not leave enough monies available for the Debtors to cover both operating expenses and debt service. Nevertheless, the Debtors did not default, but rather covered operating expenses and debt service through loans made to the Debtors by CNC. As of the Petition Date, the CNC loans to the Debtors total in excess of $9 million (the "CNC Debt"). As explained more fully below, C1 Trust contested the characterization of these loans as debt rather than equity. However, this dispute between C1 Trust and CNC over the CNC Claim was resolved at mediation, and their agreement is implemented as part of the Plan.

### 3.    The Debtors' Work to Restructure the C1 Trust Notes

In February 2009, the Debtors reached out to Capmark Finance Inc., master servicer of the C1 Trust Notes ("Capmark") and Midland Loan Services, Inc., special servicer of the C1 Trust Notes ("Midland"), to restructure the C1 Trust Notes out of court. After initiating discussions with Capmark and Midland, the Debtors hired 1st Service Solutions ("1st Service") to assist the Debtors in communications with Capmark and Midland.

Upon being retained in late February 2009, 1st Service immediately contacted Capmark to explain the Debtors' dire economic circumstances, and to request some level of debt service relief to allow the Debtors to continue owning the Properties. In doing so, 1st Service requested that the C1 Trust Notes be transferred immediately to Midland, in its capacity as special servicer, because of Midland's ability to entertain modification alternatives. The C1 Trust Notes were subsequently transferred to Midland.

Through 1st Service and on their own, the Debtors requested meetings with senior decision makers at Midland, offered profit sharing and other viable options for restructuring the debt, provided all requested (and even some not requested) accounting and financial information,

Debtors' Third Amended Disclosure Statement
213423v1

communicated the accomplished track record and past successes of CNC, and bombarded Midland with phone calls, letters, and e-mails requesting that Midland consider the Debtors' proposals.   Notwithstanding these efforts, the Debtors and C1 Trust could not reach a restructuring agreement.

### 4.      The March 2009 Default

In March 2009, for the first time, the Debtors failed to make their full monthly interest payment to C1 Trust by failing to deposit all of the rents in the "lockboxes" pursuant to the operative Cash Management Agreements.   Contrary to C1 Trust's allegations of potentially misappropriated rental income from the Properties during this time, the Debtors used the decreased rental income to maintain and improve the Properties, and undertake efforts aimed at securing additional tenants.   The Debtors have properly accounted for all distributions of rental income from the Properties throughout the Debtors' ownership of the Properties, including February through April 2009.   Despite failing to make their March 2009 payment to C1 Trust, the Debtors continued to reach out to Midland and work towards a mutually beneficial restructuring of the C1 Trust Notes.

### 5.      C1 Trust's Receivership Action

On or about April 22, 2009, C1 Trust, acting by and through Midland, without notice or an opportunity to cure, alleged certain defaults on the C1 Trust Notes, and thereafter initiated proceedings in Williamson County, Texas to obtain a temporary restraining order against the Debtors and appoint a receiver for the Properties.

On April 22, 2009, without any notice to the Debtors of these proceedings, and without any hearing wherein the Debtors could present evidence or opposing arguments, the Williamson County Court entered the temporary restraining order and ordered the appointment of receiver for the Properties.   Upon appointment, Mr. Jay Parmmelee, the receiver (the "Receiver"), commenced actions to gain possession of the Properties.   On the evening of Wednesday April 22, 2009, the Debtors peacefully left the Properties.

### 6.      The Debtors Seek Relief from the Bankruptcy Court to Protect the Properties

The Debtors sought to amicably resolve the crisis facing the Properties by the *ex parte* appointment of the Receiver and the orders that C1 Trust had obtained from the state court judge in Williamson County.   However, the Debtors and C1 Trust could not reach a mutually agreeable resolution under which the Debtors could continue owning or operating the Properties.   The Debtors thereafter filed these Chapter 11 cases in this Court on the afternoon of April 23, 2009, at which time the Receiver left the Properties.

The Debtors filed these Chapter 11 cases to protect the Properties as going concern businesses and to preserve the Properties value for all of the Debtors' creditors and interest holders.   The Debtors have put forth the Plan in good faith to reorganize their capital structure to provide the highest recovery possible for all of the Debtors' creditors and interest holders.

Debtors' Third Amended Disclosure Statement
213423v1

### 7.    The Joint Marketing Proposal

After several months in bankruptcy, the Debtors negotiated with C1 Trust to develop a Joint Marketing Proposal under which, among other items, the Debtors and C1 Trust would work together to retain a marketing company to provide potential investors with an opportunity to bid on the Properties themselves as a portfolio, through a sales process to be implemented by a plan of reorganization designed to address all obligations of the Debtors' estates (the "Properties Option" to be marketed by the "Properties Marketing Company").

The Debtors viewed the Properties Option as an avenue to both establish the market value of the Properties and potentially locate a buyer willing to maximize returns to the Debtors' creditors.

The Debtors retained Apartment Realty Advisers ("ARA") as the Properties Marketing Company.  The marketing process resulted in over 50 offers ranging from $79 million to $140 million (the highest offer initially considered was $133 million), with anywhere from $0 to $20 million down as a cash payment.  Based on advice from ARA, the Debtors and C1 Trust agreed to a best and final offer process, under which the top 13 prospective purchasers were provided with an opportunity to raise their offers.  The best and final offer process ultimately resulted in offers ranging from $123 million to $150 million (the top legitimate offer was $140 million), with anywhere from $0 to $15 million down as a cash payment.

After the best and final offer process, the Debtors and C1 Trust mutually agreed that the offer from Levin Realty Advisors LLC ("Levin") constituted the highest and best offer.  Levin offered a purchase price of $139.5 million, with $10 million down as a cash payment, and assumption of the remaining $129.5 million to be set forth in modified loan documents negotiated by the parties.

### 8.    Mediation and the Global Settlement Agreement

Even after the results of the Joint Marketing Proposal, several disputes exist among the Debtors, C1 Trust, CNC and Charlie Yalamanchili, all of which threatened to impede the development of a consensual plan of reorganization.  Specifically, in addition to the general plan treatment disputes between the parties, the following disputes exist among the parties: (a) Case No. 09-20670-C1 Trust v. Debtors, in the United States Court of Appeals for the Fifth Circuit; (b) Civil Action No. 4:09-CV-01499-C1 Trust v. Mr. Yalamanchili, in the United States District Court for the Southern District of Texas, Houston Division; (c) Cause No. 09-370-C277-C1 Trust v. Debtors, in the 277th Judicial District Court of Williamson County, Texas; and (d) C1 Trust v. CNC-Contested Matter: Claim Objection RE: Claim No. 30 (as amended), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

Accordingly, in an effort to potentially pave the way for a consensual plan of reorganization, the Bankruptcy Court ordered the parties to mediate their disputes.  After two full day mediation sessions conducted by John F. Higgins on March 10, 2010 and March 16, 2010, a comprehensive compromise settlement was reached among the Debtors, C1 Trust, CNC and

Charlie Yalamanchili. The Plan incorporates and constitutes this comprehensive compromise and settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure among the Debtors, C1 Trust, CNC and Charlie Yalamanchili, which is incorporated by reference and attached hereto at Exhibit 4 to this Disclosure Statement (the "Global Settlement Agreement").

Without the resolution set forth in the Global Settlement Agreement, the disputes existing among the Debtors, C1 Trust, CNC and Charlie Yalamanchili would have resulted not only in litigation (in various forums), but also would have resulted in litigation and disputes regarding the treatment of C1 Trust and CNC's claims under the Plan. But for the Global Settlement Agreement, the Debtors would likely have expended substantial time and resources relating to plan disputes and contesting hearings on all issues.

The Debtors assert that the Global Settlement Agreement satisfies those conditions that courts should consider and evaluate when determining whether a settlement is fair and equitable, and that the Global Settlement Agreement is in the best interests of the Debtors' estates and its creditors. *See Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 425 (1968); *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355-56 (5th Cir. 1997); *In re Jackson Brewing Co.*, 624 F.2nd 599, 609 (5th Cir. 1995); *Matter of Foster Mortgage Corp.*, 68 F.3rd 914, 917 (5th Cir. 1994). Specifically, the Global Settlement Agreement was negotiated by the parties in good faith and at arm's length. The Global Settlement Agreement is beneficial to the estates, because: (i) it avoids extensive and expensive litigation; (ii) it resolves complex issues; (iii) it allows confirmation to proceed expeditiously; and (iv) it is a fair resolution of outstanding issues.

### 9.    The Debtors Continue to Pursue Both Alternatives

As set forth more fully in Exhibit 4 to this Disclosure Statement, the Debtors recognize that certain conditions exist (including, but not limited to, approval from C1 Trust's Committee), which could potentially derail the ultimate implementation of the Global Settlement Agreement. The Debtors, C1 Trust, CNC and Charlie Yalamanchili are all working diligently to satisfy the remaining conditions set forth in the Global Settlement Agreement. However, while the parties work through these remaining conditions, the Debtors and C1 Trust are continuing to work and negotiate with Levin (who, as stated above, the Debtors and C1 Trust both agree to have proposed the highest and best offer through the Joint Marketing Proposal) on the terms of a Purchase Money Contract. The Debtors intend to continue these efforts with Levin until all remaining conditions in the Global Settlement Agreement are fully satisfied or waived, and deem the pursuit of both alternatives at this time to be in the best interest of the estates' creditors and parties in interest.

### B.    Assets and Liabilities

In the Schedules of Assets and Liabilities filed in these cases, the Debtors list their assets and liabilities in proportion to their undivided ownership interests in the Properties pursuant to the tenancy-in-common agreement (80% for ALP and 20% for Keerthi). In the Schedules, the Debtors previously listed their assets in an "unknown" amount due to undetermined value of their primary assets, the Properties. The Debtors thereafter sought authority from the Court to

Debtors' Third Amended Disclosure Statement
213423v1

retain David R. Bolton of Bolton Real Estate Consultants, Ltd. to perform an appraisal of the Properties, and Mr. Bolton has subsequently appraised the Properties at an estimated value of $113 million as of June 26, 2009.  As noted above, the Joint Marketing Proposal resulted in legitimate offers in the $123 million to $140 million range.  For purposes of the Plan, the Debtors and C1 Trust have agreed through negotiations during these cases and at mediation that C1 Trust holds an Allowed Secured Claim in the amount of $140 million.  This agreement between the Debtors and C1 Trust is not intended to serve as an admission by the Debtors or Reorganized Debtors regarding the actual value of the Properties.

### 1.    Assets

The Debtors' primary assets are the Properties and the personal property detailed in each Debtor's Schedule B filed with the Bankruptcy Court.

### 2.    Liabilities

The primary liabilities of the Debtors include (i) the C1 Trust Notes, (ii) accrued real estate taxes for January 1, 2010 through the Effective Date (which, as described below, are currently being escrowed by the Debtors and will be transferred over to C1 Trust, to be held in a separate account, for purposes of ensuring that 2010 real estate taxes are paid in full when they become due under Texas state law), (iii) home owner association fees by the Cat Hollow at Brushy Creek and Steiner Ranch home owners associations ("HOAs"); (iv) various mechanic and materialmen lien claims; (v) general trade creditor claims; (vi) claims by CNC for loans to the Debtors; and other claims detailed in the Schedules and in proofs of claim filed in these cases.

3.    **Litigation**

The Debtors are parties to the following litigation matters:

| Caption | Case Number | Nature Of Proceeding | Court | Status | Attorney Representing Debtors |
|---|---|---|---|---|---|
| Paul Gates v. Monterone Round Rock | 09-0338CC4 | Deposit Dispute | County Court at Law No. 4 for Williamson County | Settlement Reached | None at  this time |
| Chris & Christine Johnson v. Monterone Steiner Ranch | 011438 | Deposit Dispute | Small Claims Court, Precinct No. 4 for Travis County, Texas | Settlement Reached | None at this time |
| Cat Hollow at Brushy Creek Owners Assoc. v. Western Rim Investors, *et al.* | 06-1058-C368 | Claim for Association Dues | District Court of Williamson County, Texas | Pending | Harvey Heller |
| Cat Hollow at Brushy Creek Owners Assoc. v. Western Rim Investors, *et al.* | 09-356-C368 | Claim for Association Dues | District Court of Williamson County, Texas | Pending | Harvey Heller |
| Minton et al. v. ALP and Keerthi | C-1-CV-09-004940 | Recovery of Attorneys' Fees | County  Court at Law No. 2 for Travis County, Texas | Judgment Granted for Plaintiff | None at this time |
| Wells Fargo Bank, Trustee v. Amaravathi LP, *et al.* | 09-370C277 | Receivership Action | District Court of Williamson County, Texas | Pending | No attorney formally retained prior to automatic stay |
| ALP v. Williamson County Appraisal District | 07-766-C26 | 2007 and 2008 Property Tax Valuations | District Court of Williamson County, Texas | Pending | O'Connor, Craig, Gould & Evans |
| ALP v. Travis County Appraisal District | D-1-GN-07-002981 | 2007 and 2008 Property Tax Valuations | District Court of Travis County, Texas | Pending | O'Connor, Craig, Gould & Evans |

With respect to the litigation pending with Paul Gates and Chris & Christine Johnson, the plaintiffs assert claims for security deposits as an offset to claims that the plaintiffs improperly terminated their residential leases.  The Debtors deny any liability.  Prior to the Petition Date, the Debtors were in communication with these plaintiffs to settle these lawsuits, and the Debtors are confident that these lawsuits can be resolved for nominal amounts.

With respect to the litigation pending with Cat Hollow at Brushy Creek Owners Association, the plaintiffs assert claims of past due association dues.  The plaintiffs seek to recover $148,214.82 (plus they will likely seek to add on 2010 dues to this alleged amount).  The Debtors deny any liability and intend to defend this lawsuit.  The Debtors estimate the cost to defend the lawsuit will total approximately $10,000.  Additionally, it should be noted that the Debtors are currently in discussions with Cat Hollow at Brushy Creek Owners Association to try

and settle the claim for an agreed upon Allowed amount.  This paragraph will be updated should such settlement discussions ultimately result in a settlement approved by the Bankruptcy Court.

With respect to the lawsuit filed by Minton against the Debtors, the Plaintiff claims approximately $15,000.00 in damages relating to past due attorneys' fees from 2007.  The Debtors were unaware that this lawsuit was filed during the pendency of these bankruptcy cases, and a judgment was entered in June 2009.  Upon becoming aware of the lawsuit and judgment, the Debtors have sent correspondence to the Court and the Plaintiff's counsel informing them of the Debtors' bankruptcy, the automatic stay, and the need to vacate the judgment granted during the pendency of the Debtors' bankruptcy.

With respect to the seventh lawsuit currently pending in the District Court of Williamson County Texas, styled *Wells Fargo Bank, Trustee v. Amaravathi LP*, *et al.*, Plaintiff has asserted claims against the Debtors based, in part, on certain defaults that occurred under C1 Trust's loan documents.  Plaintiff also sought the appointment of a receiver based, in part, on alleged mismanagement and misappropriations of rental income.  The state court granted plaintiff's request for the appointment of a receiver, thus prompting this bankruptcy filing.  On the Effective Date, this litigation will be dismissed.

Finally, the Debtors currently have lawsuits pending against the Williamson County and Travis County Appraisal Districts relating to the overvaluation of the Debtors' Properties in 2007 and 2008.  The Debtors have sought authority from the Court to employ O'Connor, Gould, Evans and Craig as special litigation counsel for these lawsuits.  The legal fees and expenses to prosecute this litigation are 15% of the tax savings awarded.  The Debtors' Properties are currently valued at approximately $180,000,000.00 total by the taxing authorities, resulting in a significant and burdensome property tax payment.  The Debtors are confident that, through the pending litigation, the appraised value of the Properties will be substantially diminished, resulting in an appreciable property tax savings to the Reorganized Debtors going forward.

Unless these lawsuits are resolved prior to the Effective Date, the Debtors intend to object to the claims filed by the opposing side in these lawsuits and have such claims adjudicated by the Bankruptcy Court.

## VI.

## POST-BANKRUPTCY OPERATIONS AND SIGNIFICANT EVENTS

### A.    Post-Bankruptcy Operations

Since the Petition Date, the Debtors have continued to manage their properties for the benefit of creditors as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

## B.        Significant Orders Entered During the Cases

On the Petition Date, in addition to filing the Petition, the Debtors filed a Motion for Joint Administration (Docket No. 3), asking the Bankruptcy Court to transfer the Debtors' two Chapter 11 cases to the same judge and jointly administer the two cases under one lead case number.  On April 27, 2009, the Bankruptcy Court entered its Order for Joint Administration (Docket No. 10).  Pursuant to this order, Judge Marvin Isgur jointly administers the Debtors' cases under Case No. 09-32754.

The Debtors also filed their Emergency Motion for Interim and Final Order (I) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code § 363(C); (II) Granting Adequate Protection Pursuant to § 363; and (III) Setting Final Hearing Pursuant to Bankruptcy Rule 4001(B) (the "Cash Collateral Motion," Docket No. 2).

On April 24, 2009, the Court held a hearing on the Cash Collateral Motion and entered an agreed interim order, authorizing the Debtors' use of cash collateral through May 7, 2009, pursuant to an interim cash collateral budget.  On May 7, 2009, the Court held a further hearing on the Cash Collateral Motion and entered an additional interim order extending the Debtors' use of cash collateral through May 20, 2009, pursuant to an extended interim budget.

On May 14, 2009, C1 Trust filed an objection to the Cash Collateral Motion arguing, among other objections, that the Assignment of Rents the Debtors executed with the Original Noteholder provided C1 Trust absolute ownership of the rents the Debtors collect from the Properties.  C1 Trust asserted that this assignment deprived the Debtors and their estates of any interest in these rents, preventing the Court from allowing the Debtors to use the rents as "cash collateral."

On May 19, 2009, the Debtors filed their response to C1 Trust's objection, maintaining that the Debtors' rents are property of the Debtors' estates and that the Assignment of Rents was merely a "collateral assignment," granting C1 Trust a security interest in, but not title to, the rents from the Properties.  Accordingly, the Debtors asserted that the rents they collect from the Properties are cash collateral that the Debtors may use to operate the Properties and preserve the value of the estates for all creditors.

On May 20, 2009, the Court held an evidentiary hearing and received argument from the parties to determine whether Debtors may use rents as cash collateral.  The Court held that the Debtors could use rents as cash collateral, and thereafter entered a Corrected Final Order Authorizing the Debtors' Use of Cash Collateral on June 4, 2009.

On June 3, 2009, the Court entered its Final Order Authorizing the Debtors' Use of Cash Collateral, and a "corrected" Final Order Authorizing the Debtors' Use of Cash Collateral was entered the next day, June 4, 2009 (the "Cash Collateral Order").  The Debtors' continued use of cash collateral has been approved through subsequent Orders authorizing the use of cash collateral entered on August 10, 2009; October 15, 2009; and January 15, 2010.

On June 15, 2009, C1 Trust filed its Notice of Appeal of the Cash Collateral Order. Thereafter, on June 26, 2009, C1 Trust filed its Unopposed Expedited Request for Certification Pursuant to 28 U.S.C. § 158(d)(2) and Rule 8001(f) of the Federal Rules of Bankruptcy Procedure, which seeks direct certification of its appeal of the Court's Cash Collateral Order. Certification of the appeal to the Fifth Circuit Court of Appeals was approved by Order entered by the district court on July 24, 2009; however, the appeal has been stayed pursuant to Joint Marketing Proposal discussed below.

## C.    Professionals

### 1.    Professionals Employed by the Debtors

On May 1, 2009, the Debtors filed their application to employ the law firm of Diamond McCarthy LLP ("Diamond McCarthy") as its general bankruptcy counsel in connection with the Chapter 11 cases (the "Application to Employ Diamond McCarthy"). The Bankruptcy Court approved the Debtors' Application to Employ Diamond McCarthy on June 4, 2009.

On June 23, 2009, the Debtors filed their application to employ David R. Bolton of Bolton Real Estate Consultants, Ltd. as appraiser for the Debtors (the "Application to Employ Bolton"). The Bankruptcy Court approved the Debtors' Application to Employ Bolton on July 22, 2009.

On July 10, 2009, the Debtors filed their application to employ O'Connor, Craig, Gould & Evans ("O'Connor") as special counsel for the Debtors in regards to property tax lawsuits filed on behalf of the Debtors against the Williamson and Travis County taxing authorities (the "Application to Employ O'Connor"). The Bankruptcy Court approved the Application to Employ O'Connor on August 21, 2009.

On September 8, 2009, the Debtors filed their application to employ Apartment Realty Advisors ("ARA") as Properties Marketing Company under the Joint Marketing Proposal submitted by the Debtors and C1 Trust (the "Application to Employ ARA"). The Bankruptcy Court approved the Application to Employ ARA on September 15, 2009.

On September 29, 2009, in accordance with the provisions of the Joint Marketing Proposal, the Debtor filed their Application to Employ Capmark Securities, Inc. ("CapMark") as their equity marketing company (the "Application to Employ CapMark"). The Bankruptcy Court approved the Application to Employ CapMark on October 21, 2009.

Finally, on November 6, 2009, the Debtors filed their application to employ R. David Fritsche ("Fritsche") as special counsel to the Debtors related to eviction disputes at the Debtors' properties (the "Application to Employ Fritsche"). The Bankruptcy Court approved the Application to Employ Fritsche on December 7, 2009.

### 2.    No Committee

No official committees have been appointed in these Chapter 11 cases.

# VII.

# DESCRIPTION OF THE PLAN

## A.      Introduction and General Overview of the Plan

In general, the Plan provides that the Reorganized Debtors will continue owning all of the Properties with modified obligations to C1 Trust to be set forth in modified loan assumption documents.  Distributions will be made to C1 Trust and all other holders of Allowed Claims using available cash on hand as of the Effective Date, allotted funds made available through an equity contribution, and income generated from operations at the Properties.

As part of the Plan, C1 Trust will be provided with eight restructured term loans, one secured term loan and one unsecured term loan for each of the four Properties.  For purposes of the Plan, the Debtors and C1 Trust have agreed through negotiations during these cases and at mediation that C1 Trust holds an Allowed Secured Claim in the amount of $140 million.  This agreement between the Debtors and C1 Trust is not intended to serve as an admission by the Debtors or Reorganized Debtors regarding the actual value of the Properties.

As part of the Plan, on the Effective Date, C1 Trust will be paid $4 million in cash to reduce the $140 million secured loan balance, and the remaining $136 million will be assumed pursuant to four restructured secured term loans, one secured term loan for each of the four Properties.  The restructured secured loans for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.  The four restructured secured term loans will maintain the current maturity date, and will only be modified from their original terms to account for the reduced outstanding secured principal loan balance, interest rate reductions, lowered and modified DSCR provisions (to the extent deemed necessary and applicable by the Debtors), and changed guarantors.

Moreover, as part of the Plan, CNC will resign as the management company for the Properties and be replaced by Greystar, and Rao Kothapalli will replace Charlie Yalamanchili to become the controlling person of both the ultimate general partner of ALP and the ultimate managing member of Keerthi (or of the ultimate subsidiary affiliated controlling entities of ALP and Keerthi).

As part of the Plan, C1 Trust will also receive four restructured unsecured term loans, one unsecured term loan for each of the Properties, totaling $20 million.  This is the amount attributable to the deficiency amount remaining between the current $160 million principal loan balance of the Properties and the amount of C1 Trust's secured claim under this Plan.  The restructured unsecured note for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.  The four restructured unsecured term loans will have the same maturity date as the restructured secured term loans.  The restructured unsecured loans will be modified to reflect their unsecured nature, account for the agreed upon unsecured principal loan balances, and set forth interest rate reductions as agreed to by the parties.

27

The Plan provides for full payment in cash on the Effective Date to all holders of Allowed Claims, other than the Allowed Secured Claim and Deficiency Claim of C1 Trust, the CNC Claim, and claims of Equity Interest Holders.  The Reorganized Debtors will object to any objectionable Claims and will escrow payments to disputed creditors until their claims are allowed or disallowed.

The Plan also proposes that the Reorganized Debtors will receive an equity contribution in the amount of $5 million ($4 million attributable to equity in ALP, and $1 million attributable to equity in Keerthi).  The $5 million contribution, as well as the cash on hand in the Debtors' estates as of the Effective Date, will be allocated by the Debtors and C1 Trust pursuant to agreement by the parties.

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Equity Interests is set out below.  The summary is entirely qualified by the Plan.  This Disclosure Statement is only a summary of the terms of the Plan; it is the Plan and not the Disclosure Statement that governs the rights and obligations of the parties.

## B.    Designation of Claims and Interests

The following is a designation of the Classes of Claims and Equity Interests under the Plan.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expenses, Fee Claims, and Priority Tax Claims are not true Classes for voting purposes, but are included for informational purposes only.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Equity Interest which is not an Allowed Claim or Equity Interest is not in any Class.  Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim or Equity Interest that is not an Allowed Claim or Allowed Equity Interest.  As set forth above, solely for the purposes of voting and receiving distributions under the Plan, ALP's 80% interest and Keerthi's 20% interest in each of the respective claims and classes are consolidated to ensure efficiency and minimize confusion among creditors and interest holders.

**Class A – Unclassified Claims**
A-1   Administrative Expenses
A-2   Priority Non-Tax Claims
A-3   Priority Tax Claims

**Class B – Secured Claims**
B-1   Secured Tax Claims
B-2   C1 Trust Claims

28

**Class C – Unsecured Claims**
C-1    General Unsecured Claims
C-2    C1 Trust Deficiency Claim
C-3    CNC Claim
C-4    Subordinated Claims

**Class D – Equity Interests**
D-1    Equity Interests in ALP
D-2    Equity Interests in Keerthi

C.    **Estimated Size of Allowed Claims in Classes**

| Class | | Impaired | Amount |
|---|---|---|---|
| **Class A – Unclassified Claims** | | | |
| A-1 | Administrative Expenses | No | $215,000.00 |
| A-2 | Priority Non-Tax Claims | No | $0 |
| A-3 | Priority Tax Claims | No | $225,000.00 |
| **Class B – Secured Claims** | | | |
| B-1 | Secured Tax Claims | No | $0 |
| B-2 | C1 Trust Claims | Yes | $140,000,000.00 |
| **Class C – Unsecured Claims** | | | |
| C-1 | General Unsecured Claims | Yes | $746,246.84 |
| C-2 | C1 Trust Deficiency Claim | Yes | $20,000,000.00 |
| C-3 | CNC Claim | Yes | $9,750,028.61 |
| C-4 | Subordinated Claims | Yes | $0 |
| **Class D – Equity Interests** | | | |
| D-1 | Equity Interests in ALP | Yes | N/A |
| D-2 | Equity Interests in Keerthi | Yes | N/A |

D.    **Treatment of Claims and Interests**

1.    **Treatment of Unclassified Claims**

(a)    **Administrative Expenses and Fee Claims**

Administrative Expenses are Claims for any cost or expense of the Chapter 11 cases allowable under Bankruptcy Code sections 503(b) and 507(a)(1). Those expenses include all actual and necessary costs and expenses related to the preservation of the bankruptcy estate or the operation of the Debtors' business, all claims for cure payments arising from the assumption of executory contracts and unexpired leases under Bankruptcy Code section 365, and all United States Trustee quarterly fees.

The holder of any Administrative Expense other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by the Debtors, or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtors and their counsel, notice of such Administrative Expense within 30 days after the Effective Date.

29

### (b)    Fee Claims

Each Person asserting a Fee Claim for services rendered or expenses incurred before the Effective Date shall file with the Bankruptcy Court, and serve on the U. S. Trustee, the Debtors and their counsel, a Fee Application within 30 days after the Effective Date.

Assuming an Effective Date of June 25, 2010, the Debtors estimate there will not be any Fee Claims that have not been previously budgeted for by the Debtors.

### (c)    Allowance of Administrative Expenses

An Administrative Expense with respect to which notice has been properly filed and served pursuant to the Plan shall become an Allowed Administrative Expense if no objection is filed within 30 days after the filing and service of notice of such Administrative Expense.  If an objection is timely filed, the Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by Final Order.  An Administrative Expense that is a Fee Claim, and with respect to which a Fee Application has been timely filed pursuant to section 4.1 of the Plan, shall become an Allowed Administrative Expense only to the extent Allowed by Final Order.

Each holder of an Allowed Administrative Expense Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment to which the holder of such Administrative Expense and the Reorganized Debtors may agree in writing.

The Debtors anticipate incurring the following administrative expenses from attorneys and other professionals and the Texas Comptroller of Public Accounts: (i) legal fees and expenses to be incurred by Diamond McCarthy as legal counsel for the debtors; (ii) fees to be incurred by O'Connor, Gould, Evans and Craig as special counsel for the Debtors in regards to property tax lawsuits filed on behalf of the Debtors against the Williamson and Travis County taxing authorities; (iii) fees incurred by ARA as Properties Marketing Company under the Joint Marketing Proposal; and (iv) amounts owed for 2010 franchise taxes to the Texas Comptroller of Public Accounts.  Additionally, the Debtors have agreed that Jay Parmelee has an allowed administrative expense claim in the amount of $4,523.93 for custodian services and expenses.

The Debtors estimate that Allowed Administrative Expense Claims will total approximately $215,000.00.

### (d)    Priority Non-Tax Claims

Certain claims are entitled to priority pursuant to sections 507(a)(3) (Claims for wages, salaries, or commissions), 507(a)(4) (Claims for contributions to employee benefit plans), and 507(a)(6) (Claims by individuals for refunds of deposits) of the Bankruptcy Code.

Each holder of an Allowed Priority Non-Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim; (ii) such other treatment to which the holder of such Allowed Priority Non-Tax Claim and the Reorganized Debtors may agree in writing; or (iii) the amount of such holder's Allowed Claim in accordance with Bankruptcy Code section 1129(a)(9)(B).

The Debtors estimate that there will not be any Priority Non-Tax Claims on the Effective Date.

### (e)  Priority Tax Claims

Certain claims of governmental units and taxing authorities are entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim; (ii) such other treatment to which the holder of such Allowed Priority Tax Claim and the Reorganized Debtors may agree in writing; or (iii) the amount of such holder's Allowed Claim in accordance with Bankruptcy Code section 1129(a)(9)(C).

The Debtors estimate that Allowed Priority Tax Claims will total approximately $225,000.00.

### 2.  Classification and Treatment of Claims and Equity Interests

### (a)  Class B – Secured Claims

Class B is composed of Allowed Claims secured by a Lien on Collateral.  The Plan further divides Secured Claims into three classes, including (i) Secured Claims held by taxing authorities; and (ii) Secured Claims held by C1 Trust.  The Plan impairs only the Secured Claim of C1 Trust.  Secured Claims will receive the following treatment under the Plan:

**Class B-1 – Secured Tax Claims**.  Each holder of an Allowed Secured Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim; or (ii) such other treatment to which the holder of such Allowed Secured Tax Claim and the Reorganized Debtors may agree in writing.

The Debtors paid real estate taxes for 2009 in January 2010.  Real estate taxes are being escrowed by the Debtors for 2010 real estate taxes, and these amounts will be turned over to C1 Trust on the Effective Date.  Accordingly, the Debtors estimate that there will not be any unpaid Secured Tax Claims on the Effective Date.

Claimants in Class B-1 are unimpaired.

**Class B-2 – C1 Trust Claims.**  The Debtors and C1 Trust have agreed that C1 Trust will hold an Allowed Secured Claim in the amount of $140,000,000, with the remaining $20,000,000 of C1 Trust's claim to be a Deficiency Claim treated in accordance with Class C-2.  The Debtors estimate that Allowed Claims in Class B-2 will total approximately $140,000,000.00.

As part of the Plan, C1 Trust will be provided with $4,000,000 in cash on the Effective Date, and four restructured secured term loans, one secured term loan for each of the four Properties, totaling an assumed loan balance of $136,000,000.00.  Each restructured secured loan will be evidenced by a promissory note in a form identical to the C1 Trust Notes (including cross-default provisions), except for certain modifications already agreed to by the Debtors and C1 Trust and any additional modifications that may be subsequently agreed to by the Debtors and C1 Trust.  Those limited modifications already agreed to by the Debtors and C1 Trust include the following: the restructured secured loans will only be modified from their original terms to account for the reduced outstanding secured principal loan balance, interest rate reductions, lowered and modified DSCR provisions (to the extent deemed necessary and applicable by the Debtors), and changed guarantors.  All four restructured secured term loans will maintain the maturity date of January 11, 2017, as set forth in the original loan documents.

Accordingly, the total amount of the restructured secured loans for the Properties will be $136 million, with the note for each Property to be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.

The restructured secured loans will provide C1 Trust with interest only payments at a rate of 4.77% in years 1 and 2, interest only payments at a rate of 5.77% in years 3-7, and a balloon payment of the entire outstanding principal loan balance in year 7 on the maturity date.  Assuming an Effective Date of June 25, 2010, the initial interest only payment will be due from the Reorganized Debtors to C1 Trust on August 11, 2010, and subsequent payments will be due every month thereafter on or before the 11th of each month.

The restructured secured loans will also contain modified DSCR provisions to the extent deemed necessary and applicable by the Debtors.

Charlie Yalamanchili will be replaced as the guarantor of the restructured secured notes by two guarantors: (i) Greystar will serve as the guarantor for all "bad boy" carve-out provisions which they control, or have the ability to control (*e.g.*, misapplication of rents, etc.), EXCEPT the carve-out provision regarding initiating a voluntary bankruptcy filing or an involuntary bankruptcy filed against the Reorganized Debtors, so long as Greystar has not participated in any way (directly, indirectly, expressly or impliedly) in the involuntary bankruptcy filing; and (ii) Rao Kothapalli will serve as the guarantor in his individual capacity ONLY for the carve-out provision regarding initiating a voluntary bankruptcy or intentionally refusing to prosecute a dismissal of an involuntary bankruptcy filing against the Reorganized Debtors.

Moreover, the Debtors and C1 Trust have agreed to stipulate as to the following two agreements: (i) So long as any portion of the C1 Trust Notes remains outstanding, neither Debtors nor the Reorganized Debtors shall voluntary seek relief under any chapter of Title 11, U.S.C. (the U.S. Bankruptcy Code, as amended); and (ii) In the event of any voluntary or

32

involuntary bankruptcy filing by or against Debtors or the Reorganized Debtors, all parties agree that each of the various Assignments of Rents agreements affected the Debtors' Properties (including, without limitation, as may or may not be modified herein) are, indeed absolute assignments and not assignments intended as collateral; that Debtors and Reorganized Debtors agree to entry of a confirmation order which so declares and provides that in the event of any future bankruptcy filing affecting Debtors, Reorganized Debtors, their respective assignees, if any, or the Properties, then in any event, postpetition rents or other income of any type from the Properties shall not be property of the estate under 11 U.S.C. § 541 (including for purposes of illustration but not limitation, 11 U.S.C. § 541(a)(6)), and neither Debtors nor the Reorganized Debtors or their respective assignees, if any, shall be deemed to own any residual interest in the rents or other income of any type generated from the Properties, and as such, the rents or other income of any type shall not be subject to usage by Debtors, Reorganized Debtors (or their assignees, if any) as cash collateral in connection with any such subsequent bankruptcy filing. The Bankruptcy Court has held that it is unwilling to provide for the foregoing in the confirmation order and, as such, the Debtors and C1 Trust nonetheless intend to stipulate as to these agreements.

Additionally, on the Effective Date, C1 Trust will receive an additional cash payment comprised of those portions of the cash on hand and equity contributions not made to holders of Allowed Claims on the Effective Date as contemplated in the Plan. The Debtors and C1 Trust have agreed to the allocation and uses for these remaining amounts, which include: (i) approximately $1.8 million to account for real estate tax escrows from January 1, 2010 through June 30, 2010, to be held by C1 Trust in a separate account; (ii) $1.6 million for an interest reserve account, to be held by C1 Trust in a separate account. To the extent any amounts remain in this interest reserve account after year 2, such amounts will be applied towards satisfaction of the outstanding secured principal balance in C1 Trust's restructured secured loans on a pro rata basis; (iii) a capital expenditure reserve account in the amount of $400,000; (iv) insurance reserves in the amount $170,000; and (v) payments for special servicer fees, C1 Trust's legal fees and expenses, and expenses for travel and inspection.

Section 1111(b) of the Bankruptcy Code gives C1 Trust an option to elect to be treated as the holder of a fully secured claim and to waive its unsecured deficiency claim. However, as part of the mediation, C1 Trust has agreed not to elect for this class to be treated pursuant to Bankruptcy Code section 1111(b).

Claimants in Class B-2 are impaired.

### (b)   Class C –Unsecured Claims

Class C is comprised of Allowed unsecured claims against the Debtors. Unsecured claims are claims not secured by any lien or security interest in the Debtors' Assets and are not entitled to priority under Bankruptcy Code section 507 or similar provision. The Plan further divides unsecured claims into four classes, including classes for (i) general unsecured claims held by trade vendors and other miscellaneous creditors who do business with the Debtors, including the claims of HOAs deemed unsecured by virtue of holding a lower secured status than C1 Trust, (ii) the unsecured deficiency claim held by C1 Trust, (iii) the unsecured claim held by

Debtors' Third Amended Disclosure Statement
213423v1

CNC, and (iv) unsecured claims that have been subordinated to other unsecured claims by order the Bankruptcy Court or operation of law.  The treatment for each unsecured class is detailed below and in the Plan.  The Plan impairs all classes of unsecured claims.

**Class C-1 – General Unsecured Claims**.  Class C-1 includes any Claim other than an Administrative Expense, a Secured Claim, a Priority Claim, a Subordinated Claim, Deficiency Claim of C1 Trust or the Claim of CNC or an Insider Claim.  Most vendors and parties who extended credit to the Debtors at each of the Properties will be treated in this class.  Additionally, this class includes holders of Allowed HOA Claims, who are unsecured by virtue of holding a lower secured status than C1 Trust.

The Plan provides for payment in full to all holders of Allowed General Unsecured Claims.  However, during the pendency of these bankruptcy cases, several Claims in this Class have already received certain payments from the Debtors on account of utility deposits, locator fees or vendor deposits.  Any such post-petition amounts paid by the Debtors to holders of Allowed General Unsecured Claims will serve to offset the amounts such holders of Allowed General Unsecured Claims will receive under this Plan.

Accordingly, each holder of an Allowed General Unsecured Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim, but with, if applicable, a dollar for dollar reduction to the amount of such holder's Allowed Claim to account for any post-petition payments made by the Debtors for utility deposits, locator fees and/or vendor deposits; or (ii) such other treatment to which the holder of such Allowed General Unsecured Claim and the Reorganized Debtors may agree in writing.  The Debtors estimate that Allowed Claims in Class C-1 will total approximately $746,246.84.

Claimants in Class C-1 are impaired.

**Class C-2 – C1 Trust Deficiency Claim**.  The Debtors and C1 Trust have agreed that C1 Trust will hold an Allowed Deficiency Claim in the amount of $20,000,000.00.  The Debtors estimate that Allowed Claims in Class C-2 will total approximately $20,000,000.00.

As part of the Plan, C1 Trust will be provided with four restructured unsecured term loans, one unsecured term loan for each of the four Properties, with the same January 11, 2017 maturity date as the restructured secured term loans.  Each restructured unsecured loan will be evidenced by a promissory note in a form identical to the C1 Trust Notes (including cross-default provisions), except for certain modifications already agreed to by the Debtors and C1 Trust and any additional modifications that may be subsequently agreed to by the Debtors and C1 Trust.  Those limited modifications already agreed to by the Debtors and C1 Trust include the following: the restructured unsecured loans will be modified to reflect their unsecured nature, account for the agreed upon unsecured principal loan balances, and set forth interest rate reductions as agreed to by the parties.

Specifically, the total amount of the restructured unsecured loans for the Properties will total $20 million, with the note for each Property to be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.

The restructured unsecured loans will provide C1 Trust with no principal or interest payments in year 1, interest only payments at a rate of 1.00% in years 2-5, interest only payments at a rate of 2.00% in years 6-7, and a balloon payment of the entire outstanding principal loan balance in year 7 on the maturity date.  Assuming an Effective Date of June 25, 2010, the initial interest only payment will be due from the Reorganized Debtors to C1 Trust on July 11, 2011, and subsequent payments will be due every month thereafter on or before the 11th of each month.

Claimants in Class C-2 are impaired.

**Class C-3 – CNC Claim**.  The holder of the CNC Claim shall be paid from the cash flows of the Reorganized Debtors, but only after the Reorganized Debtors have satisfied the treatment of creditors holding claims in Classes A, B and C-1 through C-2.  By agreement, the CNC Claim will be subordinated to the General Unsecured Claims, C1 Trust Deficiency Claim, and all subsequent trade payables of the Reorganized Debtors.  Payments on the CNC Claim will be as follows: no principal or interest payments in years 1-6, with a balloon payment for the entire outstanding principal balance of $9,750,028.61 in year 7 on the maturity date after payment in full to C1 Trust on both its secured and unsecured deficiency claims, as well as satisfaction of the claims of the Debtors' trade creditors, and any subsequent trade payables of the Reorganized Debtors, to the extent such claims exist.  The Debtors estimate that Allowed Claims in Class C-3 will total approximately $9,750,028.61.

Claimants in Class C-3 are impaired.

**Class C-4 – Subordinated Claims**.  The holder of any Subordinated Claim shall be paid from the cash flow remaining after the Reorganized Debtors have satisfied in full creditors holding claims in Classes A, B and C-1 through C-3.

The Debtors do not anticipate any Class C-4 Claims.

(c)     **Class D – Equity Interests**

Class D represents the Equity Interests held in the Debtors.

**Class D-1 – Equity Interest in ALP**.  Under the Plan, the Reorganized Debtors will receive an equity contribution in the amount of $4 million attributable to ALP.  The equity contribution will constitute new value, and will be made by both current Equity Interest Holders in ALP and new investors (the "ALP New Value Equity Contribution").  As a result of the ALP New Value Equity Contribution, the current equity interests and general and limited partnership interests in ALP will be cancelled, and the Equity Interests in ALP will be reissued to a new general partner formed by those investors making the ALP New Value Equity Contribution, who will then be the only Equity Interest Holders in ALP.  This resulting structure will be consummated as part of the Plan.

35

Commitment letters from those investors in the ALP New Value Equity Contribution will be received on or before May 1, 2010, and the ALP New Value Equity Contribution will be placed in an escrow account on or before May 15, 2010.

No distributions to Equity Interest Holders in ALP will be made until after all payments are made to all secured and unsecured claimants of the Debtors and any subsequently incurred trade payables of the Reorganized Debtors.

Claimants in Class D-1 are impaired.

**Class D-2 – Equity Interest in Keerthi**.  Under the Plan, the Reorganized Debtors will receive an equity contribution in the amount of $1 million attributable to Keerthi.  The equity contribution will constitute new value, and will be made by both current Equity Interest Holders in Keerthi and new investors (the "Keerthi New Value Equity Contribution").  As a result of the Keerthi New Value Equity Contribution, the current equity interests and membership and management interests in Keerthi will be cancelled, and the Equity Interests in Keerthi will be reissued to a new managing member formed by those investors making the Keerthi New Value Equity Contribution, who will then be the only Equity Interest Holders in Keerthi.  This resulting structure will be consummated as part of the Plan.

Commitment letters from those investors in the Keerthi New Value Equity Contribution will be received on or before May 1, 2010, and the Keerthi New Value Equity Contribution will be placed in an escrow account on or before May 15, 2010.

No distributions to Equity Interest Holders in Keerthi will be made until after all payments are made to all secured and unsecured claimants of the Debtors and any subsequently incurred trade payables of the Reorganized Debtors.

Claimants in Class D-2 are impaired.

**E.**     **Means of Implementation of the Plan**

The Plan provides that on the Effective Date, all Assets of the Debtors including the Litigation Claims will be transferred to, and will vest in, the Reorganized Debtors.  The Reorganized Debtors will continue to own the Debtors' business, have Greystar manage the Properties, and use the cash on hand as of the Effective Date, the contribution received through the equity contribution, and the revenues subsequently generated to satisfy the Claims either on the Effective Date or over time pursuant to the Class treatments detailed above.  As noted above, the Debtors are currently working on the exact equity arrangement that will be structured as a result of the new value equity contribution.  The Debtors expect net operating income to improve and an appreciable increase in the valuation of the Properties over the 7-year time period of the Plan based on the Properties' historical performance with an anticipated gradual improvement in economic and market conditions in the Austin and Round Rock area, including gradual reductions in vacancy and concessions and increases in rents, and a property tax savings resulting from currently pending litigation by the Debtors against the Williamson and Travis County taxing authorities.

1.      **Powers and Duties of the Reorganized Debtors**

Subject to the provisions of the Plan, the Reorganized Debtors will take possession of all the Assets, delegate operations of the Properties to Greystar, and manage their estates.

The Reorganized Debtors will be a representative of the Debtors' estate pursuant to Code § 1123(b)(3) and will have the power to prosecute any of the Litigation Claims that the Reorganized Debtors in good faith believes to be valid.  Additionally, the Reorganized Debtors will have power to do all acts contemplated by the Plan and other acts that may be necessary or appropriate to comply with the Plan's terms.

2.      **Management of the Reorganized Debtors**

The management of the Reorganized Debtors will change from the Debtors' current management.  Rao Kothapalli will become the controlling person of both the ultimate general partner of ALP and the ultimate managing member of Keerthi (or of the ultimate subsidiary affiliated controlling entities of ALP and Keerthi).  The Debtors are currently working on the exact arrangement under which Rao Kothapalli will undertake these roles.  The Debtors contemplate that the ultimate structure will be designed in conjunction with the equity arrangement discussed above, and will be consummated as part of the Plan.  Related to these potential structures is C1 Trust's agreement with the Debtors in the mediation to not waive any right or remedy in its Intercreditor Agreement with the mezzanine holder, and to use commercially reasonable efforts to enforce its rights and remedies under the Intercreditor Agreement.

CNC will resign as the management company for the Properties and be replaced by Greystar.  Management Agreements will be entered into between the Reorganized Debtors and Greystar on the same terms as those currently set forth in CNC's Management Agreements.  However, a provision will be added to Greystar's Management Agreements to provide that, on 60 days written notice, the Reorganized Debtors can cancel the Management Agreements with Greystar due to violations of the express terms of the Management Agreements or poor performance.  The replacing third party management company (who cannot be CNC or any management company owned by or affiliated with Charlie Yalamanchili) must provide the same guarantees to C1 Trust as those being provided under the restructured secured term loans.  Further, the Reorganized Debtors will be required to obtain the consent of C1 Trust, which will not be unreasonably withheld, regarding both the cancellation of the Greystar Management Agreements and the selection of the new third party management company.

F.      **Provisions Governing Distribution**

Any payments or distributions to be made by the Reorganized Debtors pursuant to the Plan shall be made on the Effective Date except as otherwise provided for in the Plan, or as may be ordered by the Bankruptcy Court.

Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of Claim or proofs of interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or proof of interest is filed); or if the Reorganized

Debtors have been notified of a change of address, at the address set forth in such notice.  All Unclaimed Property shall revert to the Reorganized Debtors.

No interest shall be paid on any Claim unless, and only to the extent that, the Plan specifically provides otherwise.

### G.   Contested and Contingent Claims

Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed no later than ninety (90) days after the Effective Date or ninety (90) days after a particular proof of Claim is filed, whichever is later.  Any proof of Claim filed more than thirty (30) days after the Confirmation Date shall be of no force and effect, shall be deemed disallowed, and will not require objection.  All Contested Claims shall be litigated to Final Order; *provided, however,* that the Reorganized Debtors may compromise and settle any Contested Claim, without approval of the Bankruptcy Court.

No payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

### H.   Executory Contracts and Leases

The Plan constitutes and incorporates a motion by the Debtors to assume, as of the Effective Date, all prepetition executory contracts and unexpired leases to which the Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (b) are the subject of a separate motion pursuant to section 365 of the Bankruptcy Code to be filed and served by the Debtors on or before the Effective Date, or (c) are terminated pursuant to the Global Settlement Agreement upon confirmation of the Plan.  The Debtors list all executory contracts to this Disclosure Statement at Exhibit 3 to this Disclosure Statement.

If the rejection of an executory contract or an unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their properties or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Trustee by the earlier of (a) 30 days after the Confirmation Date or (b) such other deadline as the Court may set for asserting a Claim for such damages.

Any Rejection Claim arising from the rejection of an unexpired lease or executory contract not barred by Section 10.2 of the Plan shall be treated as a Class C-1 General Unsecured Claim against the Debtors pursuant to Article 5.0 of the Plan; *provided, however*, that any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.

For executory contracts assumed by the Reorganized Debtors, all cure payments which may be required by Bankruptcy Code section 365(b)(1) under any executory contract or

unexpired lease that is assumed, or assumed and assigned, under this Plan shall be made by the Reorganized Debtors; provided, however, in the event of a dispute regarding the amount of any cure payments, the cure of any other defaults, the ability to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Reorganized Debtors shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Bankruptcy Code section 365(b)(1), following the entry of a Final Order resolving such dispute.  To the extent that a party to an assumed executory contract or unexpired lease has not filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30th) day after the Confirmation Date disputing the amount of any cure payments offered to it by the Reorganized Debtors, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

**I.      Causes of Action**

At this time, the Debtors do not anticipate prosecuting or seeking any affirmative recoveries in the prosecution of claims for preferences, fraudulent transfers or other avoidance actions.   All Avoidance Actions are being released as an affirmative recovery, but may be used as a setoff against a filed claim.

**1.      Preferences**

Pursuant to the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.  There are certain defenses to preference actions.  Transfers made in the ordinary course of the debtor's and the transferee's business according to the ordinary business terms are not recoverable.  If the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a transfer is recovered by the debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.  The Reorganized Debtors are waiving all rights to pursue, in their sole discretion, any preferences

**2.      Fraudulent Transfers**

Under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered it insolvent if, and to the extent, the debtor receives less than fair value for such property.  A debtor may also recover certain transfers if the transfer was made with actual intent to hinder, delay or defraud any creditor.  These transfers are referred to as "fraudulent transfers." The Reorganized Debtors are waiving all rights to pursue any fraudulent transfers.

### 3. Other Potential Litigation

The Debtors may also have claims and causes of action against third parties and creditors arising prior to the Petition Date. These causes of action may be prosecuted by the Reorganized Debtors or enforced by way of setoff against Claims filed against the bankruptcy estate. The Reorganized Debtors have sole discretion to prosecute any such litigation and to object to any Claims as they see fit.

## J. Discharge of the Debtors and Related Injunctions.

**ALL CLAIMANTS SHOULD REVIEW THESE INJUNCTION AND DISCHARGE PROVISIONS CAREFULLY WITH THEIR COUNSEL. THE PLAN'S INJUNCTIONS AND DISCHARGE WILL AFFECT YOUR RIGHTS.**

### 1. Discharge of Debtors.

The Plan provides a discharge of Claims against the Debtors to the fullest extent allowed by the Bankruptcy Code. To the extent permitted by section 1141 of the Bankruptcy Code, all consideration distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever against the Debtors or any of their assets or properties. Except as otherwise provided herein, upon the Effective Date, the Debtors and their successors in interest shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims treated in the Plan, as well as all other Claims and Equity Interests, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted this Plan; or (d) the Claim has been Allowed, disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors and their successors in interest other than those obligations specifically set forth pursuant to this Plan.

### 2. Injunction Regarding Actions against the Debtors and their Assets.

To implement the Plan, including the Debtors' discharge, Sections 7.2, 13.2 and other Plan provisions act to enjoin certain actions against the Debtors, the Reorganized Debtors and their property.

The injunction in Plan Section 7.2 provides that, except as otherwise provided in the Plan, from and after the Confirmation Date, all holders of Claims against and Equity Interests in the Debtors are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors and their Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets or

the Debtors; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and the Debtors; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; provided, however,  (i) that each holder of a Contested Claim may continue to prosecute its proof of claim in the Bankruptcy Court and all holders of Claims and Equity Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan, and (ii) the holder of a Lien on any Collateral which is surrendered pursuant to this Plan or hereafter by the Reorganized Debtors may exercise its legal and contractual rights and remedies, including foreclosure sale, with respect thereto.

The injunction in Plan Section 13.2 provides that, except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that from the Confirmation Date, all Persons who are or may be past, current or future holders of a Claim or Equity Interest against Debtors or their  estates:

(a)     shall receive recovery on account of such Claim, if Allowed, solely from the Reorganized Debtors and on the Effective Date such Claim, if Allowed, shall exist and be valid only to the extent it is solely asserted against the Reorganized Debtors;

(b)     hereby permanently, irrevocably and unconditionally release and discharge Debtors and each of their officers, directors, agents, employees, representatives, financial advisors, attorneys and accountants from all liabilities, rights of contribution, and rights of indemnification, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or in part on any act, omission, transaction, or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Debtors, their estates and business affairs, the Chapter 11 cases and the Plan; and

(c)     are and shall be permanently, irrevocably and unconditionally enjoined and barred from asserting or taking any of the following actions (all of which shall be permanently, irrevocably and unconditionally waived, released and discharged) against Debtors or any of their property on account of any liability, claim or interest in any way relating to the Debtors, and their estates, the Chapter 11 cases and the Plan:

i.     commencing or continuing, in any manner or in any place, any suit, cause of action or other proceeding;

ii.     enforcing attaching, collection or recovering in any manner any judgment, award, decree or order;

iii.     creating, perfecting or enforcing any Lien or other encumbrance; and

41

      iv.    commencing or continuing, in any manner or in any place, any suit, action or proceeding that does not comply with or is inconsistent with the provisions of the Plan.

## K.    Exculpation and Limitation of Liability

Section 13.4 of the Plan provides for the exculpation of the Debtors (including their officers, directors and employees) and professional Persons retained by the Debtors from liability related to the Debtors' Chapter 11 cases, the Plan and its administration.  This limitation of liability excludes gross negligence or willful misconduct as may be determined by the Bankruptcy Court.

## L.    U.S. Trustee Quarterly Fees

The Reorganized Debtors shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6).  Any fees due as of the date of confirmation of the Plan will be paid in full on or before the Effective Date of the Plan.  After confirmation, the Reorganized Debtors shall pay United States Trustee quarterly fees as they accrue until their cases are closed by the Court.  The Reorganized Debtors shall file with the Court and serve on the United States Trustee a financial report for each quarter, or portion thereof, that their Chapter 11 cases remains open in a format prescribed by the United States Trustee.

## VIII.

## FEASIBILITY AND RISKS

## A.    Business Risks

The Plan provides that the Reorganized Debtors will continue owning all of the Properties, using available cash on hand as of the Effective Date, allotted funds made available through an equity contribution, and income generated from operations at the Properties to make distributions to holders of Allowed Claims.  As part of the Plan, C1 Trust will be provided with eight restructured term loans, one secured term loan and one unsecured term loan for each of the four Properties.  For purposes of the Plan, the Debtors and C1 Trust have agreed through negotiations during these cases and at mediation that C1 Trust holds an Allowed Secured Claim in the amount of $140 million.  This agreement between the Debtors and C1 Trust is not intended to serve as an admission by the Debtors or Reorganized Debtors regarding the actual value of the Properties.  C1 Trust will additionally be provided with a Deficiency Claim in the amount of $20 million.

The Plan provides for certain interest only payments to be made to C1 Trust through the maturity date set forth in the original loan documents and, thereafter, for the Reorganized Debtors to monetize or refinance the Properties to pay C1 Trust the entire outstanding loan balance on the secured and unsecured deficiency claims.  The Debtors believe reorganization proposed in the Plan is reasonable and entirely feasible based on the 7-year projections included

as Exhibit 2 to this Disclosure Statement.  The Debtors base these projections on their historical performance with an anticipated gradual improvement in economic and market conditions in the Austin and Round Rock area, thereby allowing the Reorganized Debtors to gradually reduce vacancy and concessions and increase rents, and a property tax savings resulting from currently pending litigation by the Debtors against the Williamson and Travis County taxing authorities.

Nevertheless, the Reorganized Debtors' business plan faces risks.  The Debtors' financial situation deteriorated primarily due to historically unfavorable economic and market conditions. The Plan assumes a moderate improvement in these conditions over time; however, the Debtors cannot guaranty that market conditions will improve.  If the Austin and Round Rock economies experience further declines, or fail to recover from the current recession, it will negatively affect the Reorganized Debtors' performance as well as their ability to fund the Plan distributions.

The Reorganized Debtors will also continue to face significant competition for tenants from other apartment developments in the Austin and Round Rock markets.   Although construction of new rental units has recently slowed, the current excess rental capacity in these markets will contribute to continued competition for tenants.  The addition of further capacity to the Debtors' markets, aggressive discounts from competitors and other competitive forces pose a risk to the Reorganized Debtors' projected performance and their ability to fund payments under the Plan.

The Debtors believe their financial projections are reasonable, will provide the Reorganized Debtors sufficient income to fund distributions to creditors and support confirmation of the Plan.  Nevertheless, all Claimants should consider these and all risks in voting on the Plan.

**THIS DISCLOSURE STATEMENT AND THE MATERIAL INCORPORATED BY REFERENCE HEREIN (THE "INCORPORATED MATERIALS") INCLUDE "FORWARD-LOOKING STATEMENTS" AS DEFINED IN SECTION 27A OF THE SECURITIES ACT OF 1933 AND SECTION 21 E OF THE SECURITIES EXCHANGE ACT OF 1934.  ALL STATEMENTS OTHER THAN STATEMENTS OF HISTORICAL FACTS INCLUDED IN THIS DISCLOSURE STATEMENT AND THE INCORPORATED MATERIALS REGARDING THE REORGANIZED DEBTORS' FINANCIAL POSITION, BUSINESS STRATEGY, PLANS AND OBJECTIVES OF MANAGEMENT FOR FUTURE OPERATIONS AND INDEBTEDNESS COVENANT COMPLIANCE, INCLUDING BUT NOT LIMITED TO STATEMENTS USING WORDS SUCH AS "ANTICIPATES," "EXPECTS," "ESTIMATES," "BELIEVES" AND "LIKELY" ARE FORWARD-LOOKING STATEMENTS. MANAGEMENT BELIEVES THAT ITS CURRENT VIEWS AND EXPECTATIONS ARE BASED ON REASONABLE ASSUMPTIONS; HOWEVER, THERE ARE SIGNIFICANT RISKS AND UNCERTAINTIES THAT COULD SIGNIFICANTLY AFFECT EXPECTED RESULTS. IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE IN THE FORWARD-LOOKING**

STATEMENTS ("CAUTIONARY STATEMENTS") ARE DISCLOSED THROUGHOUT THIS DISCLOSURE STATEMENT AND INCLUDE, WITHOUT LIMITATION, THE RISK FACTORS DISCUSSED HEREIN, CONDITIONS IN THE CAPITAL MARKETS, AND COMPETITION. ALL WRITTEN AND ORAL FORWARD-LOOKING STATEMENTS ATTRIBUTABLE TO THE DEBTORS, OR PERSONS ACTING ON THEIR BEHALF, ARE EXPRESSLY QUALIFIED IN THEIR ENTIRETY BY THE CAUTIONARY STATEMENTS.   THE REORGANIZED DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN TO REFLECT EVENTS OR CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

**B.      Risk of Nonconfirmation of the Plan**

Even if all Classes of Claims and Equity Interests that are entitled to vote accept the Plan, the Bankruptcy Court may not confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting creditors and equity interest holders not be less than the value of distributions such creditors and equity interest holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

**C.      Nonoccurrence of Effective Date of the Plan**

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied.   The Debtors believe they will satisfy all requirements for consummation under the Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## IX.

## ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtors' Chapter 11 cases, (b) the Debtors' Chapter 11 cases could be converted to liquidation cases under Chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by some other party.

A.      **Dismissal**

If the Debtors' Chapter 11 cases were dismissed, the Debtors would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code.  The Debtors anticipate that C1 Trust would seek control of the Properties through receivership or foreclosure.  In such a scenario, the Debtors believe the General Unsecured Creditors would not receive a recovery on their Claims.

B.      **Chapter 7 Liquidation**

If the Plan is not confirmed, it is likely that the Debtors' Chapter 11 Cases would be converted to cases under Chapter 7 of the Bankruptcy Code.  In Chapter 7, the Court would appoint (or the creditors elect) a trustee to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  Whether a bankruptcy case is one under Chapter 7 or Chapter 11, Secured Creditors, Administrative Expenses and Priority Claims are entitled to be paid in cash and in full before General Unsecured Creditors receive any funds.

If the Debtors' Chapter 11 Cases are converted to Chapter 7, the present Administrative Expense may have a priority lower than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

The Debtors have prepared the Liquidation Analysis attached as Exhibit 5 to this Disclosure Statement.  The Debtors' Liquidation Analysis uses the year 2010 proforma Net Operating Income ("NOI") which is reflected in the Debtors' financial projections (Exhibit 2 to this Disclosure Statement) dividing this NOI by a market capitalization rate of 7%.  Although there are many approaches to valuing the Properties and the Debtors' other assets, this is a commonly used approach to determine the value of businesses with these income levels.  Depending on market conditions, sales efforts and other variables, a third party may be willing to pay significantly more or less for the Debtors' assets in liquidation.  Further, other valuation methods may provide substantially different liquidation values for the Debtors' assets.

Based on the Liquidation Analysis, the Debtors' creditors will receive substantially less in a liquidation of the Debtors assets.  Specifically, in a Chapter 7 liquidation, it is very possible that General Unsecured Claims would receive no recovery on their Claims.

C.      **Alternative Plan**

No party other that the Debtors can propose an alternative plan at this time because the Debtors filed the Plan and seek its confirmation within the Exclusive Period.  If the Exclusive Period is terminated or if the Plan proposed by the Debtors is not confirmed or is rejected by the creditors, the Court can allow the Debtors to propose a different plan or may allow other parties to file their own plan.

## X.

### CERTAIN UNITED STATES FEDERAL INCOME
### TAX CONSEQUENCES OF THE PLAN

**THE FOLLOWING DISCUSSION IS A SUMMARY OF CERTAIN SIGNIFICANT FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS AND TO HOLDERS OF CLAIMS AND EQUITY INTERESTS AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986 (TITLE 26, UNITED STATES CODE), AS AMENDED TO THE DATE HEREOF (THE "TAX CODE"), TREASURY REGULATIONS PROMULGATED AND PROPOSED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF COULD SIGNIFICANTLY AFFECT THE TAX CONSEQUENCES DESCRIBED BELOW. NO RULINGS HAVE BEEN REQUESTED FROM THE IRS. MOREOVER, NO LEGAL OPINIONS HAVE BEEN REQUESTED FROM COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

**THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. IN ADDITION, THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR THE HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS (SUCH AS HOLDERS WHO DO NOT ACQUIRE THEIR CLAIM ON ORIGINAL ISSUE), NOR DOES THE DISCUSSION DEAL WITH TAX ISSUES PECULIAR TO CERTAIN TYPES OF TAX PAYERS (SUCH AS DEALERS IN SECURITIES, S CORPORATIONS, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS). NO ASPECT OF FOREIGN, STATE, LOCAL OR ESTATE AND GIFT TAXATION IS ADDRESSED.**

**THE FOLLOWING SUMMARY IS, THEREFORE, NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO THEM UNDER THE PLAN. THE DEBTORS ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONFIRMATION AND RECEIPT OF ANY DISTRIBUTION UNDER**

46

**THE PLAN MAY HAVE ON ANY GIVEN CREDITOR OR OTHER PARTY IN INTEREST.**

A.     **General**

No administrative rulings will be sought from the Internal Revenue Service (hereinafter "IRS") with respect to any of the federal income tax aspects of the Plan.  Consequently, there can be no assurance that the treatment described in the Plan will be accepted by the IRS.   No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

B.     **IRS Circular 230 Disclosure**

**THIS DISCLOSURE STATEMENT IS WRITTEN TO SUPPORT THE PROMOTION OR THE MARKETING OF TRANSACTIONS DISCUSSED HEREIN.   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, THE DEBTORS ARE INFORMING YOU THAT THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES THAT MAY BE IMPOSED ON SUCH TAXPAYER UNDER THE TAX CODE.   TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

C.     **Consequences to Holders of Claims**

1.     **Realization and Recognition of Gain or Loss in General**

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder's claim becomes an Allowed Claim, when the holder received payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such claim, whether the Claimant receives consideration in more than one tax year of the Claimant, whether the Claimant is a resident of the United States, whether all the consideration received by the Claimant is deemed to be received by that Claimant in an integrated transaction and whether the holder's Claim constitutes a "security" for federal income tax purposes.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash and the issue price of any debt instrument (other than any consideration attributable to a Claim for accrued but unpaid interest), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). The treatment of accrued but unpaid interest and amounts allocable

thereto varies depending on the nature of the holder's claim, such as (i) the nature and origin of the Claim; (ii) the tax status of the holder of the Claim; (iii) whether the holder is a financial institution; (iv) whether the Claim is a capital asset in the hands of the holder; (v) whether the Claim has been held for more than one (1) year; (vi) the extent to which the holder previously claimed a loss, bad debt deduction or charge to a reserve for bad debts with respect to the Claim, and is discussed below.

Whether or not such realized gain or loss will be recognized for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other "reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof. In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security. Generally, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term of fewer than five years will not. Debt instruments having a term of at least five years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued, and other factors. Each holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

## 2.     Accrued Interest

The Debtors intend to take the position that all payments in respect of Allowed Claims will be first allocated to the principal amount of the Allowed Claim, with any excess allocated to accrued unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes.

A holder, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing Claims, and who exchanges its interest Claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that holder realizes an overall gain or loss as a result of the exchange of its existing Claims.

3.       **Withholding**

All distributions to holders of Claims under the Plan are subject to any applicable withholding.  Under federal income tax law, interests, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at a 28% rate.  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

4.       **Consequences to Debtors or Reorganized Debtors - Discharge of Indebtedness Income Generally**

In general, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount and less the amount of any previously amortized bond issue premium) gives rise to cancellation of indebtedness ("COD") income which must be included in a debtor's income for federal income tax purposes, unless, in accordance with section 108(e)(2) of the Tax Code, payment of the liability would have given rise to a deduction. A corporate debtor that issues its own stock or its own debt in satisfaction of its debt is treated as realizing COD income to the extent the fair market value of the stock or the issue price of new debt issued is less than the adjusted issue price of the old debt.  COD income is not recognized by a taxpayer that is a debtor in a title 11 (bankruptcy) case if a discharge is granted by the Bankruptcy Court or pursuant to a plan approved by the Bankruptcy Court (the "Bankruptcy Exclusion Rules").

The Debtors have not determined if any COD income will be realized pursuant to the Plan, but believes that the COD income, if any, will not be recognized by the Debtors due to the Bankruptcy Exclusion rules.  However, the Debtors, as a result of the exception, may be subject to a reduction of certain of its "tax attributes" to the extent that COD income is not recognized under the Bankruptcy Exclusion Rules.  Thus, while the Debtors will not recognize taxable income from discharge of indebtedness, they may experience reductions in (i) any net operating losses ("NOL") that have accumulated, (ii) the tax basis of its property, and (iii) other tax attributes, as set forth in section 108(b)(2) of the Tax Code.

Nothing herein shall be construed as advice to the Reorganized Debtors; the Reorganized Debtors are relying solely on their own counsel and/or professionals for such advice.

The federal income tax consequences of the Plan are complex and subject to uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state

or local tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations or investors in pass through entities).

**ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES TO THEM OF THE PLAN.**

## XI.

## CONCLUSION

This Third Amended Disclosure Statement has attempted to provide information regarding the Debtors' bankruptcy estates and the potential benefits that accrue to holders of Claims against the Debtors under the Plan as proposed.  The Debtors urge creditors to vote in favor of the Plan.

Dated:  May 6, 2010.

AMARAVATHI LIMITED PARTNERSHIP

By:      _/s/ Tim Sedgwick_

AMARAVATHI KEERTHI, LLC

By:      _/s/ Tim Sedgwick_

DIAMOND MCCARTHY LLP

_/s/ Brian A. Abramson_
Kyung S. Lee
Texas Bar No. 12128400
Brian A. Abramson
Texas Bar No. 24050193
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5195

**ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

50