IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| AMARAVATHI LIMITED PARTNERSHIP, | § | Case No. 09-32754-H1-11 |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| | § | |
| In re: | § | |
| | § | |
| AMARAVATHI KEERTHI, LLC | § | Case No. 09-32755-H1-11 |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |
| | § | Jointly Administered Under |
| | § | Case No. 09-32754-H1-11 |

**DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION**

DIAMOND MCCARTHY LLP
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone: (713) 333-5100
Telecopy:   (713) 333-5195

ATTORNEYS FOR DEBTORS AND DEBTORS-
IN-POSSESSION

Dated:  May 6, 2010

Amaravathi Limited Partnership and Amaravathi Keerthi, LLC (collectively, the "Debtors") hereby propose the following Third Amended Plan of Reorganization (the "Plan") pursuant to section 1121(a) of the Bankruptcy Code.

## ARTICLE 1.

## DEFINITIONS

Defined Terms.  In addition to such other terms as are defined in other sections of this Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.1.    "Administrative Expense" means any Claim arising after the Petition Date and prior to the Effective Date, constituting a cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Debtors' estates, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed pursuant to sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estate of the Debtors pursuant to section 1930, chapter 123 of title 28 of the United States Code.

1.2.    "Administrative Expense Creditor" means any Person, including a Professional, entitled to payment on account of an Administrative Expense.

1.3.    "ALP" means Amaravathi Limited Partnership, a Texas limited partnership and a Debtor herein.

1.4.    "Allowed", when used with respect to a Claim or Equity Interest, means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) to which no objection was filed by the Objection Deadline, unless such Claim is the subject of a pending action in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (ii) to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order.  "Allowed," when used with respect to any Equity Interest, shall mean an Equity Interest, proof of which was timely and properly filed or, if no proof of interest was filed, which has been or hereafter is listed by the Debtors on their Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which no objection to the allowance thereof has been interposed on or before the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court, or the Plan, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the holder thereof.  "Allowed", when used with respect to a Fee Claim, shall mean a Fee Claim as to which a Final Order approving such Fee Claim has been entered.

1.5.    "Assets" means all of the right, title, and interest in and to property of whatsoever type or nature owned by the Debtors as of the Petition Date, together with assets subsequently

acquired by the Debtors, and including, but not limited to, property defined in section 541 of the Bankruptcy Code (each identified item of property being herein sometimes referred to as an Asset).  Assets include the Avoidance Actions and the Litigation Claims.

1.6.     "Avoidance Action" means a cause of action assertable by the Debtors or their successors that arises under the Bankruptcy Code or that is made available to the Debtors or a trustee under the Bankruptcy Code, including causes of actions brought pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

1.7.     "Ballot" means the form of ballot provided to holders of Claims or Equity Interests pursuant to Bankruptcy Rule 3017(d), by which each holder may accept or reject the Plan.

1.8.     "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and as codified at title 11 of the United States Code, as applicable to this Chapter 11 Case.

1.9.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over all or any part of this Chapter 11 Case.

1.10.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to this Chapter 11 Case, including applicable local rules of the Bankruptcy Court.

1.11.     "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in New York, New York are authorized or obligated by law or executive order to close.

1.12.     "C1 Trust" means Wells Fargo Bank, N. A., as trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C1.

1.13.     "Cash" means legal tender of the United States of America.

1.14.     "Chapter 11 Case" means the above captioned reorganization cases of the Debtors under Chapter 11 of the Bankruptcy Code.

1.15.     "Claim" means (a) a right to payment from the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.16.     "Claimant" means the holder of a Claim.

1.17. "Class" means a category or group of holders of Claims or Equity Interests as designated in Article 2.0 of the Plan.

1.18. "Collateral" means any Asset subject to a first priority valid and enforceable Lien to secure payment of a Claim.

1.19. "Confirmation Date" means the date of entry of the Confirmation Order.

1.20. "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as the same may be continued from time to time.

1.21. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

1.22. "Contested", when used with respect to a Claim, means a Claim (a) that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; (b) that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; (c) that is the subject of a pending action in a forum other than the Bankruptcy Court unless such Claim has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court; or (d) as to which an objection has been or may be timely filed and has not been denied by Final Order.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.23. "CNC" means CNC Investments, Ltd, L.L.P.

1.24. "Creditor" means a "creditor" as defined in section 101(10) of the Bankruptcy Code.

1.25. "Debtors" means ALP and Keerthi.

1.26. "Debtors-in-Possession" means ALP and Keerthi in their capacity as debtors-in-possession under section 1101(1) of the Bankruptcy Code.

1.27. "Deficiency Claim" means the unsecured claim of a creditor Allowed by an order of the Bankruptcy Court or by agreement by and between the Debtors and the holder of the Allowed Secured Claim determined pursuant to Bankruptcy Code section 506(a).

1.28. "Disallowed", when used with respect to all or any part of a Claim or Equity Interest, means that portion of a Claim or Equity Interest to which an objection to allowance or a motion to disallow has been sustained by a Final Order.

1.29.   "Disclosure Statement" means the written statement, as amended, supplemented, or modified from time to time, describing the Plan that is approved and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.30.   "Effective Date" means June 25, 2010, or the first Business Day after the Confirmation Date on which all conditions to the effectiveness of the Plan have been satisfied or waived.

1.31.   "Equity Interest" means stock ownership, limited or general partnership interest, membership interest or other ownership interest in the Debtors, whether or not transferable.

1.32.   "Equity Interest Holder" means any owner of an Equity Interest.

1.33.   "Fee Application" means an application for allowance of a Fee Claim.

1.34.   "Fee Claim" means a Claim by a Professional or any other party in interest under sections 328, 330 or 503 of the Bankruptcy Code for compensation or reimbursement in the Chapter 11 Case.

1.35.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which order or judgment the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.36.   "General Unsecured Claim" means any Claim other than an Administrative Expense, a Secured Claim, a Priority Claim, a Subordinated Claim, Equity Interest, Deficiency Claim of C1 Trust or the Claim of CNC or an Insider Claim.

1.37.    "Greystar" means Greystar Realty Services.

1.38.    "HOA" means Home Owners Associations, including but not limited to Cat Hollow at Brushy Creek Owners Association, Inc.

1.39.   "Keerthi" means Amaravathi Keerthi, LLC, a Delaware corporation and a Debtor herein.

1.40.   "Insider Claim" means any Claim held by an insider of the Debtors as the term "insider" is defined in Bankruptcy Code section 101(31).

1.41.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.42.   "Litigation Claim" means a cause of action or claim that is property of the estate under section 541 of the Bankruptcy Code, including Avoidance Actions, but excluding any actions or claims released under the Plan or the Confirmation Order.

1.43.   "M&M Lien" means a Lien created pursuant to statute or by operation of law, other than a consensual Lien held by C1 Trust or a Lien held by a HOA or a governmental unit.

1.44.   "Objection" means an objection to the allowance of a Claim or Equity Interest filed by any party entitled to do so by the deadline fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.

1.45.   "Objection Deadline" means the date by which Objections to Claims must be filed, to be fixed in the manner prescribed pursuant to section 9.1 of the Plan.

1.46.   "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

1.47.   "Petition Date" means April 23, 2009.

1.48.   "Plan" means this Third Amended Plan of Reorganization proposed by the Debtors, as it may be altered, amended, or modified from time to time.

1.49.   "Plan Documents" means any exhibits to the Plan that will be filed in the Bankruptcy Court prior to the date fixed by order of the Bankruptcy Court for the commencement of the Confirmation Hearing.

1.50.   "Priority Claim" means a Claim other than a Claim for an Administrative Expense to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.51.   "Priority Non-Tax Claim" means a Priority Claim other than a Priority Tax Claim.

1.52.   "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.53.   "Professionals" means those Persons (a) retained by the Debtors pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code or (b) who seek compensation or reimbursement pursuant to sections 503(b)(3), 503(b)(4), 503(b)(5), or 506(b) of the Bankruptcy Code.

1.54.   "Properties" means:

(a)     "Green I Property" means Mansions on Green I, located at 7710 O'Connor Drive, Round Rock, Williamson County, Texas 78681;

(b) "Green II Property" means Mansions on Green II, located at 7720 O'Connor Drive, Round Rock, Williamson County, Texas 78681;

(c) "Canyon Creek Property" means Mansions at Canyon Creek, located at 9009 RR-620 N Austin, Travis County, Texas 78726; and

(d) "Steiner Ranch Property" means Mansions at Steiner Ranch, located at 4500 Steiner Ranch Blvd., Austin, Travis County, Texas 78732.

1.55. "Pro Rata Share" means, with respect to a specific Allowed Claim, the proportion that the amount of such Claim bears to the aggregate amount of all Claims in the Class to which such Claim belongs, including Contested Claims, but not including Disallowed Claims.

1.56. "Rejection Claim" means any Claim arising under a lease or executory contract that the Debtors have rejected or will reject pursuant to section 365 of the Bankruptcy Code, including but not limited to any Claim arising under section 502(g) of the Bankruptcy Code as a consequence of such rejection, reduced by the limitations on such Claim provided by section 502(b)(6) of the Bankruptcy Code and any limitations on such Claim provided by applicable nonbankruptcy law.

1.57. "Reorganized Debtors" means the entities to whom the Assets shall re-vest on the Effective Date of the Plan.

1.58. "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements may be amended.

1.59. "Secured Claim" means (a) an Allowed Claim secured by a Lien on an Asset, which Lien is valid, perfected and enforceable pursuant to applicable law and is not subject to avoidance pursuant to the Bankruptcy Code or other applicable non-bankruptcy law, but only to the extent of the value of such Asset; and (b) a Secured Tax Claim.

1.60. "Secured Creditor" means the holder of a Secured Claim.

1.61. "Secured Tax Claim" means any Claim for prepetition ad valorem taxes.

1.62. "Subordinated Claim" means any Claim that is subordinated by Final Order of the Bankruptcy Court pursuant to Section 510 of the Bankruptcy Code.

MISCELLANEOUS INTERPRETIVE PROVISIONS

1.63. Exhibits. All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

1.64. Interpretation. Unless otherwise specified, all section, article and exhibit references in this Plan are to the respective section in, article of, or exhibit to, the Plan as the

same may be amended, waived, or modified from time to time.  The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof.

1.65.   Plan Controls.  In the event of an inconsistency between the Plan and the Plan Documents, the Plan shall control.

1.66.   Other Terms.  The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

## ARTICLE 2.0

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

2.1.   The following is a designation of the Classes of Claims and Equity Interests treated pursuant to this Plan.  Administrative Expense Claims, Priority Non-Tax Claims and Priority Tax Claims are included as Classes only for convenience notwithstanding section 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is included in a particular Class only to the extent that (i) the Claim or Equity Interest meets the description of that Class, and (ii) the Claim or Equity Interest is an Allowed Claim or Equity Interest.

2.2.   Claims and Equity Interests.

Class A -  Unclassified Claims

A-1          Administrative Expense Claims

A-2          Priority Non-Tax Claims

A-3          Priority Tax Claims

Class B – Secured Claims

B-1          Secured Tax Claims

B-2          C1 Trust Claims

Class C – Unsecured Claims

C-1          General Unsecured Claims

C-2          C1 Trust Deficiency Claim

C-3          CNC Claim

C-4        Subordinated Claims

Class D -  Equity Interests

D-1        Equity Interests in ALP

D-2        Equity Interests in Keerthi

## ARTICLE 3.0

## IDENTIFICATION OF IMPAIRED CLASSES
## OF CLAIMS AND EQUITY INTERESTS

3.1.    <u>Unimpaired Classes of Claims and Equity Interests</u>.  Except for Creditors holding claims in Classes A and B-1, no Class of Claims or Equity Interests is unimpaired under the Plan.

3.2.    <u>Impaired Classes of Claims and Equity Interests</u>.  Except for Creditors holding claims in Classes A and B-1, all Classes of Claims and Equity Interests are impaired under the Plan.

3.3.    <u>Impairment Controversies</u>.  If a controversy arises as to whether any Class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall determine such controversy after notice and a hearing.

## ARTICLE 4.0

## TREATMENT OF ADMINISTRATIVE EXPENSES
## AND PRIORITY TAX CLAIMS

4.1.    <u>Administrative Expenses</u>.  All Administrative Expenses shall be treated as follows:

(a)    <u>Administrative Expenses Bar Date</u>.  The holder of any Administrative Expense other than (i) a Fee Claim, (ii) a liability incurred and paid in the ordinary course of business by the Debtors, or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtors and their counsel, notice of such Administrative Expense within 30 days after the Effective Date.  At a minimum, such notice must identify (i) the name of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  **FAILURE TO FILE THIS NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE BEING FOREVER BARRED AND DISCHARGED.**

(b)    <u>Filing Fee Claims</u>.  Each Person asserting a Fee Claim for services rendered or expenses incurred before the Effective Date shall file with the Bankruptcy Court, and serve on the U. S. Trustee, the Reorganized Debtors and its counsel, a Fee

Application within 30 days after the Effective Date. **FAILURE TO FILE A FEE APPLICATION TIMELY SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED**.

(c)     Allowance of Administrative Expenses. An Administrative Expense with respect to which notice has been properly filed and served pursuant to section 4.1(a) of the Plan shall become an Allowed Administrative Expense if no objection is filed within 30 days after the filing and service of notice of such Administrative Expense. If an objection is timely filed, the Administrative Expense shall become an Allowed Administrative Expense only to the extent Allowed by Final Order. An Administrative Expense that is a Fee Claim, and with respect to which a Fee Application has been timely filed pursuant to section 4.1(b) of the Plan, shall become an Allowed Administrative Expense only to the extent Allowed by Final Order

(d)     Payment of Allowed Administrative Expenses. Each holder of an Allowed Administrative Expense Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment to which the holder of such Administrative Expense and the Reorganized Debtors may agree in writing.

4.2.     Priority Non-Tax Claims. Each holder of an Allowed Priority Non-Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim; (ii) such other treatment to which the holder of such Allowed Priority Non-Tax Claim and the Reorganized Debtors may agree in writing; or (iii) the amount of such holder's Allowed Claim in accordance with Bankruptcy Code section 1129(a)(9)(B).

4.3.     Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim; (ii) such other treatment to which the holder of such Allowed Priority Tax Claim and the Reorganized Debtors may agree in writing; or (iii) the amount of such holder's Allowed Claim in accordance with Bankruptcy Code section 1129(a)(9)(C).

## ARTICLE 5.0

## TREATMENT OF CLAIMS AND EQUITY INTERESTS

5.1.     General Concept of Plan. The Plan provides that the Reorganized Debtors will continue owning all of the Properties with modified obligations to C1 Trust to be set forth in modified loan assumption documents. Distributions will be made to C1 Trust and all other

holders of Allowed Claims using available cash on hand as of the Effective Date, allotted funds made available through an equity contribution, and income generated from operations at the Properties.

As part of the Plan, C1 Trust will be provided with eight restructured term loans, one secured term loan and one unsecured term loan for each of the four Properties. For purposes of the Plan, the Debtors and C1 Trust have agreed through negotiations during these cases and at mediation that C1 Trust holds an Allowed Secured Claim in the amount of $140 million. This agreement between the Debtors and C1 Trust is not intended to serve as an admission by the Debtors or Reorganized Debtors regarding the actual value of the Properties

As part of the Plan, on the Effective Date, C1 Trust will be paid $4 million in cash to reduce the $140 million secured loan balance, and the remaining $136 million will be assumed pursuant to four restructured secured term loans, one secured term loan for each of the four Properties. The restructured secured loans for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million. The four restructured secured term loans will maintain the current maturity date, and will only be modified from their original terms to account for the reduced outstanding secured principal loan balance, interest rate reductions, lowered and modified debt service coverage ratio ("DSCR") provisions (to the extent deemed necessary and applicable by the Debtors), and changed guarantors.

Moreover, as part of the Plan, CNC will resign as the management company for the Properties and be replaced by Greystar, and Rao Kothapalli will replace Charlie Yalamanchili to become the controlling person of both the ultimate general partner of ALP and the ultimate managing member of Keerthi (or of the ultimate subsidiary affiliated controlling entities of ALP and Keerthi). The Reorganized Debtors will work with Greystar to negotiate acceptable replacement Management Agreements.

As part of the Plan, C1 Trust will also receive four restructured unsecured term loans, one unsecured term loan for each of the Properties, totaling $20 million. This is the amount attributable to the deficiency amount remaining between the current $160 million principal loan balance of the Properties and the amount of C1 Trust's secured claim under this Plan. The restructured unsecured note for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million. The four restructured unsecured term loans will have the same maturity date as the restructured secured term loans. The restructured unsecured loans will be modified to reflect their unsecured nature, account for the agreed upon unsecured principal loan balances, and set forth interest rate reductions as agreed to by the parties.

The Plan provides for full payment in cash on the Effective Date to all holders of Allowed Claims, other than the Allowed Secured Claim and Deficiency Claim of C1 Trust, the CNC Claim, and claims of Equity Interest Holders. The Reorganized Debtors will object to any objectionable Claims and will escrow payments to disputed creditors until their claims are allowed or disallowed.

The Plan also proposes that the Reorganized Debtors will receive an equity contribution in the amount of $5 million ($4 million attributable to equity in ALP, and $1 million attributable to equity in Keerthi).  The $5 million contribution, as well as the cash on hand in the Debtors' estates as of the Effective Date, will be allocated by the Debtors and C1 Trust pursuant to agreement by the parties.

5.2.    Class B-1 - Secured Tax Claims.  Each holder of an Allowed Secured Tax Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date, the next business day after such Claim becomes an Allowed Claim, or the date when such Secured Tax Claim becomes due under Texas state law; or (ii) such other treatment to which the holder of such Allowed Secured Tax Claim and the Reorganized Debtors may agree in writing.

5.3.    Class B-2 - C1 Trust Claims.  C1 Trust will hold an Allowed Secured Claim in the amount of $140,000,000, with the remaining $20,000,000 of C1 Trust's claim to be a Deficiency Claim treated in accordance with Class C-2.  C1 Trust's Allowed Secured Claim will be treated in accordance with the Term Sheet attached at **Exhibit A**.

C1 Trust will be provided with $4,000,000 in cash on the Effective Date, and four restructured secured term loans, one secured term loan for each of the four Properties, totaling an assumed loan balance of $136,000,000.00.  All four restructured secured term loans will maintain the maturity date set forth in the original loan documents.  The restructured secured loans will only be modified from their original terms to account for the reduced outstanding secured principal loan balance, interest rate reductions, lowered and modified DSCR provisions (to the extent deemed necessary and applicable by the Debtors), and changed guarantors.

The restructured secured note for each Property will be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.

The restructured secured loans will provide C1 Trust with interest only payments at a rate of 4.77% in years 1 and 2, interest only payments at a rate of 5.77% in years 3-7, and a balloon payment of the entire outstanding principal loan balance in year 7 on the maturity date.  Assuming an Effective Date of June 25, 2010, the initial interest only payment will be due from the Reorganized Debtors to C1 Trust on August 11, 2010, and subsequent payments will be due every month thereafter on or before the 11th of each month.

The restructured secured loans will also contain modified DSCR provisions to the extent deemed necessary and applicable by the Debtors.

Charlie Yalamanchili will be replaced as the guarantor of the restructured secured notes by two guarantors: (1) Greystar will serve as the guarantor for all "bad boy" carve-out provisions which they control, or have the ability to control (*e.g.*, misapplication of rents, etc.), EXCEPT the carve-out provision regarding initiating a voluntary bankruptcy filing or an involuntary bankruptcy filed against the Reorganized Debtors, so long as Greystar has not participated in any way (directly, indirectly, expressly or impliedly) in the involuntary bankruptcy filing; and (2) Rao Kothapalli will serve as the guarantor in his individual capacity ONLY for the carve-out

provision regarding initiating a voluntary bankruptcy or intentionally refusing to prosecute a dismissal of an involuntary bankruptcy filing against the Reorganized Debtors.

Moreover, the Debtors and C1 Trust have agreed to stipulate that: (i) So long as any portion of the C1 Trust Notes remains outstanding, neither Debtors nor the Reorganized Debtors shall voluntary seek relief under any chapter of Title 11, U.S.C. (the U.S. Bankruptcy Code, as amended); and (ii) In the event of any voluntary or involuntary bankruptcy filing by or against Debtors or the Reorganized Debtors, all parties agree that each of the various Assignments of Rents agreements affected the Debtors' Properties (including, without limitation, as may or may not be modified herein) are, indeed absolute assignments and not assignments intended as collateral; that Debtors and Reorganized Debtors agree to entry of a confirmation order which so declares and provides that in the event of any future bankruptcy filing affecting Debtors, Reorganized Debtors, their respective assignees, if any, or the Properties, then in any event, postpetition rents or other income of any type from the Properties shall not be property of the estate under 11 U.S.C. § 541 (including for purposes of illustration but not limitation, 11 U.S.C. § 541(a)(6)), and neither Debtors nor the Reorganized Debtors shall be deemed to own any residual interest in the rents or other income of any type generated from the Properties, and as such, the rents or other income of any type shall not be subject to usage by Debtors, Reorganized Debtors (or their assignees, if any) as cash collateral in connection with any such subsequent bankruptcy filing.  The Bankruptcy Court has held that it is unwilling to provide for the foregoing in the confirmation order and, as such, the Debtors and C1 Trust nonetheless intend to stipulate as to these agreements.

Additionally, on the Effective Date, C1 Trust will receive an additional cash payment comprised of those portions of the cash on hand and equity contributions not made to holders of Allowed Claims on the Effective Date as contemplated in the Plan.  C1 Trust will allocate such amounts on the following basis: (i) approximately $1.8 million to account for real estate tax escrows from January 1, 2010 through June 30, 2010, to be held by C1 Trust in a separate account (this amount is currently being escrowed by the Debtors and will be transferred over to C1 Trust for purposes of ensuring that 2010 real estate taxes are paid in full when they become due under Texas state law); (ii) $1.6 million for an interest reserve account, to be held by C1 Trust in a separate account.  To the extent any amounts remain in this interest reserve account after year 2, such amounts will be applied towards satisfaction of the outstanding secured principal balance in C1 Trust's restructured secured loans on a pro rata basis; (iii) a capital expenditure reserve account in the amount of $400,000; (iv) insurance reserves in the amount $170,000; and (v) payments for special servicer fees, C1 Trust's legal fees and expenses, and expenses for travel and inspection.

5.4.   Class C-1 - General Unsecured Claims.  Each holder of an Allowed General Unsecured Claim shall receive from the Reorganized Debtors, at the option of the Reorganized Debtors: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the next business day after such Claim becomes an Allowed Claim, but with, if applicable, a dollar for dollar reduction to the amount of such holder's Allowed Claim to account for any post-petition payments made by the Debtors for utility deposits, locator fees and/or vendor deposits; or (ii) such other treatment to which the holder of such Allowed General Unsecured Claim and the Reorganized Debtors may agree in writing.

5.5.   Class C-2 - C1 Trust Deficiency Claim. C1 Trust will hold an Allowed Deficiency Claim in the amount of $20,000,000.00.  C1 Trust's Allowed Deficiency Claim will be treated in accordance with the Term Sheet attached at **Exhibit B**.

C1 Trust will be provided with four restructured unsecured term loans, one unsecured term loan for each of the four Properties, with the same maturity date as the restructured secured term loans.  The restructured unsecured loans will be drafted to reflect their unsecured nature, account for the unsecured principal loan balances, and set forth lowered interest rates over the term of the loans.

Specifically, the total amount of the restructured unsecured loans for the Properties will total $20 million, with the note for each Property to be provided in a pro rata amount based on the pre-petition principal loan balance of $160 million.

The restructured unsecured loans will provide C1 Trust with no principal or interest payments in year 1, interest only payments at a rate of 1.00% in years 2-5, interest only payments at a rate of 2.00% in years 6-7, and a balloon payment of the entire outstanding principal loan balance in year 7 on the maturity date.  Assuming an Effective Date of June 25, 2010, the initial interest only payment will be due from the Reorganized Debtors to C1 Trust on July 11, 2011, and subsequent payments will be due every month thereafter on or before the 11th of each month.

5.6.   Class C-3 - CNC Claim.  The holder of the CNC Claim shall be paid from the cash flows of the Reorganized Debtors, but only after the Reorganized Debtors have satisfied the treatment of creditors holding claims in Classes A, B and C-1 through C-2.  The CNC Claim will be subordinated to the General Unsecured Claims, C1 Trust Deficiency Claim, and all subsequent trade payables of the Reorganized Debtors.  Payments on the CNC Claim will be as follows: no principal or interest payments in years 1-6, with a balloon payment for the entire outstanding principal balance of $9,750,028.61 in year 7 on the maturity date after payment in full to C1 Trust on both its secured and unsecured deficiency claims, as well as satisfaction of the claims of the Debtors' trade creditors, and any subsequent trade payables of the Reorganized Debtors, to the extent such claims exist.

5.7.   Class C-4 - Subordinated Claims. The holder of any Subordinated Claim shall be paid from the cash flow remaining after the Reorganized Debtors have satisfied in full creditors holding Claims in Classes A, B and C-1 through C-3.

5.8.   Class D-1 – Equity Interest in ALP.  Under the Plan, the Reorganized Debtors will receive an equity contribution in the amount of $4 million attributable to ALP.  The equity contribution will constitute new value, and will be made by both current Equity Interest Holders in ALP and new investors.  As a result of this new value equity contribution in ALP, the current equity interests and general and limited partnership interests in ALP will be cancelled, and the Equity Interests in ALP will be reissued to a new general partner formed by those investors making the $4 million new value equity contribution to ALP, who will then be the only Equity Interest Holders in ALP.

Commitment letters from those investors making the $4 million new value equity contribution to ALP will be received on or before May 1, 2010, and the $4 million new value equity contribution to ALP will be placed in an escrow account on or before May 15, 2010.

No distributions to Equity Interest Holders in ALP will be made until after all payments are made to all secured and unsecured claimants of the Debtors and any subsequently incurred trade payables of the Reorganized Debtors.

5.9.   <u>Class D-2 – Equity Interest in Keerthi</u>.   Under the Plan, the Reorganized Debtors will receive an equity contribution in the amount of $1 million attributable to Keerthi.  The equity contribution will constitute new value, and will be made by both current Equity Interest Holders in Keerthi and new investors.  As a result of this new value equity contribution in Keerthi, the current equity interests and membership and management interests in Keerthi will be cancelled, and the Equity Interests in Keerthi will be reissued to a new managing member formed by those investors making the $1 million new value equity contribution to Keerthi, who will then be the only Equity Interest Holders in Keerthi.

Commitment letters from those investors making the $1 million new value equity contribution to Keerthi will be received on or before May 1, 2010, and the $1 million new value equity contribution to Keerthi will be placed in an escrow account on or before May 15, 2010.

No distributions to Equity Interest Holders in Keerthi will be made until after all payments are made to all secured and unsecured claimants of the Debtors and any subsequently incurred trade payables of the Reorganized Debtors.

## ARTICLE 6.0

## ACCEPTANCE OR REJECTION OF PLAN

6.1.   <u>Classes Entitled to Vote</u>.   Each impaired Class of Claims shall be entitled to vote separately to accept or to reject the Plan.  Any unimpaired Class of Claims or Equity Interests shall not be entitled to vote to accept or to reject the Plan.

6.2.   <u>Class Acceptance Requirement</u>.   A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan.

6.3.   <u>Cramdown</u>.   This section shall constitute the Debtors' request, pursuant to section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a) may not be met.

6.4.   <u>Cure Payments and Release of Liability</u>.   All cure payments which may be required by Bankruptcy Code section 365(b)(1) under any executory contract or unexpired lease that is assumed, or assumed and assigned, under this Plan shall be made by the Reorganized Debtors; *provided, however*, in the event of a dispute regarding the amount of any cure payments, the cure of any other defaults, the ability to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Reorganized

Debtors shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Bankruptcy Code section 365(b)(1), following the entry of a Final Order resolving such dispute.  To the extent that a party to an assumed executory contract or unexpired lease has not filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30th) day after the Effective Date disputing the amount of any cure payments offered to it by the Reorganized Debtors, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

## ARTICLE 7.0

## MEANS OF IMPLEMENTATION OF THE PLAN

7.1.   <u>Assumption of Liabilities</u>.  Except as otherwise provided herein, the Reorganized Debtors shall assume liability for and the obligations to make the distributions required to be made under the Plan, but shall not otherwise assume liabilities of the Debtors.

7.2.   <u>Injunction</u>.   Except as otherwise provided in the Plan, from and after the Confirmation Date, all holders of Claims against and Equity Interests in the Debtors are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim or Equity Interest against the Debtors and their Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets or the Debtors; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and the Debtors; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however,*  (i) that each holder of a Contested Claim may continue to prosecute its proof of claim in the Bankruptcy Court and all holders of Claims and Equity Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan, and (ii) the holder of a Lien on any Collateral which is surrendered pursuant to this Plan or hereafter by the Reorganized Debtors may exercise its legal and contractual rights and remedies, including foreclosure sale, with respect thereto.

7.3.   <u>Payment of Post-Confirmation Quarterly Fees</u>.  The Reorganized Debtors shall timely pay all fees incurred pursuant to 28 U.S.C. §1930(a)(6) until the clerk of the Court closes the Chapter 11 Cases.  The Reorganized Debtors shall file with the Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the cases remain open until the Clerk of the Court closes the Chapter 11 Cases.

7.4.   <u>Revocation of Plan</u>.  The Debtors reserve the right to revoke and withdraw this Plan before the entry of the Confirmation Order.  If the Debtors revoke or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by the

Debtors, or any other Person or to prejudice in any manner the rights of the Debtors or Person in any further proceedings involving the Debtors.

7.5.    Transfer of Assets to the Reorganized Debtors .   On the Effective Date, the Assets, including the Litigation Claims, will be reserved, preserved, assigned, transferred, and conveyed, as the case may be, to the Reorganized Debtors free and clear of all liens, claims and encumbrances or interests except to the extent that such Liens and Claims are expressly retained under this Plan.

7.6.    Avoidance Actions.   THE PLAN CONTEMPLATES PAYMENT IN FULL TO ALL CLASSES OF CREDITORS HOLDING ALLOWED CLAIMS, OTHER THAN THE ALLOWED SECURED CLAIM AND DEFICIENCY CLAIM OF C1 TRUST, THE CNC CLAIM, AND CLAIMS OF EQUITY INTEREST HOLDERS.    THEREFORE, THE REORGANIZED DEBTORS HEREBY WAIVE AND RELEASE ALL RIGHTS TO PURSUE ANY PREFERENCES OR FRAUDULENT TRANSFERS AS AN AFFIRMATIVE RECOVERY.  HOWEVER, SUCH ACTIONS MAY BE USED AS A SETOFF AGAINST A FILED CLAIM.

7.7.    Other Actions.   Except for Avoidance Actions, the Reorganized Debtors will prosecute the Litigation Claims and unless expressly waived, shall be preserved for the Reorganized Debtors to prosecute.   THIS PLAN DOES NOT RELEASE AND IS NOT INTENDED TO RELEASE ANY OF THE LITIGATION CLAIMS, UNLESS EXPRESSLY PROVIDED FOR IN THE PLAN OR THE CONFIRMATION ORDER.

7.8.    Compromise of Litigation Claims.   The Reorganized Debtors may compromise or settle in their sole discretion any Litigation Claim without further order or authority from the Bankruptcy Court.

## ARTICLE 8.0

## PROVISIONS GOVERNING DISTRIBUTION

8.1.    Distributions.   Any payments or distributions to be made by the Reorganized Debtors pursuant to the Plan shall be made to the holders of Allowed Claims.  Any payments or distributions to be made by the Reorganized Debtors pursuant to the Plan shall be made on the Effective Date except as otherwise provided for in the Plan, or as may be ordered by the Bankruptcy Court.  Any payment or distribution by the Reorganized Debtors pursuant to this Plan, to the extent delivered by the United States Mail, shall be deemed made when deposited by the Reorganized Debtors into the United States Mail.

8.2.    Distributions to be Made by the Reorganized Debtors.   Distributions to be made to any holder of an Allowed Claim under the Plan shall be made by the Reorganized Debtors.

8.3.    Means of Cash Payment.   Payments of Cash to be made by the Reorganized Debtors pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.4.    <u>Delivery of Distributions</u>.    Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of Claim or proofs of interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or proof of interest is filed); or if the Debtors have been notified of a change of address, at the address set forth in such notice.  All Unclaimed Property shall revert to the Reorganized Debtors.

8.5.    <u>Time Bar to Cash Payments</u>.    Checks issued by the Reorganized Debtors in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof.    Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Effective Date or ninety (90) days after the date of delivery of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred, and the amount of such checks shall become Unclaimed Property, to be treated in accordance with paragraph 8.4 of this Plan.

8.6.    <u>No Interest Unless Otherwise Provided</u>.  No interest shall be paid on any Claim unless, and only to the extent that, the Plan specifically provides otherwise.

8.7.    <u>No De Minimus Distributions</u>.  No Distribution of less than five dollars ($5) shall be made to any holder of an Allowed Claim.  Such undistributed amount shall be retained by the Reorganized Debtors.  Whenever a payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

## ARTICLE 9.0

## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

9.1.    <u>Objection Deadline</u>.  Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed no later than ninety (90) days after the Effective Date or ninety (90) days after a particular proof of Claim is filed, whichever is later. Any proof of Claim filed more than thirty (30) days after the Confirmation Date shall be of no force and effect, shall be deemed disallowed, and will not require objection.  All Contested Claims shall be litigated to Final Order; *provided, however,* that the Reorganized Debtors may compromise and settle any Contested Claim in their sole discretion, without approval of the Bankruptcy Court.  Confirmation of the Plan authorizes the Reorganized Debtors to enter into any compromise or settlement of a Claim or Litigation Claim without further order from the Bankruptcy Court or notice and hearing.

9.2.    <u>Responsibility for Objecting to Claims</u>.  Only the Reorganized Debtors may file objections to claims after the Effective Date of the Plan.

9.3.     No Distribution Pending Allowance.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

9.4.     Administration of Contested Claims.

(a)     No Distribution Pending Allowance.  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

(b)     Disputed Claims Reserve.  In determining the amount of distributions to be made under the Plan to holders of Allowed Claims, the appropriate distributions required by the Plan shall be made according to estimates and subject to the provisions of the Plan.  To protect the interests of holders of Contested Claims, the Disputed Claims Reserve shall be established on or prior to the Effective Date.  On the Effective Date, the Reorganized Debtors shall fund the Disputed Claims Reserve with Cash in an amount that represents the Pro Rata Share of the Cash that would otherwise be distributed to holders of Contested Claims if such Claims were Allowed.

(c)     Distribution After Allowance.  As soon as practicable after a Contested Claim becomes an Allowed Claim, the holder of an Allowed Claim shall receive a distribution in an amount equal to the aggregate of all the distributions that such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date.  Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs.  The Reorganized Debtors shall have the right to make or direct the making of all interim distributions to the holders of Allowed Claims.  No interest shall be paid on account of a Contested Claim that later becomes an Allowed Claim except as otherwise provided in the Plan.

(d)     Distribution After Disallowance.  If and when a Contested Claim becomes a Disallowed Claim, the Pro Rata Share of the distributions to which each holder is entitled shall increase commensurately.  Accordingly, the Reorganized Debtors, in their sole discretion, shall have the right to make or direct the making of any subsequent distributions.

## ARTICLE 10.0

## EXECUTORY CONTRACTS AND LEASES

10.1.  General Treatment; Assumed If Not Rejected.   The Plan constitutes and incorporates a motion by the Debtors to assume, as of the Effective Date, all prepetition executory contracts and unexpired leases to which the Debtors are a party, except for executory contracts or unexpired leases that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court and (b) are the subject of a separate motion pursuant to section 365 of the Bankruptcy Code to be filed and served by the Debtors on or before the Effective Date.

10.2.  <u>Bar to Rejection Damages</u>.  If the rejection of an executory contract or an unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their properties or agents, successors, or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtors by the earlier of (a) 30 days after the Confirmation Date or (b) such other deadline as the Court may set for asserting a Claim for such damages.

10.3.  <u>Rejection Claims</u>.  Any Rejection Claim arising from the rejection of an unexpired lease or executory contract not barred by section 10.2 of the Plan shall be treated as a General Unsecured Claim against the Debtors pursuant to Article 5.0 of the Plan; *provided, however*, that any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  Nothing contained herein shall be deemed an admission by the Debtors that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors of any objections to such Claim if asserted.

## ARTICLE 11.0

## MAINTENANCE OF CAUSES OF ACTION

11.1.  <u>Causes of Action</u>.  Unless expressly waived or released in the Plan or Confirmation Order, the Reorganized Debtors shall retain any cause of action belonging to the Debtors' estates pursuant to section 541 of the Bankruptcy Code, including all Litigation Claims, and may litigate rights to payments, or Claims that may belong or have belonged to the Debtors.

## ARTICLE 12.0

## SETTLEMENT

12.1.  <u>Global Settlement Agreement</u>.  The Plan incorporates and constitutes a comprehensive compromise and settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure among the Debtors, C1 Trust, CNC and Charlie Yalamanchili, which is incorporated by reference and attached hereto at **Exhibit C**.

## ARTICLE 13.0

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

13.1.  <u>Conditions to Confirmation</u>.  The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Section 13.3 of the Plan:

(a)     An order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code shall have been entered;

(b)     The Bankruptcy Court shall have entered an Order in the Chapter 11 cases pursuant to Federal Rule of Bankruptcy Procedure 9019, which may be the Confirmation Order, approving the Global Settlement Agreement between the Debtors, C1 Trust, CNC and Charlie Yalamanchili, which is incorporated by reference and attached hereto at **Exhibit C**;

(c)     The $5 million new value equity contribution shall have been made and placed into an escrow account;

(d)     The proposed Confirmation Order shall be in a form and substance satisfactory to the Debtors; and

(e)     The Bankruptcy Court will have approved any other necessary agreements or settlements required by the Plan.

13.2.   <u>Conditions to Effective Date of Plan</u>.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Section 13.3 of the Plan:

(a)     The Confirmation Order shall have been entered in a form and substance satisfactory to the Debtors, and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including without limitation, to enter into, implement and perform under the contracts, instruments and other agreements or documents created in connection with the Plan;

(b)     The Confirmation Order shall not then by stayed, vacated or reversed;

(c)     All material authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained; and

(d)     All material actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

13.3.   <u>Waiver of Conditions</u>.  Each of the conditions set forth in Sections 13.1 and 13.2 of the Plan, with the express exception of the conditions contained in Section 13.1(a) and Section 13.2(a) and (b) may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, that such waiver will not be effective without the consent of C1 Trust, which consent shall not be unreasonably withheld or delayed.

## ARTICLE 14.0

## DISCHARGE; INJUNCTION

14.1.    <u>Discharge of Debtors</u>.   To the extent permitted by section 1141 of the Bankruptcy Code, all consideration distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever against the Debtors or any of their assets or properties.  Except as otherwise provided herein, upon the Effective Date, the Debtors and their successors in interest shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims treated in the Plan, as well as all other Claims and Equity Interests, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted this Plan; or (d) the Claim has been Allowed, disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors and their successors in interest other than those obligations specifically set forth pursuant to this Plan.

14.2.    <u>Injunction</u>.    Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that from the Confirmation Date, all Persons who are or may be past, current or future holders of a Claim or Equity Interest against Debtors or their estates:

(a)     shall receive recovery on account of such Claim, if Allowed, solely from the Reorganized Debtors and on the Effective Date such Claim, if Allowed, shall exist and be valid only to the extent it is solely asserted against the Reorganized Debtors;

(b)     hereby permanently, irrevocably and unconditionally release and discharge Debtors and each of their officers, directors, agents, employees, representatives, financial advisors, attorneys and accountants from all liabilities, rights of contribution, and rights of indemnification, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or in part on any act, omission, transaction, or other occurrence taking place on, or prior to, the Effective Date in any way relating to the Debtors, their estates and business affairs, the Chapter 11 Cases and the Plan; and

(c)     are and shall be permanently, irrevocably and unconditionally enjoined and barred from asserting or taking any of the following actions (all of which shall be permanently, irrevocably and unconditionally waived, released and discharged) against Debtors or any of their property on

account of any liability, claim or interest in any way relating to the Debtors, and their estates, the Chapter 11 Cases and the Plan:

i.      commencing or continuing, in any manner or in any place, any suit, cause of action or other proceeding;

ii.     enforcing attaching, collection or recovering in any manner any judgment, award, decree or order;

iii.    creating, perfecting or enforcing any Lien or other encumbrance; and

iv.    commencing or continuing, in any manner or in any place, any suit, action or proceeding that does not comply with or is inconsistent with the provisions of the Plan.

14.3.   <u>Exculpation and Limitation of Liability</u>.  None of the Debtors, the Professional Persons retained by the Debtors and the Professional Persons employed by the Debtors; any of the Debtors, or their affiliates nor any of their managers, officers, directors, partners, associates, employees, members or agents (collectively, the "Exculpated Persons"), shall have or incur any liability to any person for any act taken or omission made in good faith in connection with or related to the bankruptcy case or actions taken therein, including negotiating, formulating, implementing, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, or other agreement or document created in connection with the Plan.  The Exculpated Persons shall have no liability to any Creditors or Equity Holders for actions taken under the Plan, in connection therewith or with respect thereto in good faith, including, without limitation, failure to obtain Confirmation of the Plan or to satisfy any condition or conditions, or refusal to waive any condition or conditions, precedent to Confirmation or to the occurrence of the Effective Date.  Further, the Exculpated Persons will not have or incur any liability to any holder of a Claim, holder of an Interest, or party-in-interest herein or any other Person for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as finally determined by the Bankruptcy Court, and in all respects such person will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

14.4.   <u>Approval of Releases</u>. To the extent necessary, the Plan constitutes the Debtors' motion pursuant to Bankruptcy Rule 9019 seeking approval of all releases and injunctions granted in the Plan.

## ARTICLE 15.0

## CONSUMMATION OF THE PLAN

15.1.   <u>Retention of Jurisdiction</u>.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)  to hear and to determine any and all objections to or applications concerning the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense, Claim, or Equity Interest;

(b)  to hear and determine any and all applications for payment of fees and expenses from the Debtors' estate made by attorneys or any other Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed from the Debtors' estates under the Bankruptcy Code, and any and all objections thereto;

(c)  to hear and determine pending applications for the rejection, assumption, or assumption and assignment of unexpired leases and executory contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect of the assumption or rejection of any executory contract or lease;

(d)  to hear and determine any and all adversary proceedings, applications, or contested matters, including any remands from any appeals;

(e)  to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan;

(f)  to liquidate any disputed, contingent, or unliquidated Claims;

(g)  to hear and determine all disputes between Creditors regarding the extent, validity or priority of Liens;

(h)  to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(i)  to enter and to implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)  to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)  to enter and to implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or to enforce the terms and conditions of the Plan and the transactions contemplated thereunder;

(l)     to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan, including any suits or actions against any third parties which are specifically reserved and assigned to the Reorganized Debtors; and

(m)     to enter a final decree closing the Chapter 11 Cases.

15.2.   <u>Abstention and Other Courts</u>.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this section of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.3.   <u>Nonmaterial Modifications</u>.   The Debtors may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Equity Interests, correct any nonmaterial defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Debtors may undertake such nonmaterial modification pursuant to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the interest of any Equity Interest holder who has not accepted in writing the modification.

15.4.   <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Debtors at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before the Effective Date, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

## ARTICLE 16.0

## MISCELLANEOUS PROVISIONS

16.1.   <u>Severability</u>.  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Debtors may modify the Plan in accordance with section 14.3 or 14.4 of the Plan, as applicable, so that such provision shall not be applicable to the holder of any Claim or Equity Interest.

16.2.   <u>Setoffs</u>.  The Reorganized Debtors or the Debtors may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder

shall constitute a waiver or release by the Reorganized Debtors or the Debtors of any such claim that the Debtors may have against such holder.

16.3.   <u>Binding Effect</u>.  The Plan shall be binding upon, and shall inure to the benefit of, the Debtors, the Reorganized Debtors the holders of the Claims, the holders of Equity Interests, and their respective successors and assigns.

16.4.   <u>Governing Law</u>.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

16.5.   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

16.6.   <u>Timing of Distributions</u>.  Any payment or distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.7.   <u>Filing of Additional Documents</u>.  The Debtors shall file, as Plan Documents, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.8.   <u>Certifications</u>.  The failure to make any certification required to be made pursuant to the Plan on a timely basis shall result in the Reorganized Debtors withholding, without interest, any distribution to which the Person required to make such certification would otherwise be entitled.  Such withheld distribution shall be made only upon such Person's compliance with the certification requirements of the Plan.

Dated:  May 6, 2010.

Respectfully submitted,

AMARAVATHI LIMITED PARTNERSHIP

By:   _____*/s/ Tim Sedgwick*_____

AMARAVATHI KEERTHI, LLC

By:   _____*/s/ Tim Sedgwick*_____

DIAMOND MCCARTHY LLP

_____/s/ Brian A. Abramson_____
Kyung S. Lee
Texas Bar No. 12128400
Brian A. Abramson
Texas Bar No. 24050193
909 Fannin, Suite 1500
Houston, Texas 77010
Telephone: (713) 333-5100
Facsimile: (713) 333-5195

**ATTORNEYS FOR DEBTORS AND
DEBTORS-IN-POSSESSION**